**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) **Civil Action No.** |
| | ) **20-11217-FDS** |
| REGENERON PHARMACEUTICALS, INC., | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF REGENERON'S**
**MOTION TO DISMISS THE GOVERNMENT'S COMPLAINT**
**UNDER RULES 12(B)(6) AND 9(B)**

## TABLE OF CONTENTS

I.   THE COMPLAINT DOES NOT AND CANNOT ALLEGE A PREDICATE AKS VIOLATION AS REQUIRED BY RULE 12(B)(6) ............................................9

    A.   The Government Fails to Allege that Regeneron's Charitable Donations Were Intended to, Or Could, Improperly Induce Patients or Physicians to Purchase EYLEA ...............................................................................................10

        1.   It is Impossible for Regeneron's Donations to CDF to Improperly Induce Patients or Physicians .......................................................11

        2.   The Implausibility of Improper Inducement is Underscored by the Alternative Treatment Option ......................................................15

        3.   The Complaint Fails to Allege that Regeneron Intended to Improperly Induce Purchases of EYLEA .....................................17

    B.   Regeneron's Donations Do Not Constitute Unlawful Remuneration Because They Were Not Offered In Return For Improper Action ........................19

II.  THE COMPLAINT FAILS TO ALLEGE THAT REGENERON'S DONATIONS TO AN INDEPENDENT CHARITY CAUSED THE SUBMISSION OF FALSE CLAIMS ...................................................................21

III. THE GOVERNMENT'S EFFORTS TO RESTRICT CHARITABLE SPEECH VIOLATE REGENERON'S FIRST AMENDMENT RIGHTS ...............23

    A.   Preventing Communications with CDF Impermissibly Restricts Regeneron's First Amendment Right to Engage in Charitable Speech ................24

    B.   Prohibiting Pharmaceutical Manufacturers, But Not Others, From Engaging in Communications with Charitable Foundations Constitutes Impermissible Viewpoint Discrimination .............................................................26

IV.  THE GOVERNMENT'S PROSECUTION THEORY VIOLATES REGENERON'S FIFTH AMENDMENT DUE PROCESS RIGHTS ......................27

V.   THE COMPLAINT FAILS TO PLEAD BOTH THE UNDERLYING AKS VIOLATION AND THE SUPPOSED RESULTING FALSE CLAIMS WITH THE PARTICULARITY REQUIRED BY RULE 9(B) .................................30

CONCLUSION.............................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States ex rel Banigan v. Organon USA Inc.*,
  2016 WL 10704126 (D. Mass. Aug. 23, 2016) ....................................................................18

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989)...............................................................................................................24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................................9, 19

*United States ex rel. Booker v. Pfizer, Inc.*,
  188 F. Supp. 3d 122 (D. Mass. 2016) ...................................................................................19

*United States ex rel. Booker v. Pfizer, Inc.*,
  847 F.3d 52 (1st Cir. 2017)...............................................................................................21, 30

*United States ex rel. Carpenter v. Abbott Labs., Inc.*,
  723 F. Supp. 2d 395 (D. Mass. 2010) ...................................................................................21

*Chongris v. Bd. of Appeals of Town of Andover*,
  811 F.2d 36 (1st Cir. 1987)....................................................................................................14

*Citizens Against Rent Control v. City of Berkeley*,
  454 U.S. 290 (1981)...............................................................................................................24

*United States ex rel. Colquitt v. Abbott Labs*,
  858 F.3d 365, 372 (5th Cir. 2017) .........................................................................................31

*United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*,
  579 F.3d 13 (1st Cir. 2009)....................................................................................................31

*FEC v. Wis. Right To Life, Inc.*,
  551 U.S. 449 (2007)...............................................................................................................25

*First Am. Bank v. Dole*,
  763 F.2d 644 (4th Cir. 1985) ............................................................................................3, 28

*Freeman v. Town of Hudson*,
  849 F. Supp. 2d 138 (D. Mass. 2012) .....................................................................................4

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
  880 F.3d 89 (3d Cir. 2018)..........................................................................................21, 22, 23

*Guilfoile v. Shields,*
   913 F.3d 178 (1st Cir. 2019) ............................................................................ *passim*

*United States ex rel. Health Dimensions Rehab., Inc. v. RehabCare Grp., Inc.,*
   2013 WL 992642 (E.D. Mo. Mar. 13, 2013) ....................................................... 27

*United States ex rel. Kelly v. Novartis Pharms. Corp.,*
   827 F.3d 5 (1st Cir. 2016) .............................................................................. 31, 32

*United States ex rel. Leysock v. Forest Labs., Inc.,*
   55 F. Supp. 3d 210 (D. Mass. 2014) ............................................................... 30, 32

*United States ex rel. Lokosky v. Acclarent, Inc.,*
   No. 11-cv-11217 (D. Mass. Mar. 17, 2016) ........................................................ 16

*Lyman v. Baker,*
   954 F.3d 351 (1st Cir. 2020) ........................................................................... 9, 19

*McCutcheon v. FEC,*
   572 U.S. 185 (2014) .......................................................................................... 25

*In re Neurontin Mktg. & Sales Practices Litig.,*
   712 F.3d 21 (1st Cir. 2013) ................................................................................. 2

*In re Neurontin Mktg. and Sales Practices Litig.,*
   2011 WL 3852254 (D. Mass. Aug. 31, 2011) ...................................................... 17

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992) .......................................................................................... 26

*Republican Party of N.M. v. King,*
   741 F.3d 1089 (10th Cir. 2013) ......................................................................... 24

*Riley v. Nat'l Fed'n of the Blind of N. C., Inc.,*
   487 U.S. 781 (1988) ........................................................................................... 24

*Skilling v. United States,*
   561 U.S. 358 (2010) ..................................................................................... 11, 20

*Smith v. Truman Rd. Dev.,*
   LLC, 414 F. Supp. 3d 1205 (W.D. Mo. 2019) ..................................................... 27

*Sorrell v. IMS Health, Inc.,*
   564 U.S. 552 (2011) .......................................................................................... 26

*Speet v. Schuette,*
   726 F.3d 867 (6th Cir. 2013) ............................................................................. 24

*United States ex rel. Strunck v. Mallinckrodt Ard LLC,*
 2020 WL 362717 (E.D. Pa. Jan. 22, 2020)............................................................13

*United States v. Aegerion Pharm., Inc.,*
 No. 17-cr-10288 (D. Mass. Sept. 22, 2017)..........................................................16

*United States v. Celgene Corp.,*
 226 F. Supp. 3d 1032 1057 (C.D. Cal. 2016) ..................................................13, 14

*United States v. Chin,*
 No. 14-cr-10363-RGS, ECF No. 1399 (D. Mass. 2018).......................................16

*Hagerty ex rel. United States v. Cyberonics, Inc.,*
 844 F.3d 26 (1st Cir. 2016)....................................................................................32

*United States v. Hoechst Celanese Corp.,*
 128 F.3d 216 (4th Cir. 1997) .................................................................................28

*United States v. Krikheli,*
 461 F. App'x 7 (2d Cir. 2012) ...............................................................................20

*United States v. Lachman,*
 387 F.3d 42 (1st Cir. 2004)...............................................................................28, 29

*United States v. Luce,*
 873 F.3d 999 (7th Cir. 2017) .................................................................................22

*United States v. McClatchey,*
 217 F.3d 823 (10th Cir. 2000) .........................................................................14, 18

*United States v. Medtronic,*
 189 F. Supp. 3d 259 (D. Mass. 2016) ...............................................................10, 30

*United States v. Paz-Alvarez,*
 799 F.3d 12 (1st Cir. 2015)....................................................................................28

*United States v. Playboy Entm't Grp., Inc.,*
 529 U.S. 803 (2000)...............................................................................................24

*United States v. Prashad,*
 437 F. Supp. 3d 105 (D. Mass. 2020) .....................................................................9

*United States v. Reichel,*
 No. 15-cr-10324-DPW (D. Mass. June 17, 2016) ...........................................20, 21

*United States v. Shaw,*
 106 F. Supp. 2d 103 (D. Mass. 2000) ....................................................................19

*Lawton ex rel. United States v. Takeda Pharm. Co., Ltd.*,
   842 F.3d 125 (1st Cir. 2016) ................................................................................30

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ...........................................................................................24

*Wang Yan v. ReWalk Robotics Ltd.*,
   330 F. Supp. 3d 555 (D. Mass. 2018) ................................................................16

*United States ex rel. Westmoreland v. Amgen, Inc.*,
   812 F. Supp. 2d 39 (D. Mass. 2011) ..................................................................21

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015) ...........................................................................................24

*Zenón v. Guzman*,
   924 F.3d 611 (1st Cir. 2019) ..............................................................................19

**Statutes**

21 U.S.C. § 9 ..................................................................................................................15

31 U.S.C. §§ 3729-3733 ........................................................................................ *passim*

41 U.S.C. § 52 ................................................................................................................11

41 U.S.C. § 8701(2) ........................................................................................................11

42 U.S.C. § 1320a-7b(b) .................................................................................................29

42 U.S.C. § 1320a-7b(b)(1) ............................................................................................20

42 U.S.C. § 1320a-7b(b)(2) ............................................................................................20

42 U.S.C. § 1320a-7b(g) .................................................................................................31

42 U.S.C. § 1396a(a)(10)(E)(i) .........................................................................................6

U.S. Const. amend. XIV, § 1 ................................................................................... *passim*

U.S. Const. amend. XIV, § 5 ..............................................................................3, 27, 28

**Other Authorities**

42 CFR § 400.200 .............................................................................................................6

70 Fed. Reg. 70623 (Nov. 22, 2005)........................................................................6, 7, 29

79 Fed. Reg. 31120 (May 30, 2014) .................................................................................7

Fed. R. Civ. P. 9(b) ...........................................................................................................1, 3, 30

Fed. R. Civ. P. 12(b)(6)........................................................................................................1, 9

Defendant Regeneron Pharmaceuticals, Inc. ("Regeneron" or the "Company") respectfully submits this Memorandum of Law in support of its Motion to Dismiss the government's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## PRELIMINARY STATEMENT

In an ill-conceived and unfounded enforcement action, the Complaint alleges that Regeneron committed a federal offense by donating money to an independent charity, the Chronic Disease Fund ("CDF"),[1] which assists patients in paying for various medications *after* those drugs have been prescribed by their physicians. Specifically, the government alleges that Regeneron violated the Anti-Kickback Statute ("AKS") and the False Claims Act ("FCA") by making donations to a fund operated by CDF that is designed to assist low- and middle-income individuals diagnosed with wet age-related macular degeneration ("wet AMD" or "AMD") afford various on-label medications, including Regeneron's drug EYLEA. The government's theory of liability is hopelessly flawed, and the Complaint should be dismissed.

Notwithstanding the conclusory and disquieting characterizations of otherwise innocuous business practices, the Complaint and exhibits actually unequivocally show that:

- Regeneron did not have any control over CDF, or have any role in determining how donations were spent by CDF;
- Charitable donations made by Regeneron, Genentech, and all other donors were pooled together by CDF and co-pay assistance was provided to patients on a first-come, first-served basis, without regard to the on-label medication prescribed; and
- There was no ability for CDF or Regeneron to influence a physician's clinical decision-making, given that the prescribing decision occurred before the application for co-pay assistance.

These admissions, stripped of any mischaracterizations, reveal that Regeneron's donations to CDF were charitable in nature—not kickbacks.

---

[1] CDF currently operates under the name "Good Days." Compl. ¶ 34. For convenience, the organization is referred to in all time-periods herein as "CDF."

Moreover, in a remarkable departure from decades of enforcement policy, the government's theory presumes that physicians should have instead prescribed Avastin for needy patients—even though, when used to treat AMD, Avastin is a compounded, off-label,[2] and dangerous drug.  *See* Compl. ¶ 30.  Indeed, compounded drugs and compounding pharmacies have been linked to patient blindness and even patient death, leading to prosecutions, including by this U.S. Attorney's Office. *See* n.14, *infra*.  For the reasons discussed below, the allegations of the Complaint fail to support a cognizable kickback theory.

Unable to state well-founded assertions against Regeneron, the government inundates this Court with numerous internal emails and presentations in an effort to create a veneer of wrongdoing.  But these documents plainly show that Regeneron did not know which patients its donations would assist, or actually did assist, because CDF operated independently from Regeneron in both theory and practice.  Moreover, the Complaint's painstaking recitation of both internal communications and discussions with CDF serves only to underscore the critical deficiency in this case: it was impossible for any Regeneron donations to CDF to have improperly induced EYLEA prescriptions.

Similarly, the government points to alleged misrepresentations made by two Regeneron employees to the Company's internal auditors as evidence that the Company knew its donations were improper.  These allegations do not support an AKS scheme.  Instead, the supposed misrepresentations—which were made during a proactive review initiated by Regeneron's founder and CEO—are no more than a red herring, and do not remedy the Complaint's deficiencies.  Nowhere in the myriad of allegations describing Regeneron's charitable donations

---

[2] In this context, 'off-label' refers to the practice of prescribing drugs for "conditions not included on the official label approved by the FDA."  *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 27–28 (1st Cir. 2013).

does the Complaint allege facts to support an AKS violation, or further explain how Regeneron's alleged conduct caused the presentment of claims that violated the FCA.

Further, the allegedly improper communications between Regeneron and CDF constitute speech protected by the First Amendment, and the government fails to explain how its efforts to regulate protected speech here are narrowly tailored to further a compelling government interest in combatting fraud or abuse.  The government also takes an improper and overly expansive reading of non-binding guidance from the U.S. Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") concerning communications between pharmaceutical manufacturers and third-party charities.  Specifically, the government bases its entire case against Regeneron on the theory that mere non-compliance with this OIG guidance could consitute illegal activity even though it is not specified in any statute.  This position is not supported by the AKS, and does not provide fair warning under the Fifth Amendment of what specific conduct constitutes a violation of the law.

In sum, the Court should dismiss the Complaint in its entirety for the following reasons:

- *First*, the government does not and cannot allege a violation of the AKS under the facts alleged in the government's Complaint;
- *Second,* there is no FCA violation because the government has not and cannot plead Regeneron caused the submission of a false claim;
- *Third*, the speech constituting the alleged violation is protected speech under the First Amendment;
- *Fourth,* Regeneron did not receive fair warning under the Fifth Amendment that receiving projections or estimates of patient financial need from an independent charity could violate the AKS; and
- *Fifth*, the Complaint's FCA allegations fail to meet the specificity requirements of Fed. R. Civ. P. 9(b).

## BACKGROUND

The government goes out of its way in the Complaint to obscure basic facts about Regeneron, the nature of its relationship with CDF, and the payment and reimbursement

structure for EYLEA, all of which illuminate the fundamental failure to plead an AKS violation.[3]

*Regeneron Is an Extraordinary, Science-Based, Patient-Focused Company*. Regeneron was founded in 1988 as a biopharmaceutical company committed to developing new medicines for people with serious and rare diseases. *See* Compl. ¶ 28. The physician-scientists that make up the Regeneron Board of Directors and executive leadership team established and maintained Regeneron's research-driven approach from 1988 to the present.[4] Regeneron spent 20 years and $1.3 billion conducting research before bringing its first drug to market in 2008.[5] *See id.* Since then, the Company has developed seven FDA-approved medicines, while continually reinvesting in the development of innovative and urgently needed drugs. In recent years, Regeneron has promptly and passionately responded to global public health emergencies, developing the leading treatment to combat the Ebola epidemic in 2019, and is presently conducting clinical trials for a promising COVID-19 antibody treatment for the concurrent prevention and treatment of the virus.[6]

*EYLEA was priced lower than its on-label alternatives*. The Complaint focuses on

---

[3] "In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, *documents attached as exhibits* or incorporated by reference in the complaint and matters of which judicial notice can be taken." *Freeman v. Town of Hudson*, 849 F. Supp. 2d 138, 147 (D. Mass. 2012) (Gorton, J.) (emphasis added).

[4] Since its founding, Regeneron's Board of Directors—comprised of its founding scientists, industry experts, and Nobel Laureates—have consistently pushed the boundaries of scientific excellence and discovery with a shared commitment to transforming lives. Presently, nine members of Regeneron's 12-member Board hold doctorate-level degrees in medical or scientific fields, and the majority are members of the National Academy of Sciences.

[5] Regeneron's first product, ARCALYST (rilonacept), was approved for the treatment of Cryopyrin-Associated Periodic Syndromes. With an estimated incidence of only a few hundred patients in the U.S., ARCALYST underscores Regeneron's commitment to addressing unmet medical needs and helping patients access these breakthrough treatments.

[6] *See* News Release, *PALM Ebola Clinical Trial Stopped Early as Regeneron's REGN-EB3 Therapy Shows Superiority to ZMapp in Preventing Ebola Deaths* (Aug. 12, 2019), https://newsroom.regeneron.com/news-releases/news-release-details/palm-ebola-clinical-trial-stopped-early-regenerons-regn-eb3; News Release, *Regeneron Begins First Clinical Trials of Anti-Viral Antibody Cocktail REGN-COV2 for the Treatment and Prevention of COVID-19* (June 11, 2020) (https://newsroom.regeneron.com/news-releases/news-release-details/regeneron-begins-first-clinical-trials-anti-viral-antibody).

Regeneron's first actively marketed drug, EYLEA® (aflibercept) Injection, an ophthalmic injection approved by the FDA in 2011 to treat wet AMD, a leading cause of blindness in the elderly. *See id.* ¶ 29. Upon market entry, Regeneron set the list price of EYLEA at $1850 per injection—*below* that of its only on-label, FDA-approved competitor at the time, Genentech's Lucentis® (ranibizumab injection). *See id.* ¶¶ 29-30. Despite tremendous demand and continued investment in new indications, Regeneron has never increased the price for EYLEA. The *per injection* list price of EYLEA remains lower than Lucentis in treating wet AMD. *Id.* EYLEA also requires *fewer injections per the recommended dose* than Lucentis, which further reduces annual out-of-pocket costs for patients and providers. *See id.* Another common treatment is Avastin® (bevacizumab). *See* Compl. ¶ 30. But Avastin is a chemotherapy drug that must be compounded before use in wet AMD patients, which can be dangerous to those patients. *See id.*; *see also* n. 18, *infra* (citing Compl. ¶ 30).

   ***Medicare Part B and the Coverage Gap***. Because EYLEA is administered by intra-ocular injection, it is subject to the Medicare Part B reimbursement model known as "buy-and-bill." *See* Compl. ¶ 13. Under this regulatory regime, physicians purchase, prescribe, and administer the drug *before* they receive reimbursement. Only after each of these steps is complete does the physician seek reimbursement for the cost of the prescription. *See, e.g.*, *id.* ¶ 16. For most Medicare beneficiaries—who are typically required to pay a $144.60 minimum monthly payment, a $198 deductible, and a 20 percent co-pay for all Part B drugs, with no cap on out-of-pocket costs[7]—*any* on-label treatment may be cost-prohibitive.[8] This scenario

---

[7] FDA, Centers for Medicare & Medicaid Services, *Medicare Costs at a Glance* (last visited July 21, 2020) (https://www.medicare.gov/your-medicare-costs/medicare-costs-at-a-glance).

[8] The Complaint alleges that Regeneron considered a price range of $1500 to $1950 before settling on $1850 for its drug price. Compl. ¶ 2. Putting aside whether that allegation correctly reflects the Company's decision-making process with regard to setting the list price of EYLEA, if the drug had been priced at $1500, rather than $1850, the

highlights the shortcomings of Medicare's cost-sharing provisions when applied to revolutionary, life-altering medical treatments, as they require elderly patients to pay a significant portion of their income to obtain medically necessary treatments their doctors prescribe.

While pharmaceutical manufacturers may lawfully provide commercially-insured patients with financial assistance to help with their co-pay obligations, the government has taken the position that providing similar support to Medicare patients may implicate the AKS.[9]  This interpretation means that while Medicare will provide full insurance benefits for some wealthy Medicare patients, who can afford their co-pays, and the most socioeconomically disadvantaged Medicare patients, who may be eligible for subsidies,[10] the bulk of the Medicare population would be denied their Medicare benefits and meaningful access to EYLEA, Lucentis, and other on-label prescriptions because of their inability to afford Medicare's co-pays.  In an effort to address this financial obstacle and ensure that all patients, regardless of their income, status, or insurance, have access to necessary medical treatment, pharmaceutical companies like Regeneron have historically provided support to independent charities that provide co-pay assistance to certain patients, as permitted by HHS-OIG in the manner detailed below.

*Independent Charitable Patient Assistance Programs*.  In an effort to help these patients afford their medicines, HHS-OIG has sanctioned a system where independent, charitable foundations such as CDF may provide financial assistance to federally-insured patients with

out-of-pocket cost for most Part B patients would still have been cost-prohibitive (a deductible of $198 plus $300 per injection, instead of $198 and $370 per injection).

[9] *See* HHS-OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005) ("[P]harmaceutical manufacturer [patient assistance programs] that subsidize Part D cost-sharing amounts present heightened risks under the antikickback statute.") ("2005 OIG Guidance").

[10] The Qualified Medicare Beneficiary program assists patients with their Part B co-pays, and the program is restricted to individuals with income below 100% of the Federal Poverty Level, or $12,760 in 2020.  *See* 42 U.S.C. §§ 1396a(a)(10)(E)(i), 1396d(p); 42 CFR § 400.200.

serious diseases requiring costly treatment and management.  OIG has promulgated guidance that "makes clear that pharmaceutical manufacturers can effectively contribute to the pharmaceutical safety net by making cash donations to independent, bona fide charitable assistance programs."  HHS-OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623, 70626 (Nov. 22, 2005) (". . . cost-sharing subsidies provided by bona fide, independent charities unaffiliated with pharmaceutical manufacturers should not raise anti-kickback concerns, even if the charities receive manufacturer contributions.") (*hereinafter* "2005 OIG Guidance").

But OIG has long maintained that this system presents "risks" and "require[s] scrutiny," such that "[a] determination regarding whether a particular arrangement violates the anti-kickback statute requires a case-by-case evaluation of all of the relevant facts and circumstances, including the intent of the parties."  *Id.*; HHS-OIG Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs, 79 Fed. Reg. 31120, 31121 (May 30, 2014).  Though OIG's guidance is neither law, nor binding, it recognizes the need for a case-by-case analysis against the statutory standard.[11]  To this end, the guidance makes clear the core concern at its heart:  "[s]imply put, the independent charity [assistance program] must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices."  2005 OIG Guidance, 70 Fed. Reg. at 70627.

***CDF's Assistance to Wet AMD Patients in Need***.  Since 2004, CDF has served as a charity dedicated to helping Americans afford prohibitively costly Medicare co-pays for life-extending and life-saving treatments.  Compl. ¶ 32.  And since 2010, CDF has supported wet

---

[11] *Cf.* DOJ Justice Manual § 1-20.100 ("Criminal and civil enforcement actions brought by the Department must be based on violations of applicable legal requirements, not mere noncompliance with guidance documents issued by federal agencies, because guidance documents cannot by themselves create binding requirements that do not already exist by statute or regulation.").

AMD patients by providing co-pay assistance for on-label treatment, including EYLEA and on-label alternatives, such as Lucentis. *Id.* ¶ 33. CDF's process is simple and straightforward: physicians exercise their independent medical judgment, free from third-party influences (including CDF's), to determine the medically appropriate drug for their patient, prescribe that drug, and then administer that drug to the patient. *Id.* ¶ 35. After the prescribing decision is made, the patient applies to CDF for financial assistance. *Id.*

CDF, in turn, awards co-pay assistance to patients regardless of the on-label drug prescribed by their physician (*i.e.*, first-come, first-served). *See* Compl. Ex. 10, p. 1 ("As you are aware, we fund our renewal patients first then new patients in accordance with the first come, first served requirement."). If approved by CDF, a physician treating a CDF-qualifying patient could obtain the approved co-pay assistance from CDF, rather than from the patient. Compl. ¶ 35. This protocol allows doctors to determine what medication and course of treatment is best for each patient. Put another way, CDF guaranteed co-pay assistance to patients regardless of the drug regimen prescribed—EYLEA, Lucentis, or other on-label treatment—to ensure that sick Medicare patients would not be denied necessary medical treatment because they could not meet their co-pay obligations.

***Regeneron's Donations to CDF were Charitable***. The Complaint and the attached exhibits show that Regeneron's donations were charitable. As an initial matter, the allegations, exhibits, and data show that Regeneron's donations to CDF and CDF's assistance to EYLEA patients did not match. *See, e.g.* Compl. Ex. 18; Compl. ¶¶ 41, 58 (showing that as of June 2013, CDF made co-pay assistance payments relating to EYLEA in an amount of approximately "$32.6MM through 6/3/13" while Regeneron made donations of $13.25MM dollars during the same period). Even if the donations lined up precisely with the requests—which they do not—

Regeneron had no control over how CDF spent those funds.  Compl. Ex. 10 at ¶ 5(b) ("In operating the Program, the Foundation will not discriminate against or otherwise vary its procedures for processing a patient who applies to the Program based upon the treatment prescribed for such patient . . . ."); Compl. Ex. 1, p. 57 ("Donations to copay charities have several limitations, such as no control over which product is supported, limited data provided by the foundation, and no control over operations of the fund . . . .").  In other words, even if Regeneron matched CDF's requests dollar for dollar—which it did not—that fact would be meaningless because doctors retained and exercised full autonomy over their prescribing decisions, CDF paid claims on a first-come, first-served basis, and Regeneron had no role in determining how or which patients CDF assisted.

## ARGUMENT

### I.      THE COMPLAINT DOES NOT AND CANNOT ALLEGE A PREDICATE AKS VIOLATION AS REQUIRED BY RULE 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A court, therefore, must "focu[s] on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint," which ultimately must "permit the court to infer more than the mere possibility of misconduct . . ." *United States v. Prashad*, 437 F. Supp. 3d 105, 108 (D. Mass. 2020).  In doing so, the Court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements" in order to "see if they plausibly narrate a claim for relief." *Lyman v. Baker*, 954 F.3d 351, 360 (1st Cir. 2020).  "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [the court] to draw on [its] judicial experience

and common sense." *Id.*

Here, the government affixes sinister labels to common commercial behavior in an attempt to transform lawful conduct into something nefarious but fails to allege even the basics of an AKS violation: the bribe, the bribe recipient, and the intent to improperly induce the bribe recipient. Instead, the government tries to fashion a kickback scheme out of little more than projections of anticipated demand for charitable grants from CDF, requests for donations from Regeneron, Compl. ¶¶ 5, 45-46, 53-55, 57, 59, 60, 65, and alleged misrepresentations by former employees to Regeneron's internal audit team, *id.*¶¶ 5, 75-88. Based on nothing more than those allegations, the Complaint summarily concludes that because the government believes that Regeneron's donations correlated "very closely" with CDF's assistance to EYLEA *patients*, the fund "effectively functioned" as a conduit for kickbacks from Regeneron to *physicians*. *Id.* ¶ 90.

Despite this conclusory assertion, there is not a single factual allegation that Regeneron's donations were intended to improperly influence—or could have influenced—patients or physicians to purchase or prescribe EYLEA. To the contrary, the alleged facts demonstrate that it was impossible for Regeneron's donations to CDF—which operated its fund on a first-come, first-served basis—to induce patients to purchase, or physicians to prescribe, EYLEA. Critically, the Complaint is devoid of allegations that Regeneron colluded with CDF to ensure that its donations went to EYLEA patients or to physicians that prescribed EYLEA. The Complaint, therefore, does not allege a "facially plausible" AKS violation. For that reason alone, the Complaint should be dismissed.

A.  **The Government Fails to Allege that Regeneron's Charitable Donations Were Intended to, Or Could, Improperly Induce Patients or Physicians to Purchase EYLEA.**

As this Court has recognized, the AKS requires proof of an "intent to induce a referral or recommendation," which "means an intent to gain influence over the reason or judgment" of the

party being induced.  *United States v. Medtronic*, 189 F. Supp. 3d 259, 268, 271 (D. Mass. 2016) (quotation omitted).   Accordingly, the AKS only applies where remuneration is intended to *improperly* or *corruptly* influence the relevant individual's decision-making.  *Guilfoile v. Shields*, 913 F.3d 178, 192-93 (1st Cir. 2019).   This requirement of improper or corrupt influence in an AKS case is consistent with the Supreme Court's recognition, in the context of honest services fraud prosecutions, that "kickback" has an established, circumscribed meaning under federal statutes.  *See Skilling v. United States*, 561 U.S. 358, 412-13 (2010).  In *Skilling*, the Supreme Court analyzed several statutes that define "kickback" as a thing of value given "for the purpose of *improperly* obtaining or rewarding favorable treatment."  *Id*.  (citing the Anti-Kickback Act, 41 U.S.C. § 52)[12] (citing also 18 U.S.C. § 666(a)(2) ("corruptly gives . . . anything of value . . . with intent to influence or reward"), and the federal bribery statute, 18 U.S.C. § 201(b) (same)).

Consistent with this precedent, the defining element of a kickback under the AKS is that it be given with the intent to improperly influence the provision of federally funded medical products and services.  Nonetheless, the Complaint fails to allege that Regeneron intended to—or could—improperly induce EYLEA purchases.  To the contrary, the allegations of the Complaint undermine any such conclusion.

1.      *It is Impossible for Regeneron's Donations to CDF to Improperly Induce Patients or Physicians.*

The allegations in the Complaint and the accompanying exhibits acknowledge both that a physician's purchase of and decision to prescribe EYLEA (or any other medication to treat AMD) occurs before the patient applies to CDF for funding, and that patients receive funding from CDF on a first-come, first-served basis. *See* pp. 8-9, *supra* (citing Compl. Ex. 1; Compl. Ex. 10).  As a result, there are no circumstances in which Regeneron's donations to CDF could

---

[12] 41 U.S.C. § 52 has since been renumbered as 41 U.S.C. § 8701(2).

improperly induce a physician or patient to purchase, or a physician to prescribe, EYLEA.

As an initial matter, the basic timeline of diagnosis, prescription, and co-pay assistance precludes a conclusion that Regeneron's donations could have swayed any prescribing decision. Indeed, the Complaint makes clear that a patient first must be diagnosed with AMD by his or her physician *and prescribed a treatment regimen* before applying to CDF for financial support. *Cf.* Compl. Ex. 1, p. 29 ("Wet AMD patients apply for funds to help pay [out-of-pocket] costs for treatment associated with the disease."). <u>Thus, before a patient approaches CDF for any financial assistance, and before the physician collects the co-pay, the medical decision to prescribe EYLEA has already been made, and in many cases the drug has already been administered.</u> It defies common sense that inducement can occur when the question of whether co-pay assistance will be provided is decided only *after* the prescribing decision is made.

Moreover, the structure of CDF's fund and its method for allocating donations eliminate any possibility that Regeneron improperly influenced physicians' decisions.[13] The Complaint acknowledges that charitable donations made by Regeneron, like those made by Genentech and other CDF donors, are pooled and allocated on a first-come, first-served basis to any patient with an on-label prescription for any of the drugs in CDF's charitable fund. *See* Compl. ¶ 40 ("Regeneron's management knew that CDF paid Lucentis patients' co-pays in addition to EYLEA patients' co-pays."); Compl. Ex. 10, p. 1 ("As you are aware, we fund our renewal patients first then new patients in accordance with the first come, first served requirement."). And, critically, there are no allegations that Regeneron tried to direct its financial support only to EYLEA patients, nor are there any allegations that Regeneron had any agreement with CDF to ensure that its donations went only to support patients taking EYLEA. *See* Compl. Ex. 1, p. 57

---

[13] *See* Compl. Ex. 10 at ¶ 5(b) ("In operating the Program, the Foundation will not discriminate against or otherwise vary its procedures for processing a patient who applies to the Program based upon the treatment prescribed for such patient. . . .").

("Donations to copay charities have several limitations, such as no control over what drug is supported").

In short, patients received assistance, and physicians received reimbursement, irrespective of the drug for which CDF provided co-pay assistance. This highlights the similarities between this case and others where federal courts have dismissed kickback claims because the foundation reimbursed multiple drugs not manufactured by the defendant, and there was no evidence that the donations were "contingent on the foundation's agreement to purchase or recommend [a donor's] drugs." *See, e.g., United States v. Celgene Corp.*, 226 F. Supp. 3d 1032 1057 (C.D. Cal. 2016).

Moreover, despite the government's use of scare quotes to allege that CDF was only "purportedly 'independent,'" Compl. ¶ 3, there is not a single allegation that CDF was not independent or facilitated an improper transaction. The Complaint does not allege that Regeneron attempted to control the fund's eligibility criteria, discriminate against patients using other drugs, earmark its donations, or favor EYLEA patients in any way that could plausibly affect their—or their physicians'—decision-making. *Cf. United States ex rel. Strunck v. Mallinckrodt Ard LLC*, 2020 WL 362717, at *2 (E.D. Pa. Jan. 22, 2020) (manufacturer "designed" fund that covered only a single drug, and "prevented other drugs from being financed through the fund."). To the contrary, CDF's Donation Agreement makes clear that its independence from Regeneron, and indeed any donor, is unwavering and absolute. *See* Compl. Ex. 10 at ¶ 3.

In support of the government's theory of collusion, the Complaint asserts that because the amount Regeneron donated to CDF is supposedly "very close[]" to the amount that CDF provided to EYLEA patients, the fund "effectively functioned as a conduit." *See* Compl. ¶ 90.

This conclusory allegation is false, as demonstrated by the government's own allegations. *See Chongris v. Bd. of Appeals of Town of Andover*, 811 F.2d 36, 37 (1st Cir. 1987) (observing that a court need not accept allegations that contradict a plaintiff's concessions or filings) (citing *Snowden v. Hughes*, 321 U.S. 1, 10 (1944)). Indeed, Regeneron made donations of just $725,000 from 2011 through mid-February 2013, while CDF provided over $10MM in co-pay assistance to patients prescribed EYLEA during that same period. *Id.* ¶¶ 41, 90. This disparity continued through at least June 2013, when Regeneron had made donations of approximately $13MM, but CDF had paid approximately "$32.6MM through 6/3/13" to assist patients receiving EYLEA—a difference of over 246%. Compl. Ex. 18, p. 3; Compl. ¶¶ 41, 58. Similarly, in 2014, CDF's co-pay assistance to EYLEA patients again outstripped Regeneron's donations to CDF by millions of dollars. Compl. ¶ 90.

Regardless, the failure to plead that CDF agreed to channel these donations into the hands of EYLEA patients and physicians is fatal to the Complaint. *See United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000) (upholding jury instruction stating that defendant "cannot be convicted merely because they hoped or expected or believed that referrals may ensue from remuneration"); *see also Celgene,* 226 F. Supp. 3d at 1057 (payments of tens of millions of dollars per year to co-pay assistance foundation were not kickbacks where there was "no evidence that these donations were contingent on the foundation's agreement to purchase or recommend Celgene's drugs").

The Complaint then summarily concludes that "Regeneron understood from CDF that CDF was using Regeneron's money to ensure that physicians did not need to consider the impact of Medicare co-pays when deciding to purchase and prescribe EYLEA." Compl. ¶ 70. But removing a financial obstacle so that physicians can determine the best medically reasonable

course of treatment does not—and cannot—constitute "improper" influence over the "judgment" of the physician. In fact, it is the opposite of improper influence. This is particularly true where the treatment decision had already been made, the physician did not know whether the patient would qualify for CDF co-pay assistance, and the patient (if eligible) could receive co-pay assistance for any on-label treatment—including the higher-priced, on-label alternative to EYLEA. "The heartland of what the AKS is intended to prevent [is] the use of payments to *improperly influence* decisions on the provision of health care that lead to claims for payment to federal health care programs." *Guilfoile*, 913 F.3d at 192-93 (emphasis added). There is not a single allegation in the Complaint that a patient or physician was—or could be—improperly induced to prescribe EYLEA.

2. *The Implausibility of Improper Inducement is Underscored by the Alternative Treatment Option.*

Unable to allege that Regeneron's donations could have induced physicians to prescribe EYLEA, the Complaint instead alleges that absent Regeneron's donations, patients or providers would have chosen to use Avastin—a cancer drug that is not approved or marketed for the treatment of AMD, and which must be compounded and repackaged by pharmacies prior to use. Compl. ¶ 30.

The government's position is incredible. The U.S. Attorney's Office bringing this case prosecuted numerous drug manufacturers under the Food Drug and Cosmetic Act ("FDCA") and the FCA for doing precisely what they endorse here: promoting and submitting claims for drugs and devices used off-label. Indeed, the government's stated purpose in pursuing those off-label prosecutions was to protect patients from the dangers of using drugs off label, citing its "fundamental role in ensuring the safety and efficacy of medical devices and drugs in this country" and promising to "vigorously pursue those who ignore or seek to circumvent these

important patient protections," concerning off-label prescribing of drugs.[14]

Similarly, this U.S. Attorney's Office has pursued significant criminal prosecutions of compounding pharmacies, including the New England Compounding Center (NECC), which killed nearly 100 patients and sickened another 800 after their compounding process tainted drugs with a dangerous fungus that caused meningitis.[15]   In commenting on the subsequent convictions of several NECC owners and employees, the FDA Commissioner made clear that NECC was not an isolated bad actor, but was representative of the inherent problem: that "compounding and compounded drugs can present serious risks to patients."[16]   Notwithstanding these prosecutions, injuries, and deaths that correlate with the use of off-label, compounded drugs, the government now suggests that patients or physicians should have used compounded Avastin off-label in lieu of EYLEA—an on-label, non-compounded drug with a demonstrated safety record and proven efficacy in treating wet AMD.

In another ironic twist, the government goes to some length to suggest that off-label

---

[14] DOJ, Johnson & Johnson Subsidiary Acclarent Inc. Pays Government $18 Million to Settle False Claims Act Allegations (July 22, 2016) (https://www.justice.gov/opa/pr/johnson-johnson-subsidiary-acclarent-inc-pays-government-18-million-settle-false-claims-act).   The penalties assessed in connection with the off-label cases pursued by this U.S. Attorney's Office are staggering:  $3 billion from GlaxoSmithKline in 2012; $2.3 billion from Pfizer in 2009; $950 million from Merck in 2009; and $435 million from Schering-Plough in 2006.  *See* DOJ, GlaxoSmithKline to Plead Guilty and Pay $3 Billion to Resolve Fraud Allegations and Failure to Report Safety Data (July 2, 2012); DOJ, Justice Department Announces Largest Health Care Fraud Settlement in Its History (Sept. 2, 2009); DOJ, U.S. Pharmaceutical Company Merck Sharp & Dohme to Pay Nearly One Billion Dollars Over Promotion of Vioxx® (Nov. 22, 2011); DOJ, Schering To Pay $435 Million for the Improper Marketing of Drugs and Medicaid Fraud (Aug. 29, 2006).  Nor, as this Complaint's apparent advocacy for off-label uses might suggest, has the government's position against off-label promotion softened in recent years.  *See, e.g.*, U.S. Attorney's Office, District of Massachusetts, Pharmaceutical Companies to Pay $214.5 Million To resolve Allegations of Off-label Promotion of Epilepsy Drug, (Dec. 15, 2010); *United States v. Aegerion Pharm., Inc.*, No. 17-cr-10288 (D. Mass. Sept. 22, 2017); *United States ex rel. Lokosky v. Acclarent, Inc.*, No. 11-cv-11217 (D. Mass. Mar. 17, 2016).

[15] *See, e.g.*, Sentencing Memorandum, *United States v. Chin*, No. 14-cr-10363-RGS, ECF No. 1399 (D. Mass. 2018).   Judicial notice of court records is appropriate on a motion to dismiss. *See, e.g.*, *Wang Yan v. ReWalk Robotics Ltd.*, 330 F. Supp. 3d 555, 561 n.1 (D. Mass. 2018).

[16] Department of Justice, U.S. Attorney's Office, District of Massachusetts, *Owner and Four Former Employees of New England Compounding Center Convicted Following Trial*, (Dec. 13, 2018) (https://www.justice.gov/usao-ma/pr/owner-and-four-former-employees-new-england-compounding-center-convicted-following-trial).   Other contaminations tracked to compounding activities abound.  *See generally* Nadine Shehab et al., *U.S. Compounding Pharmacy-related Outbreaks, 2001–2013—Public Health and Patient Safety Lessons Learned*, Journal of Patient Safety (Sept. 2018) (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4668233/).

Avastin has similar efficacy to its on-label competitors.  But that is an argument often made (unsuccessfully) by companies seeking to avoid penalties related to off-label promotion.  *See, e.g.*, *In re Neurontin Mktg. and Sales Practices Litig.*, 2011 WL 3852254, at *34 (D. Mass. Aug. 31, 2011) (Saris, J.) (rejecting an argument that "[a drug] is actually effective for the off-label indications at issue in this case" because "[t]he FDA requires two [double-blind randomized controlled trials] to prove the efficacy of a drug").  While the government points to evidence of Avastin's alleged equivalency with Lucentis, it fails to point to any evidence of its equivalency with EYLEA for the treatment of wet AMD.[17]  Further, the government does not—and cannot — allege that the FDA had approved Avastin as a treatment of AMD based upon scientifically controlled trials of any kind.  Finally, in stark contrast to the government's characterization of Avastin, there is considerable evidence that Avastin in fact carries serious risk for patients when used off-label to treat the eye.[18]

3. *The Complaint Fails to Allege that Regeneron Intended to Improperly Induce Purchases of EYLEA.*

Even ignoring these considerable deficiencies, there is still no basis to find that Regeneron's donations were intended to be kickbacks.  The Complaint demonstrates, at most, that Regeneron hoped its donations would help EYLEA patients afford their co-pay, thereby generating increased sales.  But as courts have made clear, a defendant "cannot be convicted

---

[17] The article the government cites at Compl. ¶ 30 to suggest that Avastin has similar efficacy to EYLEA shows only that "Avastin [is] as effective as EYLEA for treating central *retinal vein occlusion*," not wet AMD.  In contrast, a two-year long NIH-funded study found that EYLEA provided significant benefits in vision improvement for patients with worse than 20/50 vision compared to Avastin in treating vision loss caused by diabetic macular edema.  See John A. Wells et al., AFLIBERCEPT, BEVACIZUMAB, OR RANIBIZUMAB FOR DIABETIC MACULAR EDEMA: TWO-YEAR RESULTS FROM A COMPARATIVE EFFECTIVENESS RANDOMIZED CLINICAL TRIAL, Ophthalmology, Feb. 27, 2016 (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4877252/).

[18] One of the very articles cited by the Government to demonstrate Avastin's supposed efficacy reveals that it also had a 25 percent greater incidence of serious adverse events.  *See* Compl. ¶ 30 (citing National Institutes of Health, *Avastin and Lucentis Are Equivalent in Treating Age-Related Macular Degeneration* (Apr. 30, 2012) ("Serious adverse events (SAEs) occurred at a 40 percent rate for patients receiving Avastin and a 32 percent rate for patients receiving Lucentis.")).

merely because he *hoped or expected or believed* that referrals may ensue." *See McClatchey*, 217 F. 3d at 834 (emphasis added, alteration omitted).

Critically, there are no allegations that Regeneron intended its donations to improperly influence physician decision-making. Despite spending more than 15 paragraphs detailing how Regeneron determined its contributions to CDF, the Complaint alleges only that Regeneron's intent in making its donations was to "adequately fund [its] patient responsibility for 2013" and ensure it contributed enough "to keep the fund solvent." Compl. ¶¶ 55, 57. Further supporting that conclusion are several attachments to the Complaint, including a 2012 slide presentation that clearly reveals Regeneron's charitable intent behind its 2013 CDF donations: to "[p]rovide adequate funding so that CDF's AMD/RVO specific funds have the resources available to provide assistance to patients in need through-out 2013." Compl. Ex. 8, p. 4; *see also* Compl. ¶¶ 53, 56, 67-69; Compl. Exs. 7, 10, 25-26. These documents emphasize that Regeneron donated with the intent to keep the fund open so that patients needing assistance would receive it, regardless of choice of therapy. *See id.*[19]

To obscure this truth, the government repeatedly alleges that Regeneron tracked and monitored the "return on investment" associated with its donations to CDF, in an effort to again ascribe sinister intent to Regeneron's innocuous actions. Compl. ¶¶ 3-5, 46-48, 60. But as noted by Judge Woodlock in another AKS case, it is "unremarkable that [a drug manufacturer] tracked its return on investment from [an alleged kickback scheme involving paying doctors for speeches advocating the benefits of a drug]," because "as a for-profit company, this is to be expected."

---

[19] The Complaint tries to unreasonably stretch the fact that two Regeneron employees—Robert Terifay and William Daniels—failed to disclose to internal audit that the company received projections from CDF into the knowing and willful scienter required by the AKS. Compl. ¶¶ 75-88. Even assuming these allegations are true, they do not support a finding that either Terifay or Daniels intended to *violate a law,* such as the AKS. *See United States ex rel Banigan v. Organon USA Inc.*, 2016 WL 10704126, at *3 (D. Mass. Aug. 23, 2016). Rather than alleging that these employees believed Regeneron's donations served as an *inducement* or *kickback* to patients or physicians, the Complaint alleges only that Regeneron employees knew of potential non-compliance with non-binding OIG guidance. *See* Compl. ¶ 74.

*United States ex rel. Booker v. Pfizer, Inc.*, 188 F. Supp. 3d 122, 134 (D. Mass. 2016); *cf. also United States v. Shaw*, 106 F. Supp. 2d 103, 120 (D. Mass. 2000) ("[P]rofit motive does not necessarily trigger criminal liability.").

It is also unremarkable that, prior to making charitable donations to a patient assistance charity, Regeneron sought information that would help it understand how the charity operated, whether donations were spent responsibly, and what level of funding would help accomplish the charity's goals.  To this end, Regeneron's analysis of data received from CDF is entirely consistent with lawful and expected conduct for a large pharmaceutical company.

The government's allegation that Regeneron received and/or interpreted data from CDF simply does not cross the line from a possible violation of the law to a plausible one, and mischaracterizing that conduct to assign a sinister motive does not change the analysis.  *See Twombly*, 550 U.S. at 557 (noting allegations that could serve as circumstantial evidence of a violation of the law, but that were still otherwise consistent with lawful conduct, were insufficient to survive a motion to dismiss because such allegations "ge[t] the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief.") (alterations omitted); *see also Zenón v. Guzman*, 924 F.3d 611, 616 (1st Cir. 2019) (holding that plausibility, for the purposes of surviving a motion to dismiss, "means something more than merely possible").  As described above, the Court is required to focus on the factual allegations and must "isolate and ignore" the government's labels, conclusions, and attempts to portray Regeneron's lawful and commercially reasonable conduct as unlawful and nefarious.  *Lyman*, 954 F.3d at 360.

### B.   Regeneron's Donations Do Not Constitute Unlawful Remuneration Because They Were Not Offered In Return For Improper Action.

The AKS prohibits a physician from soliciting remuneration "in return for" purchasing or

recommending a product, 42 U.S.C. § 1320a-7b(b)(1), and by the same token, prohibits manufacturers from offering remuneration "to induce" those physicians to purchase or recommend a product, *id.* at § 1320a-7b(b)(2). Thus, remuneration in this circumstance is only illegal if it was offered "to induce" a particular action, which the First Circuit and the Supreme Court have clarified means to "improperly influence" or "corruptly influence" the physician's decision-making, such as through a "*quid pro quo.*"  *See Guilfoile,* 913 F.3d at 192-93; *Skilling*, 561 U.S. at 412-13; *see also* Sec. I.A, *supra.*  To hold otherwise would mean that an entirely lawful action that the government in fact encourages—manufacturer donations to independent charities that provide co-pay assistance—becomes unlawful solely based on whether the government believes the manufacturer had wrongful intent.

There is not one allegation in the Complaint that enables this court to draw a reasonable inference that Regeneron's donations to CDF could even theoretically facilitate a *quid pro quo* transaction between Regeneron and patients or physicians.  *Guilfoile*, 913 F.3d at 189 ("[T]he AKS targets any remunerative scheme through which a person is paid 'in return for' referrals.") (quotation omitted); *see also* Jury Instructions, *United States v. Reichel,* No. 15-cr-10324-DPW, at 5 ("[T]he contemplated inducement must be what is referred to as a quid pro quo ('this for that') transaction"); *United States v. Krikheli,* 461 F. App'x 7, 11 (2d Cir. 2012) ("[T]he prosecution had to prove that the remuneration was offered or paid as a quid pro quo in return for the referring of the patient.").

Specifically, there are no allegations that CDF, acting as Regeneron's conduit, provided reimbursement to physicians only if physicians prescribed EYLEA.  Nor are there allegations that CDF provided co-pay assistance only to EYLEA patients.  Rather, CDF reimbursed all co-pays that the fund supported, no matter which drug was prescribed.  Compl. Ex. 10, p. 1.

Moreover, there are no allegations that physicians or patients knew where the funding originated from when they were reimbursed by CDF on behalf of the patient, let alone allegations that Regeneron offered physicians or patients co-pay reimbursement as part of a "this for that" transaction.  Given these facts, the government cannot allege that the co-pay reimbursement from CDF created "a quid pro quo transaction of payments of remuneration for order or purchase of drugs" between Regeneron and physicians or patients.  *See* Jury Instructions, *Reichel* at 5-6.[20]

## II.    THE COMPLAINT FAILS TO ALLEGE THAT REGENERON'S DONATIONS TO AN INDEPENDENT CHARITY CAUSED THE SUBMISSION OF FALSE CLAIMS.

The Complaint also fails to allege a causal connection between the purported kickbacks paid by Regeneron and physicians' alleged submission of false claims.  To the contrary, much of the evidence in the Complaint conclusively breaks any causal link between the two.  For that independent reason, the Complaint should be dismissed.

Evidence of an actual false claim is the "*sine qua non* of a False Claims Act violation." *United States ex rel. Booker v. Pfizer, Inc.,* 847 F.3d 52, 57 (1st Cir. 2017) ("FCA liability attaches only if [fraudulent] conduct resulted in the filing of a false claim for payment from the government.").  Accordingly, to state a claim under the FCA, the Complaint must plead "a sufficient causal connection between [the] AKS violation and a claim submitted to the federal government." *Guilfoile,* 913 F.3d at 190 (citing *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96-98 (3d Cir. 2018)).

Where, as here, "a defendant is alleged to have 'caused' a third party to submit a false claim, there must be a predicate showing of a 'connecting causal link.'" *United States ex rel. Carpenter v. Abbott Labs., Inc.,* 723 F. Supp. 2d 395, 403 (D. Mass. 2010).  The Third Circuit

---

[20] *See e.g., United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 68 (D. Mass. 2011) (finding that free drug "overfill" did not constitute remuneration because the defendant did not encourage providers to seek reimbursement for it).

has conducted the most in-depth analysis on this issue and concluded that there must be "evidence that shows a link between the alleged kickbacks and the medical care received . . ." *Medco*, 880 F.3d at 100 (rejecting argument that the presence of an AKS violation "renders every reimbursement claim false"); *see also Guilfoile*, 913 F.3d at 190 (citing *Medco* and noting that after the 2010 amendments to the FCA, a successful claim requires "a sufficient causal connection between an AKS violation and a claim submitted to the federal government").[21]  In reaching this conclusion, the Third Circuit specifically rejected theories of causation that relied on indirect links, including that the presence of a kickback "taints" a claim or otherwise "renders every reimbursement claim false," or that mere "temporal proximity between [the] alleged kickback plot and the submission of claims for reimbursement," satisfies causation. *Medco,* 880 F.3d at 100.

The government's best effort to describe a link is the conclusory statement that Regeneron "provided illegal co-pay subsidies to induce thousands of Medicare-reimbursed purchases of Eylea, resulting in tens of millions of dollars of false claims to Medicare." Compl. ¶ 98.  This is clearly insufficient—"[a] kickback does not morph into a false claim unless a particular patient is exposed to an illegal recommendation or referral." *Medco,* 880 F.3d at 100. Without allegations demonstrating a causal link "between the alleged kickbacks and the medical care received," no FCA claim is possible. *See id*.

Like in *Medco*, the Complaint assumes that any EYLEA claims that are temporally related to the patient receiving assistance from CDF, are false under the FCA.  However, the

---

[21] This case dovetails with the now uncontroversial position that proximate causation is typically a required element of an FCA claim. *See, e.g.*, *United States v. Luce*, 873 F.3d 999, 1011–13 (7th Cir. 2017) (surveying opinions from courts of appeal nationwide and holding that proximate causation is a required element of any FCA claim given "the common-law understanding of causation in fraud cases," and the ability of the proximate causation standard to "winno[w] out those claims with only attenuated links between the defendants' specific actions and the presentation of the false claim").

Complaint does not show that a single one of these patients—or any physician—was "exposed to an illegal recommendation or referral" as a result of Regeneron's donations to CDF. *Id.* Because the Complaint acknowledges that Regeneron was not the only donor to the fund, in the words of the *Medco* court, "it is impossible to rule out the chance" that the patients whose claims are listed in paragraph 101 received support from other donors. *Id.* at 99-100. Likewise, because there are no allegations that CDF funneled Regeneron's donations to EYLEA patients, it is just as plausible that Regeneron's donations subsidized co-pays for Lucentis or other drugs covered by the fund.

In sum, the government's theory of causation—that Regeneron *caused* false claims for EYLEA to be tainted by kickbacks—is inherently flawed. It is nothing more than an impermissible and conclusory statement that false claims 'must have' resulted from purported kickbacks. Because the government's allegations leave open the possibility that *none* of the claims at issue resulted from Regeneron's donations, the Complaint has failed to adequately plead a causal link. *See id.,* 880 F.3d at 100 ("It is not enough . . . to show temporal proximity between [the] alleged kickback plot and the submission of claims for reimbursement.").

## III.   THE GOVERNMENT'S EFFORTS TO RESTRICT CHARITABLE SPEECH VIOLATE REGENERON'S FIRST AMENDMENT RIGHTS.

As the Complaint's exhaustive focus on email correspondence makes clear, the crux of the alleged AKS violation here is the purportedly improper communications between Regeneron and CDF regarding Regeneron's charitable donations. Indeed, the government emphasizes that its claims rest on allegations that "Regeneron employees repeatedly contacted CDF to learn the amount of money CDF would need to cover the co-pays of EYLEA patients" and then "paid CDF exactly what CDF said it needed." Compl. ¶ 4. Leaving aside the demonstrable inaccuracies in the government's conclusory summation, the government's attempt to

criminalize otherwise lawful communications incident to charitable giving runs afoul of the First Amendment's free speech protections.

    A.     **Preventing Communications with CDF Impermissibly Restricts Regeneron's First Amendment Right to Engage in Charitable Speech**

Charitable solicitation is "fully protected speech," *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474 (1989), and is protected "whether or not any speech incident to the solicitation actually takes place, because a sufficient nexus exists between a charity's expression of ideas and its fundraising," *Speet v. Schuette*, 726 F.3d 867, 877 (6th Cir. 2013). Restricting the information manufacturers may receive from charities does not just limit charities' speech; it also restricts manufacturers' First Amendment right to receive the information. *See, e.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both.").[22] As the Supreme Court recently reiterated, an exacting level of scrutiny applies "to laws restricting the solicitation of contributions to charity, upholding the speech limitations only if they are narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 442 (2015); *see also Riley v. Nat'l Fed'n of the Blind of N. C., Inc.*, 487 U.S. 781, 789, 796 (1988). Under that standard, "[i]f a less restrictive alternative would serve the Government's purpose, [it] must use that alternative." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). "To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." *Id.*

---

[22] Not only is the speech incident to charitable solicitation fully protected, so too is the act of donating. *See, e.g.*, *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299 (1981) ("Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression."); *accord Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013) ("[R]estrictions on money spent on speech are the equivalent of restrictions on speech itself.").

Here, there can be no doubt that the government's actions would chill or restrict speech between charitable donors and donees—the Complaint admits as much by repeatedly pointing to communications between CDF and Regeneron regarding charitable donations as support for a violation of law. *See, e.g.,* Compl. ¶ 4. As a result, the government's actions are subject to strict scrutiny.

The way to achieve the government's stated purpose of eliminating improper "payoffs to those who can influence health care decisions" is, axiomatically, by prohibiting and penalizing "payoffs to those who can influence health care decisions." *Id.*¶ 21. Congress did exactly that when it enacted the AKS nearly five decades ago. *Id.* But what the government seeks to do here is to place limits on speech incident to charitable giving in the name of trying to strengthen the AKS and establishing a bright-line rule that eases the path to prosecution.

There is no basis for concluding that easing the government's path to prosecuting AKS violations constitutes a compelling state interest. *See, e.g.*, *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 479 (2007) ("The desire for a bright-line rule hardly constitutes the compelling state interest necessary to justify any infringement on First Amendment freedom . . . .") (alterations and emphasis omitted). As a result, the only compelling interest advanced by the government's speech restrictions is the interest in preventing fraud and abuse in the health care system, which *must still be accomplished through the least restrictive means*. *See McCutcheon v. FEC*, 572 U.S. 185, 221 (2014) ("Importantly, there are multiple alternatives available to Congress that would serve the Government's anticircumvention interest, while avoiding 'unnecessary abridgment' of First Amendment rights."). It has not done so.

Instead, the government has created additional restrictions on *speech* that address the same interests as the AKS's prohibitions on *conduct*. Because it cannot show that the methods it

has pursued are the least restrictive means to accomplish its compelling interest, the government's claims against Regeneron improperly restrict its protected charitable speech, and this action must be dismissed.

> B.  **Prohibiting Pharmaceutical Manufacturers, But Not Others, From Engaging in Communications with Charitable Foundations Constitutes Impermissible Viewpoint Discrimination.**

By restricting the efforts of *only* pharmaceutical manufacturers—like Regeneron—to communicate with charities about their donations, the government has imposed speaker-based restrictions that cannot stand under the First Amendment.  The government's desire to suppress prescriptions for which the government is contractually obligated to provide insurance does not provide a basis for the government to single out pharmaceutical company speech for adverse treatment.

The Supreme Court's decision in *Sorrell v. IMS Health, Inc.*, squarely addressed this issue, finding that a state law prohibiting pharmacies from disclosing records to pharmaceutical manufacturers, but not others, "must be subjected to heightened judicial scrutiny."  564 U.S. 552, 557 (2011).  Because the restrictions placed on Regeneron's communications with CDF are content-based (*i.e.*, information that "would facilitate" correlation of donation and prescriptions) and are imposed based on the viewpoint of the speaker (*i.e.*, pharmaceutical manufacturers), the government bears the burden of overcoming a presumptive invalidity of the restriction.  *Id.* at 571-72 ("Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment."); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid").

For the same reasons that the government's restriction cannot satisfy the constitutional requirements of limits on charitable speech, it cannot satisfy the requirements to impose content-based discrimination based on viewpoint.  There are other, far less restrictive measures *already*

*in place* that address the government's stated purpose—namely, the AKS itself, which prevents fraud and abuse on the federal healthcare system.   The restriction on pharmaceutical manufacturers—and *only* pharmaceutical manufacturers—receiving data from and communicating with charitable foundations fails to withstand scrutiny under the First Amendment.  Because that restriction is the core of the alleged wrongful conduct in this case, the Complaint must be dismissed.

## IV.    THE GOVERNMENT'S PROSECUTION THEORY VIOLATES REGENERON'S FIFTH AMENDMENT DUE PROCESS RIGHTS.

The government's claims against Regeneron also violate the Company's Fifth Amendment Due Process rights by attempting to criminalize conduct based upon an overly expansive and vague interpretation of non-binding OIG guidance.  Any argument that the OIG guidance is authoritative in determining whether there has been a violation of the AKS is unsustainable.  This is because the OIG guidance cannot expand the statutory definitions and purpose of the AKS—it can only refine what the statute makes illegal.  Thus, the government's attempt to transform the OIG guidance into the letter of the law violates Regeneron's Due Process rights.[23]

There are inherent concerns arising from the government's attempt to use Regeneron's alleged noncompliance with guidance as evidence of an AKS violation.  The Department of Justice has explicitly forbidden the use of regulatory guidance to establish a violation of law.  *See* DOJ Justice Manual § 1-20.100 (actions "must be based on violations of applicable legal requirements, not mere compliance with guidance documents issued by federal agencies, *because guidance documents cannot by themselves create binding requirements that do not*

---

[23] Fifth Amendment challenges are properly presented in a 12(b)(6) motion to dismiss.  *United States ex rel. Health Dimensions Rehab., Inc. v. RehabCare Grp., Inc.*, 2013 WL 992642, at *3 (E.D. Mo. Mar. 13, 2013) (considering vagueness challenge to the AKS at the motion-to-dismiss stage); *Smith v. Truman Rd. Dev.*, LLC, 414 F. Supp. 3d 1205, 1239 (W.D. Mo. 2019) (considering vagueness challenge at the motion to dismiss stage).

*already exist by statute or regulation*.") (emphasis added).[24]   Yet, notwithstanding this clear

instruction, the government improperly advances claims against Regeneron that are based upon

nothing more than purported violations of OIG's 2005 Guidance.

Even if the Complaint's use of the Guidance were appropriate, the Guidance is

impermissibly vague.  The Fifth Amendment's Due Process Clause bars the government from

prosecuting a defendant without fair warning that his behavior is actionable.  *United States v.

Paz-Alvarez*, 799 F.3d 12, 28 (1st Cir. 2015).  Any regulatory guidance that ultimately provides

for "monetary penalties against those who violate [it], . . . must give . . . fair warning of the

conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to

circumscribe the discretion of the enforcing authority and its agents."  *United States v. Hoechst

Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997) (quoting *First Am. Bank v. Dole*, 763 F.2d

644, 651 n.6 (4th Cir. 1985)).

The use of non-binding, ambiguous, and vague OIG guidance to judge whether

Regeneron violated the AKS fails to provide fair warning to Regeneron of what conduct is

prohibited.  *See United States v. Lachman*, 387 F.3d 42, 57 (1st Cir. 2004).   Here, the

government's kickback theory rests on the allegation that Regeneron improperly used CDF as a

conduit for illegal kickbacks because the Company received data from CDF and then allegedly

used this data to determine its charitable giving.  Compl. ¶¶ 4-5, 71.  But the AKS is silent as to

what data a pharmaceutical manufacturer can receive from patient assistance foundations.  When

the statute in question is sufficiently ambiguous such that it could reasonably be construed to

permit or prohibit specific conduct, the statute has a legislative gap that may be filled by an

---

[24] *See also* Memorandum from Rachel Brand, Assoc. Att'y Gen., U.S. Dep't of Justice to Heads of Civil Litigating Components U.S. Att'ys, Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases (Jan. 25, 2018) (hereinafter the "Brand Memo") (noting that the DOJ "may not use its enforcement authority to effectively convert agency guidance documents into binding rules," and that DOJ litigators "may not use noncompliance with guidance documents as a basis for proving violations of applicable law . . . .").

implementing agency, but such regulations are similarly subject to vagueness challenges.  *See Lachman*, 387 F.3d at 53-54.

Here, neither the AKS nor the OIG guidance define any of the terms necessary to provide fair warning to manufacturers as to what conduct is specifically prohibited in the context of charitable donations to foundations.  The applicable OIG guidance cited by the government begins with the understanding that, in general, cost-sharing payments from charities "should not raise anti-kickback concerns, even if the charities receive manufacturer contributions," but then states that this understanding requires that independent charities must "not function as a conduit for payments by the pharmaceutical manufacturer to patients [or] impermissibly influence beneficiaries' drug choices."  2005 Guidance, 70 Fed. Reg. at 70624, 70627.  Yet to accomplish this goal, the guidance provides, *inter alia*, that a pharmaceutical manufacturer may not solicit or receive "data" that would "facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products."  *Id*. at 70626.  That direction is inherently ambiguous—it defines the prohibited conduct by the outcome it seeks to prevent (the correlation of donations), not the conduct at issue (the receipt of data).  In other words, the 2005 Guidance concludes that two companies could engage in identical conduct—the receipt of data—but the statute is only violated if one company is able to use the data.[25]  Such a result demonstrates plain ambiguity and does nothing to make clear that the conduct at issue is prohibited.  In other words, the 2005 Guidance does not provide fair warning to Regeneron of what conduct violates the law.  Accordingly, to protect Regeneron's due process rights, the Complaint should be dismissed.

---

[25] The OIG guidance also attempts to criminalize conduct under the AKS that does not inherently violate the statute. The guidance presumes that where a manufacturer receives certain data, any donation made by that manufacturer to a foundation may constitute a kickback under the AKS, which is far beyond the conduct prohibited by the statute. *See* 42 U.S.C. § 1320a-7b(b).

## V.    THE COMPLAINT FAILS TO PLEAD BOTH THE UNDERLYING AKS VIOLATION AND THE SUPPOSED RESULTING FALSE CLAIMS WITH THE PARTICULARITY REQUIRED BY RULE 9(b).

Because the FCA is a fraud statute, the First Circuit has held that Rule 9(b) "requires both that the circumstances of the alleged fraud and the claims themselves be alleged with particularity." *Lawton ex rel. United States v. Takeda Pharm. Co., Ltd.*, 842 F.3d 125, 130 (1st Cir. 2016); *see also Booker*, 847 F.3d at 57–58 (Rule 9(b) requires the plaintiff to "set forth with particularity at least the who, what, when, where, and how of an actual false claim alleged to have been filed because of the defendant's actions.")   Thus, to properly plead the underlying fraud scheme, the Complaint must include "not only particularized allegations of kickbacks, but also particularized allegations of who received them and when, as well as particularized allegations that those kickbacks caused or were material to claims for reimbursement . . . ." *Medtronic,* 189 F. Supp. 3d at 272.  It fails to do so.

Despite an exhibit-heavy Complaint, the government never states ***who***, precisely, was allegedly induced.  Instead, the Complaint alleges only that Regeneron's funds were provided by CDF to "physicians who prescribed and purchased EYLEA for their Medicare patients."  Compl. ¶ 90.  This fails to meet the heightened pleading requirements.  For example, in *United States ex rel. Leysock v. Forest Labs., Inc.*, this Court upheld an FCA complaint based on off-label promotion that detailed misconduct related to eight specific providers, including the sales representative that visited the provider, the specific representations made to those providers, and the fact that each provider wrote off-label prescriptions for the defendant's drug "[i]n reliance of those off-label messages."   55 F. Supp. 3d 210, 218 (D. Mass. 2014).   In contrast, the Complaint's list of "representative examples" in paragraph 101 fails to list a single provider who allegedly received a "kickback" that caused him to submit a false claim.

Further, as described in Section I.A *supra.*, the Complaint does not allege specific facts

explaining how Regeneron intended to fraudulently induce a patient or a physician.   There is simply no showing of how Regeneron's donations, and CDF's subsequent co-pay assistance to a patient already prescribed a drug, improperly influenced physicians' clinical decision-making, particularly when the patient could receive co-pay support for any on-label drug.   Given this shortcoming, the government has failed to plead with the requisite particularity that there was a false claim that could "result[] from" a kickback.  42 U.S.C. § 1320a-7b(g).

The Fifth Circuit's decision in *United States ex rel. Colquitt v. Abbott Labs* is directly on point.   In *Colquitt*, the relator's complaint alleged a scheme by Abbott to give providers discounts, fellowships, and other benefits in exchange for off-label promotion of particular stent devices.   However, the complaint alleged the details of the scheme itself only vaguely, failing to address whether "the unidentified doctors who received the ill-defined benefits caused the hospital to use Abbott stents."  858 F.3d 365, 372 (5th Cir. 2017).   The court concluded that the complaint failed to comply with 9(b) because "[t]he complaint never links the alleged carrots [the remuneration] to the purchase and use of the stents at . . . the hospitals." *Id*.

Additionally, the government has failed to plead with requisite particularity that Regeneron caused others to submit false claims to the government.   Under the standard applicable to FCA claims in which a defendant allegedly caused *others* to file false claims, the government must provide "factual or statistical evidence to strengthen the inference of fraud beyond possibility." *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29 (1st Cir. 2009).   Indeed, even in this context, "it is the fraud itself that which must be pled with particularity," and "it is not enough simply to rais[e] facts that suggest that fraud was possible." *United States ex rel. Kelly v. Novartis Pharms. Corp.*, 827 F.3d 5, 13 (1st Cir. 2016).

Specifically, this includes evidence regarding the claims, such as: (1) "specific medical

providers who allegedly submitted false claims;" (2) "rough time periods, locations, and amounts of the claims;" and (3) "the specific government programs to which the claims were made." *Id.* Additionally, information as to how a defendant's actions caused the submission of the false claims can help assist in demonstrating fraud with sufficient particularity. *Hagerty ex rel. United States v. Cyberonics, Inc.*, 844 F.3d 26, 32 (1st Cir. 2016). However, where a complaint relies solely on "insinuation" rather than "factual or statistical evidence," dismissal is appropriate. *Kelly*, 827 F.3d at 15. Here, the Complaint lacks the necessary information regarding the claims themselves to strengthen the inference of fraud beyond mere possibility.

The government also fails to identify whether doctors or patients were the recipients of purported fraudulent kickbacks—leaving it for the Court and Regeneron to decipher the precise boundaries of the purported fraud. *See e.g.,* Compl. ¶¶ 5, 90 (alternating between patient and provider inducement theories). Further, even assuming physicians are the intended bribe recipient, the government fails to identify which doctors allegedly submitted false claims. And, as discussed above, the Complaint fails to allege any connection between the particular claims it lists, *id.* at ¶ 101, and Regeneron's donations. This is a particularly glaring omission given the Complaint's acknowledgment that the CDF's charitable fund was supported by multiple donors, *id.* ¶ 33, none of whom could direct how their donations were used.

The government, thus, fails to plead how "false claims were submitted for government payment as a result of the defendant's alleged misconduct." *Leysock*, 55 F. Supp. 3d at 217 (internal quotations omitted) (emphasis added). Such imprecise pleadings violate 9(b) and fail to provide Regeneron with the opportunity to properly defend itself in response to these baseless claims. As such, the government has not plead the circumstances of the alleged fraud with the requisite particularity, and the Complaint must be dismissed.

## CONCLUSION

Despite the Complaint's attempt to cast a sinister shadow over reasonable commercial behavior, it fails to allege the basic elements of a kickback violation and makes clear that there is no set of facts in which a kickback violation plausibly could have occurred.  Regeneron therefore respectfully requests that the Complaint be dismissed with prejudice.

Respectfully submitted,

Counsel for Defendant

/s/  Richard L. Scheff
Richard L. Scheff (BBO # 445130)
Carrie S. Love  (admitted *pro hac vice*)
ARMSTRONG TEASDALE
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone:  (267) 780-2000
Facsimile:  (215) 405-9070
rlscheff@armstrongteasdale.com
clove@atllp.com

/s/ Brien T. O'Connor
Brien T. O'Connor (BBO #546767)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone:  (617) 951-7000
Facsimile:  (617) 951-7050
Brien.O'Connor@ropesgray.com

Samantha B. Badlam (admitted *pro hac vice*)
ROPES & GRAP LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone:  (202) 508-4600
Facsimile:  (202) 508-4650
Samantha.Badlam@ropesgray.com

Dated:  August 24, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF electronic filing on August 24, 2020.


/s/ Richard L. Scheff
Richard L. Scheff (BBO # 445130)