**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-11217-FDS |
| | ) | |
| REGENERON PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES' OPPOSITION TO REGENERON'S MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

LEGAL BACKGROUND ...................................................................................................... 2

    I.     MEDICARE PART B AND ITS COST-SHARING PROVISIONS ..................... 2

    II.    THE FALSE CLAIMS ACT AND THE ANTI-KICKBACK STATUTE ............ 3

FACTUAL BACKGROUND .................................................................................................. 4

    I.     BACKGROUND ON REGENERON, EYLEA, AND COMPETITOR DRUGS . 4

    II.    REGENERON'S PLAN TO FUNNEL MONEY TO EYLEA PATIENTS
          THROUGH CDF .................................................................................................. 5

    III.   REGENERON'S SCHEME TO CONCEAL ITS COMMUNICATIONS WITH
          CDF FROM ITS OWN AUDITORS................................................................... 10

ARGUMENT ....................................................................................................................... 13

    I.     THE GOVERNMENT HAS PLED FACTS SUPPORTING EACH ELEMENT
          OF THE ANTI-KICKBACK STATUTE AND THE FALSE CLAIMS ACT .... 13

         A.    The Complaint Sufficiently Pleads A Violation Of The Anti-Kickback
              Statute .................................................................................................14

              1.    Regeneron Provided Remuneration To Physicians And Their
                   Patients Through CDF .................................................................14

              2.    Regeneron Intended Its Payments To Induce Purchases Of
                   Eylea .........................................................................................15

                   a.    Regeneron Knew Its Payments Benefitted Eylea Patients.15

                   b.    The Inducement Element Of The AKS Does Not Require
                       The Government To Plead A Quid Pro Quo, Though It
                       Does Here.........................................................................19

                   c.    The AKS Does Not Require The Government To Plead
                       Corruption Of Clinical Decision-Making .........................22

              3.    Payment May Be Made for Eylea, In Whole or In Part, Under
                   Medicare .....................................................................................23

4.      The Complaint Alleges That Regeneron's Conduct Was Knowing And Willful ..................................................................................23

B.      The Complaint Sufficiently Alleges That Regeneron Violated the False Claims Act ........................................................................................25

1.      Regeneron's Kickbacks Caused False Claims .............................25

2.      Regeneron's AKS Violations Were "Material" For Purposes of the FCA...................................................................................................27

3.      Regeneron's Conduct Was Knowing.............................................27

II.     THE COMPLAINT ALLEGES FALSE CLAIMS WITH PARTICULARITY .. 28

III.    REGENERON'S REMAINING LEGAL DEFENSES FAIL .............................. 30

A.      The First Amendment Does Not Protect Regeneron's Kickbacks.............30

B.      The Anti-Kickback Statute Does Not Violate The Fifth Amendment.......31

1.      The AKS Is Constitutional.............................................................31

2.      Regeneron Had Fair Notice ...........................................................33

CONCLUSION........................................................................................................ 33

# TABLE OF AUTHORITIES

Cases

*Beckles v. United States*,
    137 S. Ct. 886 (2017)...............................................................................................32

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................13

*Donovan v. City of Haverhill*,
    311 F.3d 74 (1st Cir. 2002)....................................................................................31

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949)...............................................................................................31

*Guilfoile v. Shields*,
    913 F.3d 178 (1st Cir. 2019).................................................................. 15, 22, 25-27

*Hanlester Network v. Shalala*,
    51 F.3d 1390 (9th Cir. 1995) .................................................................................32

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    491 F. Supp. 2d 12 (D. Mass. 2007) .......................................................................3

*Skilling v. United States*
    561 U.S. 358 (2010)...............................................................................................22

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011)...............................................................................................30

*United States ex rel. Banigan v. Organon USA Inc.*,
    No. CV 07-12153-RWZ, 2016 WL 10704126 (D. Mass. Aug. 23, 2016) ..........................14, 28

*United States ex rel. Bawduniak v. Biogen Idec, Inc.*,
    No. 12-CV-10601-IT, 2018 WL 1996829 (D. Mass. Apr. 27, 2018)...................................19, 26

*United States ex rel. Bilotta v. Novartis Pharm. Corp.*,
    50 F. Supp. 3d 497 (S.D.N.Y. 2014)....................................................................17, 21

*United States ex rel. Booker v. Pfizer Inc.*,
    188 F. Supp. 3d 122 (D. Mass. 2016) ......................................................................18

*United States ex rel. Brown v. Celgene Corporation*,
    226 F. Supp. 3d 1032 (C.D. Cal. 2016)  .................................................................18

*United States ex rel. Cairns v. D.S. Med., L.L.C.*,
 No. 1:12CV00004, 2017 WL 3781807 (E.D. Mo. Aug. 31, 2017) ...........................................21

*United States ex rel. Decesare v. Americare in Home Nursing*,
 No. 1:05CV696, 2011 WL 607390 (E.D. Va. Feb. 10, 2011) ...........................................28

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
 842 F.3d 103 (1st Cir. 2016) ...........................................14

*United States ex rel. Gagne v. City of Worcester*,
 565 F.3d 40 (1st Cir. 2009) ...........................................13

*United States ex rel. Ge v. Takeda Pharm. Co.*,
 737 F.3d 116 (1st Cir. 2013) ...........................................29

*United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*,
 No. CV 02-2964, 2020 WL 4260797 (E.D. Pa. July 24, 2020) ........................................... 27-28

*United States ex rel. Goodman v. Arriva Med., LLC*,
 No. 3:13-CV-0760, 2020 WL 3840446 (M.D. Tenn. July 8, 2020) ....................................15, 21

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
 880 F.3d 89 (3d Cir. 2018)........................................... 22, 25-26

*United States ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*,
 772 F.3d 1102 (7th Cir. 2014) ...........................................14

*United States ex rel. Kester v. Novartis Pharm. Corp.*,
 23 F. Supp. 3d 242 (S.D.N.Y. 2014)...........................................19

*United States ex rel. Kosenske v. Carlisle HMA, Inc.*,
 No.1:05-CV-2184, 2010 WL 1390661 (M.D. Pa. Mar. 31, 2010) ...........................................28

*United States ex rel. Lutz v. United States*,
 853, F.3d 131 (4th Cir. 2017) ...........................................25

*United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
 865 F.3d 29 (1st Cir. 2017)...........................................29

*United States ex rel. Nevyas v. Allergan, Inc.*,
 No. 09-432, 2015 WL 3429381 (E.D. Pa. May 26, 2015)........................................30

*United States ex rel. Parikh v. Citizens Med. Ctr.*,
 977 F. Supp. 2d 654 (S.D. Tex. 2013), *aff'd sub nom. United States ex rel. Parikh v. Brown*,
 762 F.3d 461 (5th Cir. 2014) ...........................................19

*United States ex rel. STF, LLC v. Vibrant America, LLC,*
  No. 16-cv-02478, 2020 WL 4818706 (N.D. Cal. Aug. 19, 2020) ............................................14

*United States ex rel. Strunck v. Mallinckrodt ARD, LLC,*
  Nos. 12-175, 13-1776, 2020 WL 362717 (E.D. Pa. Jan. 22, 2020)...............................15, 28, 29

*United States ex rel. Vitale v. MiMedx Group, Inc.,*
  381 F. Supp. 3d 647 (D.S.C. 2019).........................................................................................17

*United States ex rel. Wallace v. Exactech, Inc.,*
  No. 2:18-CV-01010-LSC, 2020 WL 4500493 (N.D. Ala. Aug. 5, 2020) ..................................26

*United States ex rel. Wilkins v. United Health Grp., Inc.,*
  659 F.3d 295 (3d Cir. 2011).....................................................................................................22

*United States ex rel. Wood v. Allergan, Inc.,*
  246 F. Supp. 3d 772 (S.D.N.Y. 2017).......................................................................................28

*United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.,*
  874 F.2d 20 (1st Cir. 1989)................................................................................................23, 32

*United States v. Berkeley Heartlab, Inc.,*
  225 F. Supp. 3d 487 (D.S.C. 2016)...........................................................................................14

*United States v. Facteau,*
  No. 1:15-cr-10076-ADB, 2020 WL 5517573 (D. Mass. Sept. 14, 2020)...................................30

*United States v. Goodwin,*
  No. 19-2778, 2020 WL 5358651 (8th Cir. Sept. 8, 2020) .........................................................24

*United States v. Mathur,*
  No. 2:11-cr-00312, 2012 WL 4742833 (D. Nev. Sept. 13, 2012) .............................................30

*United States v. McClatchey,*
  217 F.3d 823 (10th Cir. 2000) ...........................................................................................15, 18

*United States v. Medtronic, Inc.,*
  189 F. Supp. 3d 259 (D. Mass. 2016) .......................................................................................15

*United States v. Ruttenberg,*
  625 F.2d 173 (7th Cir. 1980) ...................................................................................................16

*United States v. Starks,*
  157 F.3d 833 (11th Cir. 1998) ...........................................................................................24, 32

*United States v. Teva Pharm. USA, Inc.*,
  No. 13 CIV. 3702 (CM), 2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019) ............................19, 25

*United States v. Vernon*,
  723 F.3d 1234 (11th Cir. 2013) ............................................................................................13

*United States v. Williams*,
  218 F. Supp. 3d 730 (N.D. Ill. 2016) ....................................................................................24

*United States v. Zhen Zhou Wu*,
  711 F.3d 1 (1st Cir. 2013)......................................................................................................33

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  136 S. Ct. 1989 (2016)...........................................................................................................27

*Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982)...........................................................................................................31-32

*Waterson v. Page*,
  987 F.2d 1 (1st Cir. 1993).......................................................................................................20

*Wisconsin v. Mitchell*,
  508 U.S. 476 (1993)................................................................................................................30

## Statutes

31 U.S.C. §§ 3729-33 ...............................................................................................3, 4, 14, 27

42 U.S.C. § 1320a-7b(b) .................................................................................................. *passim*

42 U.S.C. § 1395 ..........................................................................................................................2

42 U.S.C. § 1395l..................................................................................................................2, 21

42 U.S.C. § 1395w.......................................................................................................................3

## Federal Rules

Fed. R. Civ. P. 9(b) ...............................................................................................................13, 29

## Legislative History

155 Cong. Rec. S10853 (daily ed. Oct. 28, 2009) (statement of Sen. Kaufman)..........................25

H.R. Rep. No. 92-231 (1972) ......................................................................................16

H.R. Rep. No. 95-393 (1977) ......................................................................................22

Miscellaneous

Department of Justice, Justice Manual § 1-20.201 (2018) ...........................................32

HHS-OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D
Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005) ..........................................................10

HHS-OIG, Special Fraud Alert (Dec. 19, 1994),
https://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html ......................................3

## INTRODUCTION

Defendant Regeneron Pharmaceuticals, Inc. ("Regeneron"), paid kickbacks with the intent to induce the purchase of its expensive age-related macular degeneration drug, Eylea.  As the complaint details, Regeneron funneled tens of millions of dollars through the Chronic Disease Fund ("CDF"), an entity that purported to be an independent co-pay assistance foundation but actually served as a conduit for Regeneron to cover the Medicare co-pays of Eylea patients.  Regeneron paid that money so that patients and their physicians would not choose an alternative therapy that cost less than three percent of what Eylea cost.

Regeneron now argues that it acted appropriately because it did not know with certainty that each dollar it paid CDF would flow directly into the hands of an Eylea patient.  That argument, however, rests on a faulty factual premise that is legally irrelevant.  The argument is factually faulty because for a period of over 18 months, from mid-2012 to early 2014, Regeneron received spreadsheets from CDF confirming that CDF was using Regeneron's money to cover Eylea patients' Medicare co-pays and detailing exactly how much Regeneron needed to pay CDF to continue covering Eylea co-pays.  Regeneron's argument is legally irrelevant because the law only requires the government to show that by making payments to CDF, Regeneron intended to induce claims for Eylea that Medicare reimbursed.  The government's complaint clears this standard.  Simply put, Regeneron understood and intended that the money it paid to CDF was to induce the purchase of Eylea in violation of the federal anti-kickback statute and the False Claims Act.

Were Regeneron correct that this conduct was legally permissible, the cost-sharing provisions of the Medicare Part B statute would become meaningless, as each pharmaceutical manufacturer would find out what a foundation was spending on its drug and then would pay that

foundation enough to cover the foundation's expenditures for the drug. That scenario would always make economic sense for the manufacturer, because the amount of the co-pay is only 20 percent of the revenue generated from the sale of a unit of the drug—after all, no rational economic actor would decline to pay $20 in order to make $80. It also would result in no Medicare patient ever having to pay a co-pay. With patients and their physicians then having no concern about the cost of the drug, drug manufacturers would have license to charge even higher prices to the Medicare program. This is exactly the kind of conduct that Congress intended the anti-kickback statute to prevent.

As discussed further below, because the government has alleged facts supporting each element of a claim under the anti-kickback statute and False Claims Act, the Court should reject the arguments Regeneron makes in its Memorandum in Support of its Motion to Dismiss, ECF No. 21 ("Memo"), and should deny Regeneron's motion to dismiss.

## LEGAL BACKGROUND

## I.     MEDICARE PART B AND ITS COST-SHARING PROVISIONS

Congress established the Medicare program to provide health insurance coverage for people aged 65 or older and for people with certain disabilities or afflictions. *See* United States' Complaint ("Compl.") ECF. No. 1, ¶ 11; 42 U.S.C. § 1395, *et seq*. The federal treasury funds the Medicare program. *Id.* ¶ 12. Medicare Part B primarily covers outpatient medical services and physician-administered drugs, like Eylea. *Id.* ¶ 13. Once beneficiaries meet their annual deductible (currently $198), Medicare Part B pays 80 percent of the cost of prescription drugs administered by a physician in an outpatient setting. 42 U.S.C. § 1395l(a)(1). Some Medicare beneficiaries purchase a supplemental insurance product, called a Medigap plan, to cover all or

part of the remaining 20 percent co-pay.  Others are responsible for covering that co-pay directly.  Compl. ¶ 14.

Congress incorporated co-pays into Medicare to give patients an incentive to choose the most cost-effective therapy.  Compl. ¶ 15.  As the Department of Health and Human Services, Office of the Inspector General ("HHS-OIG") observed in a 1994 Special Fraud Alert, "[s]tudies have shown that if patients are required to pay even a small portion of their care, they will be better health care consumers, and select items or services because they are medically needed, rather than simply because they are free."  *See* https://oig.hhs.gov/fraud/docs/alertsandbulletins/ 121994.html.  When a physician administers a drug covered by Medicare Part B, the physician typically submits a claim to Medicare for the drug.  *Id.* ¶ 16.  Medicare then will reimburse the physician 106 percent of the average sales price of the drug, less the applicable Medicare Part B co-pay.  *See* 42 U.S.C. § 1395w–3a(b).  The physician is responsible for collecting the co-pay amount from the patient.  Compl. ¶ 16.

## II.      THE FALSE CLAIMS ACT AND THE ANTI-KICKBACK STATUTE

The False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA"), is a civil anti-fraud statute that imposes liability for anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  For purposes of the FCA, a "claim" includes a claim for Medicare reimbursement.  *See, e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 12, 18 (D. Mass. 2007).

Under the federal anti-kickback statute ("AKS"):

Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony[.]

3

42 U.S.C. § 1320a-7b(b)(2).  In 2010, Congress amended the AKS to include language that

reaffirmed prior case law and provided that any Medicare claim "that includes items or services

resulting from a violation of [the anti-kickback statute] constitutes a false or fraudulent claim for

purposes of [the FCA]."  42 U.S.C. § 1320a-7b(g).  Under this provision, claims submitted to

federal health care programs that result from violations of the AKS are *per se* false or fraudulent

within the meaning of 31 U.S.C. § 3729(a).  Accordingly, a person violates the FCA when he or

she knowingly submits, or causes to be submitted, a claim to a federal health care program that

results from a violation of the anti-kickback statute.

## FACTUAL BACKGROUND

## I.       BACKGROUND ON REGENERON, EYLEA, AND COMPETITOR DRUGS

Leonard Schleifer founded Regeneron in 1988.  Compl. ¶ 28.  In November 2011, the

Food and Drug Administration ("FDA") approved Eylea, which treats neovascular (wet) age-

related macular degeneration ("AMD").  *Id.* ¶ 29.  Eylea costs $1,850 per dose.  *Id.*  Patients

receiving Eylea often receive seven doses of the drug per affected eye each year.  *Id.*  As a result,

the annual cost is typically well over $10,000 and the associated Medicare Part B co-pays owed

by patients are well over $2,000 per year.  *Id.*  Even patients with Medigap often face annual

deductibles of several hundred dollars the first time they receive an Eylea treatment each year.

*Id.*

Another pharmaceutical company, Genentech, manufactures Eylea's two principal

competitors, Lucentis and Avastin.  Compl. ¶ 30.  Lucentis and Avastin are chemically similar.

FDA has approved Lucentis to treat various eye conditions, and it comes in .5 ml vials and costs

approximately $2,000 per vial.  *Id.*  Meanwhile, Genentech has sought FDA approval for Avastin

only to treat certain types of cancer.  Avastin comes in 4 ml and 16 ml vials.  *Id.*  Because

Lucentis is much more expensive than Avastin per milliliter, ophthalmologists sometimes use

Avastin off-label:  compounding pharmacies buy Avastin vials and divide them into smaller doses for injection into the eye; ophthalmologists purchase these vials and use them much as they would use Lucentis.  *Id.*  When used in this manner off-label, Avastin costs approximately $55 per dose and is covered by Medicare Part B.  *Id.*  Studies by the National Institutes of Health have found that Eylea, Lucentis, and Avastin have comparable efficacy in treating retinal diseases.  *Id.*  When physicians knew that co-pay coverage was not available for Eylea or Lucentis, they often prescribed Avastin, so as not to impose large Medicare co-pays on their patients or risk being unable to collect those co-pays from their patients.  *Id.*  On the other hand, when CDF co-pay coverage for Eylea or Lucentis was available, those drugs were actually cheaper for patients than Avastin, because CDF did not cover co-pays for Avastin.  *Id.* ¶ 33. Also, when CDF provided co-pay coverage for Eylea and Lucentis, physicians did not risk being unable to collect those co-pays.

## II.   REGENERON'S PLAN TO FUNNEL MONEY TO EYLEA PATIENTS THROUGH CDF

Regeneron was keenly aware of the market forces at work as it prepared for the launch of Eylea.  Executives at Regeneron understood that, if Regeneron priced Eylea similarly to Lucentis, many patients would not be able to afford the drug, resulting in physicians choosing to use Avastin instead.  Compl. ¶ 39.

To help address this problem in advance of Eylea's launch, Regeneron commissioned a third party, Xcenda, to analyze and advise on various pricing and reimbursement matters pertaining to the drug.  Compl. ¶ 36.  Xcenda advised that Regeneron could price the drug nearly as high as Lucentis without losing any patients to Avastin, provided that Regeneron paid enough

money to co-pay foundations to cover Eylea patients' co-pays.  *Id*. ¶ 37 & Ex. 1[1] at 41. Moreover, Xcenda advised that increasing the price of the drug "is largely favorable to Regeneron, since the revenue increase will offset the increase in" payments to foundations.  *Id.*

Xcenda acknowledged the limitations of covering Eylea patients' co-pays through a foundation.  In particular, Xcenda advised Regeneron that, when foundations' "funds are depleted," this could result in the "potential loss of patients."  Compl. Ex. 1 at 30.  Xcenda also advised on an alternative – that Regeneron could provide free Eylea to needy Medicare patients – but acknowledged that this option would result in "potential sales lost."  *Id.*  Ex. 1 at 31. Apparently concerned about the potential lost revenue, Regeneron barred Medicare patients from its free drug program even if they could not afford the co-pays for Eylea.  *Id.* ¶ 38.  Following Xcenda's advice, Regeneron instead referred needy Medicare patients to CDF, which would cover the patients' co-pays, thereby generating claims to Medicare and concomitant revenue for Regeneron.  *Id.*

Xcenda also advised that paying money to a co-pay foundation meant that Regeneron would not know the "allocation of funds among products in the same therapeutic space."  Compl. Ex. 1 at 30.  In other words, Regeneron was not supposed to know whether its money went to Eylea patients or Lucentis patients.  Xcenda's presentation cited "federal restrictions," *id.* Ex. 1 at 21, which governed ways in which Regeneron could support Medicare patients.  Regeneron executives chafed at these restrictions.  The company's former Chief Financial Officer, Murray Goldberg, referred to Lucentis patients as "Genentech's problem," Compl. ¶ 3, and a former Regeneron employee, Cynthia Sherman, explained that Regeneron "did not want to pay for

---

[1] Because the government docketed the civil cover sheet and category form as Attachments 1 and 2 to the Complaint, Exhibit 1 appears as the third attachment, ECF No. 1-3, and so on.

Lucentis's co-pay." *Id.* ¶ 41.  After doing research on co-pay foundations, Sherman advised senior members of Regeneron's commercial team that Regeneron could not receive data from the foundations with "a breakdown of our spend by EYLEA users." *Id.* ¶ 72.  This advice was unwelcome; Sherman testified that Regeneron's commercial team wanted to know the disposition of the funds that Regeneron paid to foundations so that Regeneron could be assured that its payments were benefiting Eylea patients.  *Id.*

Wary of the possibility of underwriting the cost of its competitor's drug, Regeneron's payments to CDF in 2011 and 2012, totaling $725,000, were substantially below what Xcenda advised would be sufficient to cover Eylea co-pays.  Compl. ¶¶ 36, 41, 42.  But when sales of Eylea greatly exceeded Regeneron's pre-launch expectations, Regeneron considered increasing its payments to CDF for 2013.  *Id.* ¶ 42.  On July 9, 2012, Robert Krukowski, Regeneron's Senior Manager for Reimbursement & Managed Markets Marketing, sent an e-mail to his direct report, William Daniels, suggesting that Daniels speak with Clorinda Walley, CDF's Executive Director, because "it is going to be hard to just pick a number" to pay CDF.  *Id.* ¶ 43 & Ex. 2.  In response to Daniels's request to Walley that they "meet . . . to review the numbers," *id.* ¶ 44 & Ex. 3, Walley provided Daniels with a spreadsheet entitled "Regeneron Projections 2013."  *Id.* ¶ 45.  Daniels understood that the spreadsheet showed how many Eylea patients were in the fund, how many Eylea patients CDF projected to be in the fund in 2013, and how much money CDF would need to cover co-pays for those patients.  *Id.*  Walley indicated that CDF's "Total Projected Funding Needed" from Regeneron was just over $40 million.  *Id.*  Daniels forwarded the spreadsheet to Krukowski, noting that Walley "is stating that her 2013 projection is pretty much our 2012 actuals."  *Id.* ¶ 45 & Ex. 4.

Concerned that Regeneron's senior management would reject a $40 million budget item

for CDF in 2013, Daniels generated a lower estimate: $5.6 million for Eylea patients already receiving CDF assistance, and $11.5 million to over $19 million for Eylea patients who would need CDF assistance for the first time in 2013.  Compl. ¶ 46.  Daniels also calculated the "potential lost sales" if Regeneron did not pay CDF enough to cover the Medicare expenses of potential new Eylea patients, as well as the return on investment ("ROI") that Regeneron would generate from paying CDF Eylea patients' Medicare co-pays.  *Id*. ¶¶ 46-50.  On October 8, 2012, however, Regeneron's Senior Vice President and most senior commercial officer, Robert Terifay, approved only a $2.5 million initial payment to CDF in 2013.  *Id.* ¶ 52.

On December 19, 2012, Walley warned Daniels that Regeneron's commitment of $2.5 million would be insufficient to keep CDF's AMD fund open past early 2013, and advised that CDF needed nearly $25 million to cover co-pays for Eylea patients in 2013.  Compl. ¶ 53.  On January 3, 2013, Daniels and Krukowski met with Terifay, Robert Davis (Regeneron's Executive Director and Head of Trade), and Stephen Dressel (a Regeneron financial analyst).  *Id.* ¶ 55. Using CDF's projections as well as his own projections, Daniels delivered a presentation articulating that, as Krukowski subsequently reiterated, Regeneron needed to pay approximately $25 million "to adequately fund our patient responsibility for 2013."  *Id.*  Krukowski understood that Terifay retained a copy of Daniels's presentation to share with Schleifer and Goldberg to get approval to pay $10 million to CDF in the first quarter of 2013.  *Id.*  The next day, Christopher Fenimore, Regeneron's Vice President of Financial Planning, advised Dressel that Terifay and Fenimore "agreed to put $25MM in the plan" for funding CDF in 2013.  *Id.* ¶ 56.  This was almost exactly what CDF had said it needed to fund Eylea co-pays in 2013.  *Id*. ¶¶ 53, 56.  Over the first half of 2013, Regeneron paid CDF $12.5 million, which was approximately half of the

funding CDF said it needed to cover Eylea co-pays for the full year 2013. *Id.* ¶ 58.[2]

On June 18, 2013, CDF once again adjusted its projections of how much money it would need to cover Eylea co-pays in 2013. Compl. ¶ 59. Walley sent Daniels a spreadsheet called "Regeneron Projections 2013," indicating that CDF needed $35 million, rather than $25 million, to cover Eylea co-pays in 2013. *Id.* On June 24, 2013, Daniels sent Krukowski a PowerPoint presentation showing why Regeneron should pay the $35 million that CDF requested. *Id.* ¶ 60. In the presentation, Daniels explained that a $35 million payment to CDF would generate $198.5 million in Eylea revenue, an "ROI" of 465%. *Id.* ¶ 60 & Ex. 18. After Daniels presented these slides to Fenimore and Dressel, Fenimore sent the slides to Goldberg, the CFO, with a note that said, "[t]his makes sense to me." *Id.* ¶ 61 & Ex. 19. Daniels's slides worked; in response to his presentation, Regeneron agreed to fund the full $35 million that CDF said it needed to cover Eylea co-pays in 2013. *Id.* ¶ 61.

On January 3, 2014, Walley sent Daniels a projection that CDF needed approximately $25.5 million to cover co-pays for Eylea patients in the first quarter of 2014. Compl. ¶¶ 64-66. On January 6, 2014, Daniels recommended that Regeneron pay this $25.5 million in two installments of $12.75 million each. *Id.* ¶ 66. Consistent with this recommendation, Regeneron paid CDF $12.75 million on January 15, 2014. *Id.* ¶ 69.

_____

[2] Regeneron misreads its own document when it attempts to compare its payments to CDF in the first half of 2013 with CDF's "co-pay assistance payments relating to EYLEA" during the same period. *See* Memo at 8 (citing Compl. Ex. 18), 14. Exhibit 18 is a Regeneron PowerPoint. On the second slide of that PowerPoint, the first bullet noted that "CDF has paid out $32.6MM through 6/3/13." The context of the bullet makes clear that this figure was for CDF's entire wet AMD fund, because the very next bullet noted that "EYLEA continues to gain share of AMD fund" and that "2013 renewals" for Eylea patients accounted for "~41% of Fund." (This is the information that enabled Regeneron to pay only enough for its patients.) 41 percent of $32.6 million is $13.37 million, which is very close to what Regeneron paid CDF in the first half of 2013.

### III.   REGENERON'S SCHEME TO CONCEAL ITS COMMUNICATIONS WITH CDF FROM ITS OWN AUDITORS

As discussed above, Regeneron's commercial team learned from Xcenda and from Sherman that it could support CDF in a charitable manner – with its payments to CDF untied to CDF's expenditures on Eylea patients – but could not use Eylea-specific data from CDF to correlate its payments to CDF with CDF's spending on Medicare co-pays for Eylea.  In addition, on December 5, 2012, Daniels sent Krukowski a copy of a Special Advisory Bulletin that HHS-OIG had issued in November 2005.  Compl. ¶ 74; *see* HHS-OIG, Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005) (the "2005 Guidance").  In the 2005 Guidance, HHS-OIG advised that, notwithstanding the facial applicability of the AKS to payments by pharmaceutical manufacturers to patients via foundations, "pharmaceutical manufacturers can donate to bona fide independent charity PAPs, provided appropriate safeguards exist."  *Id*. at 70625.  The 2005 Guidance spelled out these "safeguards," including that a foundation "must not function as a conduit for payments by the pharmaceutical manufacturer to patients," and that a pharmaceutical manufacturer should not "solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products."  *Id*. at 70626, 70627.

Knowing that they should not be using Eylea-specific data from CDF to figure out how much Regeneron would pay CDF, Regeneron executives repeatedly lied to the company's internal auditors in 2013 when the auditors posed questions about how the company was determining the amounts it was paying CDF.  In February 2013, Regeneron's Vice President of Internal Audit, John Calabro, and its Manager of Internal Audit, Thibaux Corbin de Mangoux, began asking questions about Regeneron's relationship with CDF.  Compl. ¶¶ 76-77.  On

February 20, 2013, Corbin sent Daniels an e-mail asking for "some detail around the rationale

for the amount paid" to CDF, including any "analysis used to determine that amount." *Id.* ¶ 77.

Corbin also asked whether Regeneron received any "feedback reports . . . on how money given

by Regeneron is actually being spent." *Id.*  Daniels forwarded Corbin's e-mail to Krukowski and

Davis, with the following cover e-mail (highlighting added):

> **From:** William Daniels
> **Sent:** Friday, February 22, 2013 11:00 AM
> **To:** Robert Davis
> **Cc:** Robert Krukowski
> **Subject:** FW: Co-pay referrals to non-profit organizations - Follow Up Questions
>
> Bob,
> Please see below. I am not really comfortable providing the documentation he is requesting. I wanted to know your thoughts.

Davis subsequently forwarded the e-mail chain to Terifay, who responded:  "I will handle." *Id.*

¶ 77 & Ex. 28.

By this time, as Terifay, Davis, Krukowski, and Daniels well knew, Regeneron already

had received data from CDF showing how many Eylea patients CDF was funding and how much

money CDF projected it would need to cover Eylea patients in 2013, and the company had used

that information to determine how much it planned to pay CDF in 2013.  Compl. ¶¶ 55-58, 78.

In response to Corbin's query, Terifay responded by e-mail to Calabro, Corbin's boss.

Compl. ¶ 79.  In that e-mail, Terifay correctly recognized that "[p]harmaceutical companies

cannot provide reimbursement assistance of any kind to patients covered in any way by a

government insurance program," and that, when pharmaceutical companies support foundations

like CDF, "[d]onors have no rights to information of any sort on disposition of funds." *Id.*

Terifay further stated:  "We cannot ask for any information from the CDF.  We gave a charitable

donation." *Id.*  With this e-mail, Terifay also forwarded Daniels's down-chain email, pasted

above, but altered the text to read as follows (highlighting added):

> **From:** William Daniels
> **Sent:** Friday, February 22, 2013 11:00 AM
> **To:** Robert Davis
> **Cc:** Robert Krukowski
> **Subject:** FW: Co-pay referrals to non-profit organizations - Follow Up Questions
>
> Bob,
> Please see below. I am not really comfortable asking for the documentation he is requesting. I wanted to know your thoughts.

*Id.* ¶ 80 & Ex. 29.  Specifically, Terifay had changed Daniels statement that he was "not really comfortable *providing* the documentation he is requesting" to a statement that Daniels was "not really comfortable *asking for* the documentation he is requesting." *Id.* In other words, knowing that Regeneron should not be using Eylea-specific data from CDF, Terifay altered Daniels' e-mail to convey the false impression that the Regeneron commercial team was not already receiving and using that data, and that Regeneron would have had to ask CDF to get it. *Id.* Terifay's deceit ended Calabro's and Corbin's inquiry in February 2013. *Id.* ¶ 81.

In November 2013, after some negative media reports concerning CDF, the Regeneron internal audit team revisited the same issue, and Terifay – this time in open collaboration with Davis, Krukowski and Daniels – deceived the audit team again. Compl. ¶ 82.  First, Calabro asked the commercial team to confirm that CDF did not provide any "product-level" data from CDF, and the commercial team falsely confirmed as much. *Id.* ¶ 84.  Second, Calabro asked to see a copy of CDF's aggregate monthly report that showed how much money CDF spent on patients with retinal diseases, but without breaking down CDF's spend on individual products (*i.e.*, Eylea and Lucentis). *Id.* While Regeneron had been receiving product-specific data from CDF, it had received only one aggregate report from CDF, more than a year earlier. *Id.* Consequently, Daniels needed to ask Walley for the most recent monthly aggregate report, which Walley provided and Daniels then forwarded to Calabro. *Id.* ¶ 85.  Daniels did not disclose to the audit team that he regularly received Eylea-specific data from CDF. *Id.* When Calabro

asked Daniels whether he received any other reports or data from CDF, Daniels followed the

direction of his supervisors and falsely told Calabro that he did not. *Id.* ¶¶ 86-87.  In short, when

Regeneron's audit team got close to discovering that Regeneron was correlating its payments to

CDF with Eylea-specific data that CDF supplied, Regeneron's commercial team lied to ensure

that the audit team did not discover the truth.

## ARGUMENT

A court should not dismiss a civil action as long as the plaintiff has shown "a plausible

entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  Where, as here, a

complaint sounds in fraud, the government must allege its claims with particularity.  *United

States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009).  Here, as discussed

further below, this Court should deny Regeneron's motion to dismiss because the government's

complaint pleads each of the elements of an FCA action predicated on AKS violations, satisfies

the particularity requirements of Federal Rule of Civil Procedure 9(b), and does not implicate

any constitutional concerns.

## I.     THE GOVERNMENT HAS PLED FACTS SUPPORTING EACH ELEMENT OF THE ANTI-KICKBACK STATUTE AND THE FALSE CLAIMS ACT.

The government has sufficiently alleged that Regeneron caused the submission of

kickback-tainted claims to the Medicare program.  To plead a violation of the AKS, the

government must allege that Regeneron:  (1) paid money via CDF; (2) to induce physicians or

patients to purchase Eylea; (3) for which payment may be made, in whole or in part, under

Medicare; and (4) the conduct was knowing and willful.  *See* 42 U.S.C. § 1320a-7b(b); *see also

United States v. Vernon*, 723 F.3d 1234, 1251-52 (11th Cir. 2013) (reciting elements).  To plead

a violation of the False Claims Act in this context, the government must allege that Regeneron

(1) caused the submission of false claims that were (2) materially false, and (3) acted knowingly.

*See* 31 U.S.C. § 3729(a)(1)(A); *see also United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 106 (1st Cir. 2016).  As discussed further below, the government has alleged each of the elements of an AKS violation and resulting FCA violations.

### A.   The Complaint Sufficiently Pleads A Violation Of The Anti-Kickback Statute.

#### 1.   Regeneron Provided Remuneration To Physicians And Their Patients Through CDF.

The complaint sufficiently alleges that Regeneron paid remuneration to Medicare beneficiaries and their physicians through CDF.  For purposes of the AKS, payments to patients and physicians qualify as remuneration whether the recipients receive the remuneration directly, or, as here, indirectly through intermediaries.  *See* 42 U.S.C. § 1320a-7b(b)(2); *United States ex rel. Banigan v. Organon USA Inc.*, No. CV 07-12153-RWZ, 2016 WL 10704126, at *3 n.8 (D. Mass. Aug. 23, 2016) ("[T]he AKS prohibits even the indirect receipt of prohibited remuneration.").  Co-pay subsidies, whether provided directly or indirectly, constitute illegal remuneration for purposes of the AKS.  *See United States ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102, 1104 (7th Cir. 2014) ("[W]hat is wrong with offering an inducement that reduces a product's cost to the consumer?  The answer is that a discount or refund can become a "kickback" . . . in a [co-pay waiver] case such as this because it artificially inflates the price that the government pays pharmacies for prescription drugs for Medicare or Medicaid beneficiaries."); *United States ex rel. STF, LLC v. Vibrant America, LLC*, No. 16-cv-02478, 2020 WL 4818706, at *13 (N.D. Cal. Aug. 19, 2020) (concluding that "a benefit conferred directly on third parties, such as patients in the case of [co-pay] waivers . . . can also indirectly confer a benefit on physicians sufficient to support a claim under the Anti-Kickback Statute and the FCA"); *United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 499 n.3

(D.S.C. 2016) (holding that co-pay waivers constitute remuneration under the AKS).  Here, the complaint alleges payments that Regeneron made to CDF.  Compl. ¶¶ 41, 58, 63, 69.  CDF, in turn, used Regeneron's money to subsidize Eylea patients' Medicare co-pays.  *Id.* ¶ 90.  Indeed, CDF explicitly warned Regeneron that it would cease covering Eylea patients' co-pays if Regeneron did not increase its payments to CDF.  *See* Compl. ¶ 53.  Those patients' physicians then collected the Regeneron-subsidized co-pays on behalf of their patients.  *Id.* ¶ 16.  The complaint therefore alleges that Regeneron indirectly paid patients and physicians through CDF.

> 2. Regeneron Intended Its Payments To Induce Purchases Of Eylea.

> a. Regeneron Knew Its Payments Benefitted Eylea Patients.

The complaint sufficiently alleges Regeneron intended its payments to Medicare beneficiaries and their physicians to induce purchases of Eylea.  An intent to induce means "an intent 'to gain influence over the reason or judgment'" of the purchaser.  *United States v. Medtronic, Inc.*, 189 F. Supp. 3d 259, 271 (D. Mass. 2016) (quoting *United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000)).  A payment violates the AKS as long as "one purpose" of the remuneration is to induce the referral or recommendation of federally reimbursable items or services.  *Guilfoile v. Shields*, 913 F.3d 178, 189 (1st Cir. 2019).

Several courts have concluded that co-pay subsidies necessarily influence the selection of a particular medical treatment.  With a co-pay subsidy, "the services are effectively free to [the patient].  Such enticements . . . [are] violations of the AKS."  *United States ex rel. Goodman v. Arriva Med., LLC*, No. 3:13-CV-0760, 2020 WL 3840446, at *2 (M.D. Tenn. July 8, 2020); *see also United States ex rel. Strunck v. Mallinckrodt ARD, LLC*, Nos. 12-175, 13-1776, 2020 WL 362717, at *4 (E.D. Pa. Jan. 22, 2020) ("The complaint includes numerous allegations that indicate Defendant paid such remuneration with the intent to induce Medicare-reimbursed sales

of Acthar.  Because of the funds it established at CDF, Mallinckrodt was able to market Acthar as free to doctors and patients, regardless of its actual, exorbitant price.").

Here, the complaint contains clear allegations that Regeneron understood the consequences of the unavailability of co-pay coverage for Medicare patients.  Even before Regeneron launched Eylea, the company's commercial team understood that, if co-pay coverage for Eylea were not available, physicians would treat wet AMD patients with the far less expensive alternative treatment, Avastin.[3]  Compl. ¶ 39.  After launch, Regeneron's belief was confirmed; in early 2014, Regeneron understood that, because CDF had no funds available, a large retina clinic was "putting patients only on Avastin."  *Id.* ¶ 67 & Ex. 25.  Regeneron therefore understood that its delivery of co-pay coverage to patients, indirectly through CDF, would influence what drug those physicians chose to purchase for their patients.  Notably, Regeneron effectively concedes as much in its motion papers.  *See* Memo at 5-6 n.8 (recognizing that, even if Eylea had a lower price, "the out-of-pocket cost for most Part B patients would still have been cost-prohibitive").  In short, Regeneron's intent to induce arose from its understanding and deliberate exploitation of basic economic principles.

---

[3] While Regeneron asserts that Eylea is superior to Avastin and criticizes the government for purportedly endorsing Avastin as an alternate treatment, *see* Memo at 15-17, these arguments miss the point.  The government's complaint does not make a normative allegation that patients who received Eylea should have received Avastin.  Rather, the complaint makes the simple factual allegation that the availability of Medicare co-pay subsidies for Eylea as a result of Regeneron's kickbacks influenced physicians' purchasing and prescribing choices when deciding what medication to use.  *See* Compl. ¶¶ 39, 67 & Ex. 25.  A central purpose of the AKS is to ensure that patients and their physicians choose therapies without the influence of kickbacks.  *See* H.R. Rep. No. 92-231, at 104 (1972); *see also United States v. Ruttenberg*, 625 F.2d 173, 177 n.9 (7th Cir. 1980) (observing that "kickback schemes can freeze competing suppliers from the system, can mask the possibility of government price reductions, can misdirect program funds, and, when proportional, can erect strong temptations to order more drugs and supplies than needed").

Regeneron's use of CDF's product-specific data to determine the size of its payments to CDF further demonstrates Regeneron's intent to induce purchases of its product.  Regeneron's behavior shows it intended simply to use CDF as a conduit to subsidize its own patients' co-pays.  *See United States of America ex rel. Vitale v. MiMedx Group, Inc*., 381 F. Supp. 3d 647, 659 (D.S.C. 2019) (denying motion to dismiss where plaintiff alleged that defendant paid "Medicare coinsurance and copays, indirectly via its correlated charitable contribution funding of [a co-pay foundation], *to induce* patients on Medicare to purchase Defendant's products") (emphasis added).  Here, the complaint alleges that Daniels sought and received Eylea-specific data from CDF over a period of 18 months, and thus learned how much money Regeneron needed to pay CDF to cover Eylea patients' Medicare co-pays.  Compl. ¶¶ 36, 45, 48, 59, 65. Regeneron then correlated that data with its payments to CDF, *id.* ¶¶ 58, 63, 69, thus confirming its intent to subsidize Eylea co-pays and to induce the purchase of that drug only.  *See id.* ¶ 41 ("Regeneron did not want to pay for Lucentis's co-pay.").

Regeneron's subsequent use of CDF's Eylea-specific data to generate "ROI" analyses also shows Regeneron's intent to induce purchases of Eylea.  *See United States ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 515 (S.D.N.Y. 2014) (denying motion to dismiss complaint alleging that "Novartis's return-on-investment analyses revealed that this strategy was successful in inducing prescription-writing.  Accordingly, Novartis used the sham speaker events as a key mechanism to promote its drugs.").  The complaint alleges that Daniels convinced his superiors to pay CDF by showing them that Regeneron would net more than four times the amount of money that it paid CDF, and that Regeneron would lose sales if it did not pay CDF. Compl. ¶¶ 48, 50, 60.  These allegations show that Regeneron's intent was specifically to induce Medicare beneficiaries and their physicians to purchase more Eylea.

Contrary to Regeneron's contention, the court's decision *United States ex rel. Booker v. Pfizer Inc.*, 188 F. Supp. 3d 122 (D. Mass. 2016), does not cast doubt on the relevance of ROI analyses to show intent to induce in an AKS case.  *Cf.* Memo at 19.  The plaintiffs in *Booker* alleged that the defendant pharmaceutical manufacturer calculated the ROI on its physician "speaker programs" by analyzing prescriptions by attendees at those events.  *Id.* at 134.  The court specifically found, however, that "Pfizer did not track the prescriptions written by speakers."  *Id.*  Here, by contrast, the government alleges that Regeneron calculated the ROI on its payments to CDF using the claims that resulted from the prescriptions written by the physicians who ultimately received that remuneration.  *See* Compl. ¶¶ 46, 60, and Exs. 5, 18.

This is not a case where the payor of the kickback, Regeneron, merely "hoped or expected" that its payments to CDF would flow to Eylea patients.  *Cf.* Memo at 17-18 (quoting *McClatchey*, 217 F.3d at 834).  To the contrary, the complaint alleges that CDF, through Walley, told Regeneron the number of Eylea patients for whom CDF was actually covering Medicare co-pays, *i.e.*, the "actuals," as Daniels characterized the CDF figures.  Compl. ¶¶ 45 (describing spreadsheet showing how many Eylea patients were receiving co-pay coverage from CDF), 50 (stating that Regeneron's "[s]hare" of CDF's AMD fund in summer 2012 was approximately 6,200 patients), 54 (reporting in December 2012 that "we have 6800 patients being re-enrolled").[4]  Accordingly, Regeneron well understood that CDF was covering Eylea patients' Medicare co-pays.

---

[4] The government respectfully disagrees with the holding in *United States ex rel. Brown v. Celgene Corporation*, 226 F. Supp. 3d 1032 (C.D. Cal. 2016), where the court held that Celgene's payments to a co-pay foundation could not have violated the AKS because the relator presented no evidence that the payments "were contingent on the foundation's agreement to purchase or recommend Celgene's drugs." *Id.* at 1057.  In a case like this one, the relevant question with respect to the relationship between the manufacturer and the foundation is not whether the foundation agreed to purchase or recommend the manufacturer's drugs, but whether

> b.      The Inducement Element Of The AKS Does Not Require The
>         Government To Plead A *Quid Pro Quo*, Though It Does Here.

The complaint sufficiently alleges that Regeneron's payments via CDF constituted illegal

inducements because it contains allegations that a purpose of those payments was to induce

physicians to purchase Eylea on behalf of their patients.  Contrary to Regeneron's contention,

Memo at 20, the AKS does not require evidence of an explicit *quid pro quo*; instead, the statute

proscribes any remuneration, or offer of remuneration, whose purpose is "to induce" a purchase

reimbursable by a Federal health care program.  42 U.S.C. § 1320a-7b(b)(2).  As the court held

in *United States ex rel. Bawduniak v. Biogen Idec, Inc.*, No. 12-CV-10601-IT, 2018 WL

1996829 (D. Mass. Apr. 27, 2018), the government "need not show that a quid pro quo exchange

occurred, or that physicians would not have prescribed Defendant's medication but for the

kickbacks."  *Id.* at \*3.  Rather, the *Bawduniak* court held, "[i]t is sufficient to show that

Defendant paid kickbacks to a physician for the purpose of inducing the physician to prescribe

specific drugs, and that the physician then prescribed those drugs, *even if* the physician would

have prescribed those drugs absent the kickback."  *Id.* (emphasis in original); *see also United*

*States ex rel. Parikh v. Citizens Med. Ctr.,* 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013) ("The

AKS's plain language thus makes it unlawful for a defendant to pay a kickback with the intent to

induce a referral, whether or not a particular referral results."), *aff'd sub nom. United States ex*

*rel. Parikh v. Brown,* 762 F.3d 461 (5th Cir. 2014); *United States v. Teva Pharm. USA, Inc.,*

No. 13 CIV. 3702 (CM), 2019 WL 1245656, at \*24 (S.D.N.Y. Feb. 27, 2019) (holding that the

AKS does not require evidence of a *quid pro quo* arrangement); *United States ex rel. Kester v.*

---

the manufacturer knew that the foundation would use its money on the manufacturer's drugs, so
that the foundation functioned as a conduit for indirect kickbacks from the manufacturer to
physicians and/or their patients.

*Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 263 (S.D.N.Y. 2014) (holding that the AKS "does not require a kickback scheme to succeed in generating new business (*i.e.*, new patient prescriptions) in order for a violation to have occurred," and that "[a] pharmaceutical company violates the AKS if it 'offers' a kickback 'to induce'" recommendations to purchase the company's drugs) (quoting 42 U.S.C. § 1320a-7b(b)(2)).

Even if a *quid pro quo* were necessary to prove a violation of the AKS, the government's complaint meets that standard. The complaint specifically alleges that "Regeneron management understood from the outset that, absent the availability of Medicare co-pay coverage for Eylea, physicians would prescribe and purchase Avastin rather than Eylea." Compl. ¶ 39. (As noted above, Regeneron has already effectively admitted this allegation. *See* Memo at 5.) The complaint further alleges that Regeneron funded that Medicare co-pay coverage for Eylea through CDF, thereby enabling physicians to prescribe and purchase Eylea on behalf of their patients. *Id.* ¶¶ 58, 63, 65, 69.

The "basic timeline of diagnosis, prescription and co-pay assistance," Memo at 12, does not undercut the effect of Regeneron's illegal inducement under the AKS. As a preliminary matter, Regeneron's emphatic assertion that, "before a patient approaches CDF for any financial assistance, and before the physician collects the co-pay, the medical decision to prescribe EYLEA has already been made, and in many cases the drug has already been administered," *id.*, falls outside the four corners of the complaint and cannot form the basis for dismissal. *See Waterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) ("Ordinarily, of course, any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56."). Even if true, this assertion would provide no defense to Regeneron because it ignores that the

AKS prohibits knowingly and willfully offering or paying any remuneration with an intent to induce Medicare patients *to purchase* a Medicare-reimbursed drug (*i.e.* to fill a prescription with an illegal copay subsidy), 42 U.S.C. § 1320a-7b(b)(2)(B), regardless of whether any remuneration is offered to induce a physician to prescribe that drug in the first place. Regeneron's assertion that it can have no AKS liability for co-pay subsidies it provided via CDF because many patients already had a prescription for Eylea effectively reads section 1320a-7b(b)(2)(B) out of the statute, ignores that the AKS *separately* prohibits paying such remuneration to induce physician referrals (*e.g.,* prescriptions), *id.* at § 1320a-7b(b)(2)(A), and— taken to its conclusion—would mean that drug companies could directly pay the Medicare co-pays for their high-priced drugs so long as patients already had prescriptions for them.  Such a result would effectively eliminate the statutory Medicare co-pay requirements, 42 U.S.C. § 1395l(a)(1), and remove a check on the system that Congress designed to encourage, among other things, drug companies to price their products affordably.

Contrary to Regeneron's suggestion, the AKS does not apply merely to payments *before* the conduct that the payment is intended to induce; rather, as numerous courts have held, the prospect of future remuneration, such as a co-pay subsidy or commission, also may violate the statute.  *See Arriva*, 2020 WL 3840446, at *2 ("The waived balance then serves as an enticement for the patient to choose that healthcare provider, on the ground that the services are effectively free to him."); *United States ex rel. Cairns v. D.S. Med., L.L.C.*, No. 1:12CV00004, 2017 WL 3781807, at *1 (E.D. Mo. Aug. 31, 2017) (denying summary judgment to defendant where physician allegedly chose devices to use in surgeries because of commissions that "would be paid" after the surgeries); *Bilotta*, 50 F. Supp. 3d at 503 (denying motion to dismiss where physicians allegedly "had to maintain or increase that level of prescription-writing in order to be

invited to appear as a 'speaker' again").  As Regeneron acknowledges, "CDF guaranteed co-pay

assistance to patients," Memo at 8, so physicians who prescribed Eylea for their patients knew in

advance that CDF would reimburse them for the associated Medicare co-pays and that their

patients would not have to pay anything for the drug.

              c.      The AKS Does Not Require The Government To Plead Corruption
                     Of Clinical Decision-Making.

In support of its motion, Regeneron misstates the legal standard for determining unlawful

inducement under the AKS by adding an extra-statutory requirement that the remuneration must

be offered in return for an action that "improperly or corruptly" influences clinical decision-

making.  Memo at 11.  The plain language of the AKS contains no such requirement.  *Cf.* 42

U.S.C. § 1320a-7b(b).[5]  To be sure, as the court noted in *Guilfoile*, the potential for money to

corrupt clinical decision-making was a primary motivation for the passage of the AKS.  913 F.3d

at 192.  Nevertheless, corruption of judgment is inherently difficult to prove, and Congress did

not make it an element of the AKS.  Thus, the court in *United States ex rel. Greenfield v. Medco*

*Health Sols., Inc.*, 880 F.3d 89 (3d Cir. 2018), concluded that:

> the drafters of the Anti–Kickback Statute intended "to strengthen the capability of
> the Government to detect, prosecute, and punish fraudulent activities under the
> [M]edicare and [M]edicaid programs," H.R. Rep. No. 95-393, at 1 (1977),
> because "fraud and abuse among practitioners . . . is relatively difficult to prove
> and correct," *id*. at 47.  "Since the medical needs of a particular patient can be
> highly judgmental, it is difficult to identify program abuse as a practical manner
> unless the overutilization is grossly unreasonable."  *Id*.  This counsels requiring
> something less than proof that the underlying medical care would not have been
> provided but for a kickback.

*Id.* at 96; *see also United States ex rel. Wilkins v. United Health Grp., Inc*., 659 F.3d 295, 314

(3d Cir. 2011) (stating that "[t]he Government does not get what it bargained for when a

---

[5] Because this is not an honest services fraud case, Regeneron's reliance on *Skilling v. United States*, 561 U.S. 358 (2010), is inapposite.  *See* Memo at 11, 20.

defendant is paid by [the government] for services tainted by a kickback").  By setting forth clear

allegations that Regeneron paid money to induce physicians to purchase Eylea on behalf of their

patients, the government's complaint satisfies the inducement element of the AKS.

      3.      Payment May Be Made for Eylea, In Whole or In Part, Under Medicare.

The complaint sufficiently alleges not only that, in the words of the AKS, payment for

Eylea could be made "in whole or in part under" Medicare, but that Medicare in fact reimbursed

for claims that Regeneron's kickbacks induced.  *See* Compl. ¶¶ 29, 30 (discussing the cost of

Eylea for Medicare patients), 101 (discussing specific claims); *see also infra* at Section I.B.1.

      4.      The Complaint Alleges That Regeneron's Conduct Was Knowing And Willful.

The government has alleged that Regeneron knowingly and willfully violated the AKS.

In the context of the AKS, "[k]nowingly simply means to do something voluntarily, to do it

deliberately, not to do something by mistake or by accident or even negligently.  Willfully means

to do something purposely, with the intent to violate the law, to do something purposely that

[the] law forbids."  *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d

20, 33 (1st Cir. 1989) (quoting and affirming district court's jury instructions).

As to the "knowingly" aspect, the complaint clearly alleges that Regeneron acted

"voluntarily" in making payments to CDF that it knew would benefit Eylea patients.  *See, e.g.*,

Compl. ¶¶ 58, 63, 65, 69.

As to the "willfully" aspect, Regeneron knew that it could not cover an Eylea patient's

Medicare co-pay, either directly or through a co-pay foundation, but it did so nonetheless.  Early

on, Xcenda cited the AKS and advised Regeneron that "[f]ederal restrictions prevent

manufacturers from providing direct financial support to patients covered by federally funded

insurance programs."  Compl. Ex. 1 at 21.  Likewise, Regeneron knew that funding a foundation

that covered Medicare co-pays for Eylea also could implicate the AKS unless the company

adhered to strict conditions.  Xcenda, Cynthia Sherman, and Robert Davis all cautioned that, if

Regeneron chose to fund a foundation, it could not receive product-specific data concerning

foundation utilization.  *Id*. Ex. 1 at 30, ¶¶ 72-73.  Regeneron executives with responsibility for

managing the company's relationship with CDF later received HHS-OIG guidance reiterating

that, in order to avoid risk of an AKS violation, a pharmaceutical manufacturer could not use a

foundation as a "conduit" for remuneration to patients and thus could not use product-specific

data from the foundation to correlate its funding of the foundation with the foundation's spend

on co-pays for its drugs.  *Id.* ¶ 74.  Nonetheless, Regeneron did exactly what it knew it could not

do by obtaining Eylea-specific data from CDF and then using that data to correlate its funding of

CDF with CDF's spend on Medicare co-pays for Eylea.  *Id*. ¶¶ 43-70.  Such disregard of

warnings is clear evidence of willfulness.  *See United States v. Goodwin*, No. 19-2778, 2020 WL

5358651, at *3 (8th Cir. Sept. 8, 2020) (affirming AKS conviction and finding of willfulness

based in part on evidence that defendant flouted advice on how to proceed legally).

Lest there were any doubt the company's misconduct was willful, Regeneron executives

then repeatedly lied to company auditors and effectively covered up what they had done.  Compl.

¶¶ 75-88.  Such deceit is further clear evidence of willfulness.  *See United States v. Starks*, 157

F.3d 833, 839 n.8 (11th Cir. 1998) (finding evidence of willfulness sufficient where "[t]he

government produced ample evidence, including the furtive methods by which Siegel

remunerated Starks and Henry, from which the jury could reasonably have inferred that Starks

and Siegel knew that they were breaking the law"); *United States v. Williams*, 218 F. Supp. 3d

730, 736-37 (N.D. Ill. 2016) (upholding AKS conviction and finding that "a reasonable jury

could infer that [defendant] was aware her conduct was in some way unlawful" where evidence

showed that defendant refused to discuss payment arrangement over the telephone and created

phony documents in attempt to hide kickback scheme).

     **B.**     **The Complaint Sufficiently Alleges That Regeneron Violated the False Claims Act.**

          1.     Regeneron's Kickbacks Caused False Claims.

The complaint sufficiently alleges that Regeneron's kickbacks resulted in false claims

that physicians submitted for reimbursement to the Medicare program.  In 2010, Congress

amended the AKS to dispel any doubt that "a claim that includes items or services resulting from

a violation of [the Statute] constitutes a false or fraudulent claim for purposes of [the False

Claims Act]."  42 U.S.C. § 1320a-7b(g).  This amendment "clarif[ied]" that "all claims resulting

from illegal kickbacks are 'false or fraudulent' even when the claims are not submitted directly

by the wrongdoers themselves." 155 Cong. Rec. S10853 (daily ed. Oct. 28, 2009) (statement of

Sen. Kaufman).  In other words, kickback-tainted claims are false under the FCA even if, as

here, a third party, such as a physician, submits the claim.  Based on 42 U.S.C. § 1320a-7b(g),

the First Circuit held in *Guilfoile* that "'an AKS violation that results in a federal health care

payment is a per se false claim under the FCA.'"  913 F.3d at 190 (quoting *United States ex rel.

Lutz v. United States*, 853 F.3d 131, 135 (4th Cir. 2017)).

When physicians submitted Medicare claims for Eylea where Regeneron had subsidized

the co-pays through CDF, the claims "resulted from" Regeneron's kickbacks.  To prove a false

claim resulted from an AKS violation, the government need not show that the "kickback actually

influenced a patient's or medical professional's judgment" or "that the underlying medical care

would not have been provided but for a kickback."  *Greenfield*, 880 F.3d at 96-97; *see also Teva

Pharm. USA*, 2019 WL 1245656, at *23 ("[T]he FCA does not require the kickback to be the

'but for' cause of the prescription.").  Rather, as the *Greenfield* court held, "[f]or a False Claims

Act violation, Greenfield must prove that at least one of [the] claims sought reimbursement for medical care that was provided in violation of the Anti-Kickback Statute (as a kickback renders a subsequent claim ineligible for payment)."  880 F.3d at 98; *see also Guilfoile*, 913 F.3d at 190 (citing *Greenfield* and holding that, "if there is a sufficient causal connection between an AKS violation and a claim submitted to the federal government, that claim is false within the meaning of the FCA").  While the *Greenfield* court ultimately found that the relator failed to establish causation because he had not shown that the patients at issue received the recommendations prompted by the alleged kickbacks, 880 F.3d at 99, that is not the case here. The government's complaint identifies specific Eylea claims where CDF covered the co-pay with Regeneron funding.  *See United States ex rel. Wallace v. Exactech, Inc.,* No. 2:18-CV-01010-LSC, 2020 WL 4500493, at *19 (N.D. Ala. Aug. 5, 2020) (finding that relators sufficiently alleged a causal connection between payments from a medical device manufacturer to a physician and false claims submitted to Medicare by providing examples of twelve Medicare-insured patients who received the company's devices from that physician after the physician received the payments); *United States ex rel. Bawduniak v. Biogen Idec, Inc.,* No. 12-CV-10601-IT, 2018 WL 1996829, at *6 (D. Mass. Apr. 27, 2018) (finding complaint adequate where it alleged that the defendant pharmaceutical manufacture paid kickbacks to physicians, the physicians prescribed the defendant's medication, and claims based on those prescriptions were submitted to Medicare).

Regeneron points out that CDF could have used funding from Genentech, too, to cover Eylea co-pays, Memo at 23, but Regeneron knew that CDF would cease covering Medicare co-pays for Eylea altogether if Regeneron did not significantly increase its funding of CDF.  Compl. ¶¶ 48, 50, 53.  Daniels' ROI and lost sales analyses, which ultimately persuaded Regeneron

senior management to pay CDF $35 million in 2013, confirmed the company's understanding

that its payments to CDF generated Medicare claims and reimbursement for Eylea.  *See id.* ¶¶ 48,

50, 60.  Thus, the complaint properly pleads that Regeneron's kickback scheme resulted in

claims for Eylea to Medicare.

2.      Regeneron's AKS Violations Were "Material" For Purposes of the FCA.

The claims tainted by Regeneron's kickbacks were materially false.  Although materiality

is an element of the FCA, "the vast majority of courts to address this question after *Escobar* have

agreed . . . that AKS violations are per se material."  *United States ex rel. Gohil v. Sanofi U.S.*

*Servs. Inc.*, No. CV 02-2964, 2020 WL 4260797, at *14 & n.22 (E.D. Pa. July 24, 2020)

(collecting cases and citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S.

Ct. 1989 (2016)); *see also Guilfoile*, 913 F.3d at 190 ("We further read the AKS amendment as

obviating the need for a plaintiff to plead materiality – that is, to plead that compliance with the

AKS was material to the government's decision to pay any specific claim.").  Accordingly, by

pleading an AKS violation, the government has sufficiently pled materiality of the resulting false

claims.

3.      Regeneron's Conduct Was Knowing.

Finally, the complaint alleges that Regeneron knowingly caused the submission of false

claims to Medicare.  *See* 31 U.S.C. § 3729(a)(1)(A) (making unlawful the knowing submission

of false claims).  In the context of the FCA, "knowingly" means "that a person, with respect to

information" *either* "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance

of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of

the information."  31 U.S.C. § 3729(b)(1).  In the context of an FCA suit predicated on AKS

violations, allegations of scienter are sufficient where the defendant recklessly disregarded

guidance or other advice that warned against the conduct at issue.  *See, e.g., Mallinckrodt*, 2020
WL 362717, at *4 (finding allegation of scienter sufficient because, among other things,
defendant's "Reimbursement Manager emailed articles regarding the illegality of copay
subsidies for Medicare Part D patients to the Commercial VP during the relevant time period");
*United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 828-29 (S.D.N.Y. 2017)
(finding scienter where defendant allegedly disregarded its own policies and HHS-OIG
guidance); *Banigan*, 2016 WL 10704126, at *5 (finding allegations that defendants acted with
scienter sufficient where an employee of one defendant warned that defendants' relationship
violated AKS and where other defendants were aware of HHS-OIG Special Fraud Alert and
nonetheless continued to engage in conduct "with marked parallels to those frowned upon by that
Special Fraud Alert"); *United States ex rel. Decesare v. Americare in Home Nursing*,
No. 1:05CV696, 2011 WL 607390, at *6 (E.D. Va. Feb. 10, 2011) (finding scienter where
defendant disregarded warning from third party's attorney that defendant's conduct might violate
AKS); *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, No. 1:05-CV-2184, 2010 WL
1390661, at *11 (M.D. Pa. Mar. 31, 2010) (finding scienter where defendant allegedly ignored
employees who raised concerns that defendant's actions violated AKS).  As discussed above,
Regeneron knew the rules and disregarded them.  This is sufficient.  *See Gohil*, 2020 WL
4260797, at *13 (noting that, because "[t]he AKS's scienter element is harder to meet than the
FCA's scienter standard," allegations that satisfy the AKS's scienter standard also satisfy the
FCA's scienter standard).

## II.     THE COMPLAINT ALLEGES FALSE CLAIMS WITH PARTICULARITY.

The complaint sufficiently alleges details concerning specific false claims that
Regeneron's kickbacks caused.  Because FCA actions "sound in fraud," a complaint alleging

FCA violations must satisfy Federal Rule of Civil Procedure 9(b). *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 37 (1st Cir. 2017). The rule requires that the plaintiff specify "the who, what, where, when, and how of the alleged fraud." *United States ex rel. Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 123 (1st Cir. 2013) (citations and internal quotation marks omitted). The government has pleaded each of these elements:

- The government has pled the "who," identifying not only the perpetrator of the alleged scheme – Regeneron – but also identifying the key players involved in determining how much money Regeneron would need to cover Medicare co-pays for Eylea. *See generally* Compl. ¶¶ 43-68. The complaint also identifies "who" authorized the payments, *i.e.*, the company's Chief Executive Officer, Leonard Schleifer, and Chief Financial Officer, Murray Goldberg. *Id.* ¶¶ 55, 57.

- The government has pled the "what" and "when" describing the specific payments that Regeneron made to CDF and when it made those payments. *See id.* ¶¶ 41, 58, 63, 69. In addition, the complaint alleges numerous claims that the government reimbursed and that resulted from Regeneron's payments to Eylea patients via CDF. *Id.* ¶ 101. *See Mallinckrodt*, 2020 WL 362717, at *3 (denying motion to dismiss where government's "Complaint includes more than 120 specific examples of claims submitted to Medicare on behalf of Acthar patients that received copay subsidies from CDF, which exceeds the pleading requirement").[6]

---

[6] The complaint's allegations are sufficient even absent the government's inclusion of, in paragraph 101, the identity of the physician who submitted each example of a false claim. *Cf.* Memo at 30. If the Court deems this information necessary to satisfy Rule 9(b), which it should not given the standard applicable to FCA cases predicated on an inducement theory, *see Ge*, 737 F.3d at 124, the government respectfully requests leave to replead its complaint to include it. In any event, should Regeneron request this information in discovery, the government will produce it.

- The "where" was always at Regeneron's offices.  *See, e.g., id.* Ex. 6 (describing meeting regarding "Foundation Funding considerations" in "Bob T[erifay]'s office").

- Finally, the complaint sets forth "how" Regeneron's commercial team correlated the company's payments to CDF with CDF's spend on Eylea and hid the basis for those payments from the company's internal auditors.  *Id.* ¶¶ 44-69, 75-89.

In short, the complaint alleges more than sufficient detail about the alleged kickback scheme.

## III.   REGENERON'S REMAINING LEGAL DEFENSES FAIL.

### A.   The First Amendment Does Not Protect Regeneron's Kickbacks.

This case, as alleged, is based on conduct – kickbacks – not speech.  *See United States ex rel. Nevyas v. Allergan, Inc.*, No. 09-432, 2015 WL 3429381, at *1 n.1 (E.D. Pa. May 26, 2015) ("[I]t is Allergan's conduct in providing 'illegal remuneration' to physicians and optometrists and not its speech that is at issue in the AKS claim."); *United States v. Mathur*, No. 2:11-cr-00312, 2012 WL 4742833, at *10 (D. Nev. Sept. 13, 2012) (holding that the AKS "does not regulate speech protected by the First Amendment.  Rather, it regulates the conduct of paying or offering to pay remuneration in return for Medicare or Medicaid referrals.").  As the Supreme Court held in *Wisconsin v. Mitchell*, 508 U.S. 476 (1993), "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  *Id.* at 488-89, *quoted in United States v. Facteau*, No. 1:15-cr-10076-ADB, 2020 WL 5517573, at *12 (D. Mass. Sept. 14, 2020).  Here, the government does not allege that Regeneron violated the law simply because it received and used data from CDF.  *Cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011).  Instead, the complaint alleges that Regeneron acted with scienter because it knew from CDF data that its money enabled CDF to cover Medicare co-pays

for Eylea patients.  A drug company has no First Amendment right to knowingly pay kickbacks intended to cause providers to purchase or prescribe the company's drugs.

The First Amendment does not preclude conduct from becoming illegal merely because the conduct may be carried out by means of speech.  For example, in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 497-98 (1949), the Supreme Court held that union picketing was lawfully enjoined where, in addition to promoting truthful facts about a labor dispute, the picketing was also part of a scheme designed to pressure a company to join an illegal restraint on trade.  Similarly, a pharmaceutical company may not immunize itself from AKS liability simply by using speech to accomplish the plainly impermissible goal of paying kickbacks and causing the submission of false claims to the government.  If holding such a defendant liable burdens the defendant's speech at all, it does so only in a manner incidental to the course of conduct that the AKS and FCA regulate.

There is also no support in the law for Regeneron's suggestion that there should be a unique First Amendment test applied to AKS cases that involve supposed charities.  *Cf.* Memo at 26.  If Regeneron and CDF were engaged in an endeavor that was purely charitable, their conduct would not have implicated the AKS.  As the complaint alleges in great detail, however, Regeneron's payments to CDF had only a veneer of charity.

### B.      The Anti-Kickback Statute Does Not Violate The Fifth Amendment.

#### 1.      The AKS Is Constitutional.

An argument of facial invalidity faces a "dauntingly high hurdle."  *Donovan v. City of Haverhill*, 311 F.3d 74, 77 (1st Cir. 2002).  In considering vagueness, courts consider a number of factors, including whether the challenged statute contains a sufficiently stringent scienter requirement, such as the knowing and willful requirement of the AKS.  *See Village of Hoffman*

*Estates v. The Flipside*, *Hoffman Estates, Inc.*, 455 U.S. 489, 498–500 (1982) (scienter is one of four factors).

It is settled law that the AKS is sufficiently definite to withstand Fifth Amendment scrutiny, and is not facially vague. *Bay State Ambulance*, 874 F.2d at 33; *see also Hanlester Network v. Shalala*, 51 F.3d 1390, 1398 (9th Cir. 1995) (holding that the AKS is not vague and noting that courts also have held prior versions of the AKS not to be unconstitutionally vague); *United States v. Starks*, 157 F.3d 833, 838-39 (11th Cir. 1998) (finding "no reason to view the Anti–Kickback statute as vague" and that "giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal"). As the First Circuit held in *Bay State*, "[t]he unusually high scienter requirement [in the AKS] 'mitigate[s] [any] vagueness, especially with respect to the adequacy of notice to the [defendant] that his conduct is proscribed.'" 874 F.2d at 33 (quoting *Hoffman Estates*, 455 U.S. at 499).

Meanwhile, the 2005 Guidance is not law, and it does not define a criminal offense or fix a penalty. Accordingly, it cannot be unconstitutionally vague. *See Beckles v. United States*, 137 S. Ct. 886, 892 (2017) (recognizing that the Supreme Court has only invalidated two kinds of criminal laws as void for vagueness: "laws that define criminal offenses and laws that fix the permissible sentences for criminal offenses"). The government's complaint cited the 2005 Guidance only to show that Regeneron had received warnings that its conduct was illegal. *See* Compl. ¶ 74; Department of Justice, Justice Manual § 1-20.201 (2018) ("Where a guidance document describes a relevant statute or regulation, the Department may use awareness of the guidance document (or its contents) as evidence that the party had the requisite scienter, notice, or knowledge of the law."). Contrary to Regeneron's suggestion, the complaint does not allege that Regeneron violated the AKS because it violated the 2005 Guidance; rather, the complaint

alleges that Regeneron violated the AKS by paying remuneration indirectly to physicians on behalf of their patients, and that Regeneron's awareness of the 2005 Guidance evidences its willfulness.

2.  Regeneron Had Fair Notice.

Regeneron's behavior further demonstrates that it had fair notice of what the AKS prohibited.  When analyzing the fair notice aspect of a due process challenge, the court must look at the specific facts as alleged and as applied to the specific defendant.  *See United States v. Zhen Zhou Wu*, 711 F.3d 1, 14 (1st Cir. 2013).  Here, not only did Regeneron, a large and sophisticated pharmaceutical company, allegedly receive warnings from multiple sources that its conduct was illegal, *see* Compl. ¶¶ 72-74, it also allegedly engaged in a lengthy and elaborate cover-up scheme that involved multiple lies to auditors and alteration of a crucial e-mail.  *See id.* ¶¶ 75-88.  These allegations are more than sufficient to show that Regeneron well understood the law and hardly lacked fair notice.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Regeneron's Motion to Dismiss.

Dated:  September 21, 2020                    Respectfully submitted,

                                             ANDREW E. LELLING
                                             United States Attorney

                                             /s/ Evan D. Panich
                                             GREGG SHAPIRO
                                             EVAN D. PANICH
                                             DAVID G. LAZARUS
                                             LINDSEY ROSS
                                             Assistant United States Attorneys
                                             1 Courthouse Way, Suite 9200
                                             Boston, MA 02210
                                             (617) 748-3100
                                             gregg.shapiro@usdoj.gov
                                             evan.panich@usdoj.gov
                                             david.lazarus2@usdoj.gov
                                             lindsey.ross@usdoj.gov