**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        *Plaintiff,*<br><br>v.<br><br>REGENERON PHARMACEUTICALS, INC.,<br><br>        *Defendant.* | **Civil Action No.<br>20-11217-FDS**<br><br>LEAVE TO FILE GRANTED<br>ON SEPTEMBER 22, 2020 |

**REPLY IN SUPPORT OF REGENERON'S MOTION TO DISMISS THE
GOVERNMENT'S COMPLAINT UNDER RULES 12(B)(6) AND 9(B)**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.  THE GOVERNMENT HAS FAILED TO SUPPORT KEY ELEMENTS
    OF ITS CLAIMS. ........................................................................................................ 2

    A.  The Government Must Show that any Inducement was *Improper*. ................... 3

    B.  CDF Did Not Act as a Conduit for Regeneron. .................................................. 4

        1.  *There was no conspiracy between Regeneron and CDF* ............................ 4

        2.  *Regeneron's intent to benefit patients is not equivalent to an
            intent to induce referrals* ............................................................................. 6

        3.  *Physicians and patients did not know they would receive
            CDF assistance.* ........................................................................................... 6

        4.  *The cases cited by the Government are entirely distinguishable
            and inapposite* ............................................................................................. 7

    C.  The Government Does Not Identify the Alleged Kickback Recipient ................. 8

II. THE GOVERNMENT'S EFFORTS TO PLEAD FRAUD WITH
    PARTICULARITY ARE INADEQUATE ................................................................. 9

III. THE GOVERNMENT'S AKS THEORY IMPROPERLY INFRINGES UPON
    PROTECTED SPEECH ............................................................................................ 11

CONCLUSION ..................................................................................................................... 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*United States ex rel. Bawduniak v. Biogen Idec., Inc.*,
   No. 12-cv-10601-IT, 2018 WL 1996829 (D. Mass. Apr. 27, 2018)..........................................9

*United States ex rel. Bilotta v. Novartis Pharm. Corp.*,
   50 F. Supp. 3d 497 (S.D.N.Y. 2014)..........................................................................................8

*United States ex rel. Goodman v. Arriva Medical, LLC*,
   --- F.Supp.3d ----, 2020 WL 3840446 (M.D. Tenn. July 8, 2020)............................................7

*United States ex rel. Greenfield, v. Medco, Health Sols., Inc.*,
   880 F.3d (3d Cir. 2018)...............................................................................................................9

*United States ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*,
   772 F.3d 1102 (7th Cir. 2014) ....................................................................................................7

*Guilfoile v. Shields*,
   913 F.3d 178 (1st Cir. 2019)................................................................................................3, 8

*United States ex rel. Kester v. Novartis Pharm. Corp.*,
   23 F. Supp. 3d 242 (S.D.N.Y. 2014)......................................................................................8, 9

*United States ex rel. Ruscher v. Omnicare, Inc.*,
   663 Fed. Appx 368 (5th Cir. 2016).............................................................................................6

*United States ex rel. STF, LLC v. Vibrant Am., LLC*,
   16-cv-2478, 2020 WL 4818706 (N.D. Cal. Aug. 19, 2020) .......................................................7

*United States ex rel. Strunck v. Mallinckrodt ARD, LLC*,
   Nos. 12-175, 13-1776, 2020 WL 362717 (E.D. Pa. Jan. 22, 2020).......................................5, 7

*United States v. Celgene Corp.*,
   226 F. Supp. 3d 1032 (C.D. Cal. 2016) ..............................................................................5, 6, 8

*United States v. McClatchey*,
   217 F.3d 823 (10th Cir. 2000) ................................................................................................3, 6

*United States v. Medtronic*,
   189 F. Supp. 3d 259 (D. Mass. 2016) ......................................................................................10

*United States v. Teva Pharms. USA, Inc.*,
   No. 1:20-cv-11548-NMG, Dkt. 18 (D. Mass., Sept. 17, 2020) ............................................2, 4

*United States ex rel. Vitale v. MiMedx Group, Inc.*,
    381 F. Supp. 3d 647 (D.S.C. 2019) ..................................................................................... 7

**Other Authorities**

HHS-OIG, Special Advisory Bulletin on Patient Assistance Programs for
    Medicare Part D Enrollees, 70 Fed. Reg. 70623 (Nov. 22, 2005) ................................. 3, 5, 11

Fed. R. Civ. P. 9(b) ........................................................................................................ 2, 9, 10

Defendant Regeneron Pharmaceuticals, Inc. ("Regeneron" or the "Company") respectfully submits this Reply in support of its Motion to Dismiss the government's Complaint.

## INTRODUCTION

Regeneron made donations to an independent patient assistance foundation, which allowed patients, regardless of financial need, to obtain whatever drug their physician prescribed for them. The government does not and cannot deny that Regeneron could not direct its donations to EYLEA patients. Instead, the government's Opposition to Regeneron's Motion to Dismiss (the "Opposition") introduces allegations not found in the Complaint, mischaracterizes exhibits, advances extreme legal positions that reinvent the applicable statutes, and twists the case law to support these new theories. Despite this, the government cannot transform the allegations into plausible theories of liability.

The Complaint must be dismissed for three principle reasons. First, relevant OIG guidance and the weight of the case law in this circuit flatly contradicts the government's argument that inducement under the AKS need not be "improper" and that *all* "[c]o-pay subsidies…constitute illegal remuneration for purposes of the AKS." Opp'n at 14.

Second, the government's conclusory argument that CDF acted as a conduit for Regeneron to funnel illegal kickbacks to doctors and patients is belied by the accompanying exhibits, which rule out any possibility that Regeneron's donations to CDF improperly influenced doctors and patients. To the contrary, the Complaint and its exhibits demonstrate that CDF's independence was absolute, and neither doctors nor patients had any way to know whether CDF would approve co-pay assistance until after the prescribing decision was made. Save for the conclusory arguments from the government, there is no allegation that Regeneron had any control over whether CDF used Regeneron's donations to assist EYLEA patients. Indeed, the government recently represented to Judge Gorton that it is *not* alleging that

1

Regeneron and CDF conspired to funnel Regeneron funds to EYLEA patients. *See United States v. Teva Pharms. USA, Inc.*, No. 1:20-cv-11548-NMG, Dkt. 18 (D. Mass., Sept. 17, 2020).

Finally, even if the government somehow has pleaded a plausible theory of liability under the AKS—which it has not—the Complaint must still be dismissed because the details of the purported fraud are not pled with sufficient particularity. Rather, the government purports to allege wrongful conduct at Regeneron, and then identifies—seemingly at random—EYLEA claims contemporaneous with that conduct. Rule 9(b) and *Iqbal* require more. Moreover, the government's theory violates constitutional safeguards: the government acknowledges that the only reason Regeneron's donations were unlawful was that it received information from CDF, purportedly in violation of ambiguous guidance—not law—from OIG. For all these reasons, the Complaint must be dismissed.

## ARGUMENT

### I. THE GOVERNMENT HAS FAILED TO SUPPORT KEY ELEMENTS OF ITS CLAIMS.

While Regeneron may have "hope[d] or expect[ed]" that its donations to CDF would help patients access EYLEA, the law is clear that such an expectation is insufficient to allege a violation of the AKS. Rather, to state a plausible claim of inducement under the AKS, the government must allege that Regeneron had an agreement with CDF to funnel its donations directly to EYLEA patients. The government does not allege any such conspiracy in this case (and, in fact, has specifically disavowed any such theory). The government is thus unable to convert Regeneron's mere "hope and expectation" to induce EYLEA sales into an AKS violation.

### A.  The Government Must Show that any Inducement was *Improper*.

The government argues that it need not show that the purported remuneration is intended to "'improperly or corruptly' influence[] clinical decisionmaking," Opp'n at 22. The government is wrong.

First, courts—including the First Circuit—have long recognized that the AKS *requires* that a defendant intend to *improperly* or *corruptly* influence the recipient's *decision-making* about items reimbursed by federal healthcare programs.[1] "Hope or expect[ation]" of profit[2] and the existence of cheaper, off-label alternatives[3], *see* Opp'n at 16, simply do not satisfy the government's burden to plead that intent.

Second, the government's argument cannot be reconciled with OIG's 2005 Guidance, which affirmed the principle that charitable foundation donations to assist patients make their co-pays are lawful so long as the foundations do not "***impermissibly influence*** beneficiaries' drug choices."  Special Advisory Bulletin: Patient Assistance Programs for Medicare Part D Enrollees, 70 Fed. Reg. 70624, 70627 (Nov. 22, 2005) ("2005 Guidance") (emphasis added). The government's argument also ignores that CDF provides co-pay support to patients irrespective of which drug was prescribed by physicians and without Regeneron's involvement. *Cf.* Memo at 11 (citing Compl. Ex. 1; Compl. Ex. 10). Given that fact, there is no set of

---

[1] *See, e.g., Guilfoile v. Shields*, 913 F.3d 178, 192-93 (1st Cir. 2019) ("[T]he heartland of what the AKS is intended to prevent [is] the use of payments to improperly influence decisions on the provision of health care that lead to claims for payment to federal health care programs.").
[2] *United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000) (Defendant "cannot be convicted merely because they hoped or expected or believed that referrals may ensue from remuneration that was designed wholly for other purposes.")
[3] The government's suggestion that its "complaint does not make a normative allegation that patients who received Eylea should have received Avastin," Opp'n at 16 n.3, is simply not true. The government clearly alleges that it has suffered financial loss because, if not for the availability of co-pay assistance, physicians would prescribe Avastin for patients with wet AMD.  Compl. ¶ 30.  The government's effort to shy away from its own theory speaks volumes, particularly where Avastin is an unapproved, off-label, untested, and unsafe compounded drug.

3

circumstances in which Regeneron's donations could have *improperly* induced an EYLEA prescription.

### B.     CDF Did Not Act as a Conduit for Regeneron.

The government acknowledges that an essential element of its case is that CDF functioned as a conduit for Regeneron to provide kickbacks to doctors and patients. *See, e.g.*, Opp'n at 17. However, the Complaint's exhibits conclusively demonstrate that CDF's AMD fund: (1) was funded by multiple donors; (2) provided co-pay assistance for multiple FDA-approved drugs; and (3) disbursed those funds on a first-come, first-served basis without regard to which drug was prescribed. Memo at 8-9 (citing Compl. Ex. 10, p. 1, ¶ 5(b); Ex. 1, p. 57); Memo at 32. Regeneron could not control or direct its donations to patients who received EYLEA, and the government does not allege otherwise. The government acknowledges that CDF used donations from Regeneron to fund co-pays for other, non-Regeneron AMD drugs (*i.e.*, Lucentis), and vice versa. There is no allegation that CDF favored EYLEA patients, diverted Regeneron's funds to EYLEA patients, or conditioned co-pay support on a physician prescribing EYLEA. In short, the government's own allegations show that CDF was not intended to be, and could not be, used as a conduit. This alone requires that the Complaint be dismissed.

####     1.     *There was no conspiracy between Regeneron and CDF.*

The government recently admitted to Judge Gorton that it is not alleging any conspiracy between Regeneron and CDF to direct money to EYLEA patients. *See United States v. Teva Pharmaceuticals USA, Inc.*, No. 1:20-cv-11548-NMG, Dkt. 18 (D. Mass., Sept. 17, 2020). The government thus twists the "relevant question" into "whether the manufacturer knew that the foundation would use its money on the manufacturer's drugs so that the foundation functioned as a conduit for indirect kickbacks." Opp'n at 15-16 (collecting cases). But this position directly contradicts what OIG has told pharmaceutical manufacturers for the last 15 years and creates a

false comparison. OIG acknowledges that manufacturers donating to funds expect that their donations would benefit patients taking their drugs. Indeed, OIG guidance further acknowledges that even donations to charitable funds supporting single drugs do not, standing alone, create AKS violations.[4] The cases cited by the government are entirely consistent with this position. *See* I.B.4, *infra*.

Further, the government's own exhibits highlight that Regeneron had no control over which drugs CDF funded: "Donations to co-pay charities have several limitations, such as no control over which product is supported …." Compl. Ex. 1 at 57. Thus, absent allegations that CDF earmarked Regeneron dollars for Regeneron's drug—which did not occur, and which the government does not allege—Regeneron's contributions to CDF cannot constitute a kickback.

The government's repeated citations to purportedly improper internal communications do not change this conclusion. For example, the government argues that communications among Regeneron employees discussing CDF projections are evidence of an "intent to induce purchases of its product," Opp'n 17-18, 26, but the government ignores Regeneron's undisputed lack of control over how CDF spent its donations. In short, because the government has not alleged an agreement between Regeneron and CDF to channel money to EYLEA patients, it cannot allege an AKS violation. *Compare United States ex rel. Strunck v. Mallinckrodt ARD, LLC*, Nos. 12-175, 13-1776, 2020 WL 362717, at *2 (E.D. Pa. Jan. 22, 2020) (manufacturer "designed" fund that covered only a single drug, and "prevented other drugs from being financed through the fund."), *with United States v. Celgene Corp.,* 226 F. Supp. 3d 1032, 1057 (C.D. Cal. 2016) (payments of tens of millions of dollars per year to co-pay assistance foundation were not kickbacks where there was "no evidence that these donations were contingent on the

---

[4] The Guidance notes that even in such "unusual circumstances, the fact that a disease category only includes one drug or manufacturer would not standing alone, be determinative of an anti-kickback statute violation." 2005 Guidance, n.19.

foundation's agreement to purchase or recommend Celgene's drugs"). Regeneron's donations to CDF, which allocated funds to patients with AMD on a first-come, first-served basis, without regard to the treatment prescribed, do not violate the AKS.

### 2. *Regeneron's intent to benefit patients is not equivalent to an intent to induce referrals.*

The government argues that merely *intending* to benefit EYLEA patients or knowing that CDF would use some donated funds to pay EYLEA co-pays will sustain its burden. Opp'n 15-19, n. 4. The government is wrong. Courts have repeatedly held that mere "hope," "expectation," or "belief" that remuneration intended for other purposes will cause prescriptions cannot sustain an AKS violation. *See McClatchey*, 217 F.3d at 834 (a defendant cannot be convicted under the AKS "merely because [he] hoped or expected or believed that referrals may ensue from remuneration."); *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 Fed. Appx 368, 374 (5th Cir. 2016) ("There is no AKS violation, however, where the defendant merely hopes or expects referrals from benefits that were designed wholly for other purposes.").

### 3. *Physicians and patients did not know they would receive CDF assistance.*

The CDF guidelines—most notably the first-come, first-served requirement—make clear that neither physicians nor patients knew whether they would receive CDF assistance at the time EYLEA was prescribed. Even the Complaint confirms this fact. Specifically, CDF's claim submission process requires specific information such as treatment name, service date, day supply, and quantity *before* a patient could apply for co-pay assistance. Compl. ¶ 35 (citing https://www.mygooddays.org/epay/EPay_Billing%20Guide.pdf). Only after the physician submits the request can CDF determine whether a patient is eligible for co-pay assistance. *Id*. Because this information is required before a physician even submits a claim to CDF, it is **impossible** for a physician to know whether a particular patient will receive co-pay assistance

from CDF when prescribing EYLEA. If the request is not approved, the patient is still responsible for paying, and the physician is responsible for collecting the co-pay.

These facts eliminate the possibility that Regeneron's donations were intended to, or even could (as a matter of cause and effect), improperly influence doctors and patients.

        4.     *The cases cited by the Government are entirely distinguishable and inapposite.*

The cases cited by the government are distinguishable and actually support Regeneron's position. In *Mallinckrodt*, the court sustained the complaint because the manufacturer asked CDF to create a custom-designed fund that covered only a single drug produced by the defendant. 2020 WL 362717, at *4 (noting the company "insisted on structuring the CDF funds such that only [the manufacturer's drug] would be covered"). Similarly, in *MiMedx*, the court accepted a conduit theory only because the manufacturer had manipulated the funding process by *encouraging* its sales representatives to identify eligible patients, draft patients' applications, and submit those applications in concert with the manufacturer's donations to ensure the manufacturer's donations would benefit only patients taking its drug. *See United States ex rel. Vitale v. MiMedx Group, Inc.*, 381 F. Supp. 3d 647, 651, 659 (D.S.C. 2019).[5]

In contrast, where, as here, a fund acts independently of the manufacturer, and there is no

---

[5] The other cases cited within the Opposition's lengthy string cites are similarly distinguishable. For example, many of the other cases relied upon by the Opposition require knowledge on the part of the prescribing physician that co-pay assistance will be granted, typically through marketing or advertising efforts by the manufacturer. *See United States ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102, 1106 (7th Cir. 2014) (noting that the failure to collect a co-pay by pharmacy could only serve as the basis for an FCA claim where the customer had knowledge of the kickback and it was part of their decision making process, by reciting that the plaintiff had failed to allege "facts that would support his allegation that the waivers were advertised."); *United States ex rel. STF, LLC v. Vibrant Am., LLC*, 16-cv-2478, 2020 WL 4818706, at *15-16 (N.D. Cal. Aug. 19, 2020) (noting that routine waivers of/failure to collect co-pays by a manufacturer can serve as an AKS violation, where a defendant commits to such an action, and allows the prescribing physician to reassure patients that they will not be responsible for payment) (citing *United States ex rel. Riedel v. Bos. Heart Diagnostics Corp.*, 332 F.Supp.3d 48, 66-67 (D.D.C. 2018)); *United States ex rel. Goodman v. Arriva Medical, LLC*, --- F.Supp.3d ----, 2020 WL 3840446, at *2 (M.D. Tenn. July 8, 2020) (noting, as dicta in an opinion that otherwise wholly concerned a discovery dispute, that co-pay waivers can be considered AKS violations "because they amount to paying someone to choose one provider over another.").

agreement to channel donations to particular patients, there can be no AKS violation. *See Celgene*, 226 F. Supp. 3d at 1057 (manufacturer was not liable under AKS for donations to co-pay foundation because there was no evidence that donations "were contingent on the foundation's agreement to purchase or recommend [manufacturer's] drugs"). To hold otherwise would criminalize all donations to co-pay foundations so long as the foundation supports patients taking a drug manufactured by the donor. That is contrary to the law.

### C. The Government Does Not Identify the Alleged Kickback Recipient.

The government's case also is fatally flawed because it *still* fails to identify the alleged kickback recipient. Instead, the government straddles—and in some cases casually ignores—the distinction between physician-inducement and patient-inducement theories. *See* Opp'n at 13 ("[T]he government must allege that Regeneron: (1) paid money via CDF; (2) to induce *physicians or patients* to purchase Eylea . . . ." (emphasis added)). The government's approach ignores controlling law. The First Circuit has held that the AKS "targets any remunerative scheme through which a *person* is paid in return for referrals." *Guilfoile*, 913 F.3d at 189 (emphasis added). While an alleged kickback can be provided indirectly, a complaint still must identify the recipient who was improperly induced.[6] The government has failed to do so, and this failure stands in stark contrast to the allegations in cases cited in the government's Opposition on this point. For example, in *Bilotta*, relators alleged that defendant "systematically bribed *doctors* to induce them to prescribe [defendant's] drugs." *United States ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 501 (S.D.N.Y. 2014) (emphasis added). In *Kester*, the government alleged that defendant "offer[ed] *pharmacies* kickbacks to induce them to recommend its drugs to doctors or patients." *United States ex rel. Kester v. Novartis Pharm.*

---

[6] Neither the government's efforts to plead fraud with particularity, which focus solely on Regeneron employees, *see* Opp'n at 28-30, nor their efforts to identify purported false claims, which need not have been filed by the party who was induced, *see* Opp'n at 25, satisfy this burden.

8

*Corp.*, 23 F. Supp. 3d 242, 246 (S.D.N.Y. 2014) (emphasis added).  And in *Biogen*, "[r]elators allege[d] that Biogen paid illegal kickbacks to *healthcare providers* by retaining providers in sham consulting and speaking programs."  *United States ex rel. Bawduniak v. Biogen Idec., Inc.*, No. 12-cv-10601-IT, 2018 WL 1996829, at *1 (D. Mass. Apr. 27, 2018) (emphasis added).

The government also makes the fallacious and insufficient argument that all Medicare patients who received co-pay assistance from CDF for EYLEA necessarily submitted a false claim.  This ignores that "[a] kickback does not morph into a false claim [under the FCA] unless a particular patient is exposed to an illegal recommendation or referral."  *United States ex rel. Greenfield, v. Medco, Health Sols., Inc.*, 880 F.3d at 89, 100 (3d Cir. 2018).  Theories of liability that rely upon ephemeral considerations such as temporal proximity between the receipt of co-pay assistance and the false claim, or that consider all claims submitted by recipients of co-pay assistance to be tainted without looking to whether there has been an illegal recommendation, have been rejected.  *See id.*  Despite its 35-page Complaint, more than 200 pages of exhibits, and 33 pages of briefing, the government has failed to allege facts demonstrating how even one person was exposed to such an improper recommendation.[7]  For each of the above reasons, the Complaint fails to state a viable claim.

**II.  THE GOVERNMENT'S EFFORTS TO PLEAD FRAUD WITH PARTICULARITY ARE INADEQUATE.**

The government also cannot satisfy Rule 9(b) because it has failed to plead facts showing—even theoretically—how an alleged kickback recipient could be improperly influenced to purchase or prescribe EYLEA.  The government argues that it is sufficient for the Complaint to identify the "perpetrator of the fraud."  *See* Opp'n at 29 (citing "Regeneron" and

---

[7] As set forth above, no patient or physician knows whether they will be approved for co-pay assistance by CDF until after both doctor and patient have already decided to use a particular treatment.

9

Regeneron's CEO "Leonard Schleifer" as the "who," and the dates of Regeneron's donations to CDF as the "when"). That is incorrect: the government is required to set forth "particularized allegations of *who received [kickbacks] and when.*" *United States v. Medtronic,* 189 F. Supp. 3d 259, 272 (D. Mass. 2016) (emphasis added). But the government merely re-states allegations from the Complaint and lists patient initials, dates of service, co-pay amounts, and other perfunctory information concerning 11 patients who purportedly received co-pay assistance from CDF. But the government never articulates "*how*" Regeneron purportedly intended to induce patients to purchase, or physicians to prescribe, EYLEA. This shortcoming is particularly important here because patients approach CDF with a prescription already in hand, *see* Compl. ¶ 35, and co-pay assistance was available for any on-label drug, *see* Compl. Ex. 1, p. 57; Compl. Ex. 10.

In an attempt to overcome this issue, the government improperly argues for the first time in its Opposition, without citation, that "physicians who prescribed Eylea for their patients *knew in advance that CDF would reimburse them* for the associated Medicare co-pays and that their patients would not have to pay anything for the drug." Opp'n at 22 (emphasis added). Such an unsupported allegation—which could not possibly be true and is entirely contradicted by the exhibits attached to the Complaint—is not found in the Complaint.[8] Instead, it is the latest in a series of conclusory and contradictory allegations designed to avoid dismissal. These allegations form the heart of the government's drafting strategy and also go to the heart of what Rule 9(b) is designed to prevent.

---

[8] In support of this impermissible argument, the government grossly mischaracterizes Regeneron's statement regarding CDF "guaranteeing" co-pay assistance to patients, which was that "CDF guaranteed co-pay assistance to patients *regardless of the drug regimen prescribed.*" Memo at 8 (emphasis added).

10

## III. THE GOVERNMENT'S AKS THEORY IMPROPERLY INFRINGES UPON PROTECTED SPEECH.

The Opposition fails to justify the government's intrusion into charitable speech by resorting to more of the same tactics. Specifically, the Opposition claims that it "does not allege that Regeneron violated the law simply because it received and used data from CDF," Opp'n at 30, while ignoring the allegations seeking to regulate Regeneron's receipt of data from CDF that form the core of the claims against the company, *see generally* Compl. ¶¶ 36-70 (dedicating 35 paragraphs to Regeneron's receipt and use of data); Opp'n at 6-11 (committing five pages to the same). But that is not true. The government reiterates in its Opposition that it was Regeneron's receipt and use of data from CDF that "shows it intended simply to use CDF as a conduit." Opp'n at 17.

The conduct at issue here is lawful under both the FCA and AKS: manufacturers can donate to independent foundations, patients can receive support from those foundations, doctors can collect co-pays from those patients, and companies like Regeneron can profit from those sales. The only aspect of this entire process to which the government objects is that "Regeneron did exactly what it knew *it could not do by obtaining Eylea-specific data from CDF ....*" Opp'n at 24 (emphasis added).[9] Against this backdrop, the government's suggestion that any restriction on *speech* is merely incidental to otherwise unlawful *conduct*, *see* Opp'n at 31, rings hollow.[10] Since the crux the government's claim is that engaging in charitable speech is "exactly what . . . [a party] could not do," the government criminalizes the speech itself, not Regeneron's conduct.

---

[9] The number of times that the government emphasizes that the *actus reus* is the exchange of information with CDF is notable. *See, e.g.*, Opp'n at 10 ("Regeneron's commercial team learned from Xcenda and from Sherman that it . . . *could not use Eylea-specific data from CDF ....*"); *id.* ("Knowing that they *should not be using Eylea-specific data from CDF ...*"); *id.* at 12 ("[K]nowing that Regeneron *should not be using Eylea-specific data from CDF ...*") (all emphasis added).

[10] The government's use of the 2005 Guidance is equally significant. According to the government, the reason such guidance is relevant here is because it "describes [the] relevant statute or regulation." Opp'n at 32, which under the government's theory bans "solicit[ing] or receiv[ing] data from the charity." The government is thus attempting to ban the receipt of information used to solicit charitable donations.

11

Moreover, the government's suggestion that it may use speech as evidence of intent or motive, Opp'n at 30, is entirely beside the point. As the Complaint and OIG's guidance make clear, Regeneron was permitted to donate to CDF in order to assist patients, including EYLEA patients. The *only* fact that purportedly criminalizes this conduct is that Regeneron employees allegedly received estimated projections regarding how many patients might receive EYLEA. The government thus attempts to criminalize the receipt of information. Finally, and tellingly, the government never states that such a prohibition is narrowly tailored to meet a compelling government interest.

## CONCLUSION

Regeneron made charitable donations to ensure that patients, regardless of financial need, could obtain whatever drug their physician thought would be best for them. Such conduct plainly was not criminal. Regeneron respectfully requests that the Complaint be dismissed with prejudice.

Respectfully submitted,

Counsel for Defendant

/s/ Richard L. Scheff
Richard L. Scheff (BBO # 445130)
Carrie S. Love (admitted *pro hac vice*)
ARMSTRONG TEASDALE
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone: (267) 780-2000
Facsimile: (215) 405-9070
rlscheff@atllp.com
clove@atllp.com

Dated: October 5, 2020

/s/ Brien T. O'Connor
Brien T. O'Connor (BBO #546767)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Brien.OConnor@ropesgray.com

Samantha B. Badlam (admitted *pro hac vice*)
ROPES & GRAP LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650
Samantha.Badlam@ropesgray.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record via ECF on October 5, 2020.

/s/ Richard L. Scheff
Richard L. Scheff (BBO # 445130)