**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 20-cv-11217-FDS |
| ) | |
| REGENERON PHARMACEUTICALS, INC., ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR PARTIAL SUMMARY JUDGMENT ON MATERIALITY,**
**CAUSATION, AND DAMAGES UNDER THE FALSE CLAIMS ACT**

The United States is entitled to judgment as a matter of law on the elements of materiality

and causation for its False Claims Act ("FCA") causes of action.  Provided the government

proves at trial that Regeneron violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)

(the "AKS"), rendering the claims at issue false for FCA purposes, Regeneron has no defense to

the elements of materiality and causation, as a matter of law.  The government also is entitled to

summary judgment on the minimum amount of damages Regeneron owes, if the government

proves that Regeneron violated the FCA.

To establish FCA liability premised on an AKS violation, as the government has alleged

here, the United States must prove that (1) Regeneron violated the AKS, (2) Regeneron's AKS

violations resulted in the submission of false claims, (3) the claims were materially false, and (4)

Regeneron acted knowingly.[1]

Any false claims that Regeneron caused through its AKS violations were material per se

---

[1] The government will establish at trial that Regeneron violated the AKS—thereby
rendering the claims "false" for purposes of the FCA—and that Regeneron acted knowingly.

under the FCA.  *See* 42 U.S.C. § 1320a-7b(g) ("a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim").  Accordingly, if the government proves Regeneron violated the AKS, the United States is entitled to summary judgment on materiality under the FCA.

As to the element of causation, the United States has identified the specific claims to Medicare that resulted from Regeneron's payments to the Chronic Disease Fund ("CDF"), a patient assistance foundation, thereby satisfying the FCA's causation standard.  There is no dispute of material fact that, in 2013 and 2014: (1) Regeneron paid money to CDF's Wet Age-Related Macular Degeneration Fund ("AMD Fund"); (2) the AMD Fund paid the copays for Medicare patients receiving Eylea, and (3) Medicare reimbursed claims for payment resulting from those patients' use of Eylea.  Under well-settled law (and, most importantly, the law of the First Circuit), nothing more is necessary for the government to prove causation.  While Regeneron may argue otherwise, the government is *not* required to prove "but for" causation. The United States therefore is entitled to summary judgment on the element of causation.

Finally, provided that the government establishes liability at trial by proving to a jury that Regeneron violated the AKS and the FCA, the government is also entitled to summary judgment on the amount of FCA damages.  As described further below, if liable, Regeneron owes treble damages in the amount of at least $195,800,553, and additional amounts in penalties.

## FACTS

The following facts are undisputed.  Each fact is cross-referenced in the United States'
Statement of Undisputed Material Facts ("SUMF"), which the United States has filed
contemporaneously and incorporates by reference herein.  *See* Local Rule 56.1.

## I.      BACKGROUND ON REGENERON, EYLEA, AND CDF

The defendant is a manufacturer and seller of pharmaceutical products, including Eylea.
SUMF ¶ 1.  Medicare covers physician-administered drugs, including Eylea.  SUMF ¶ 2.  In
November 2011, the Food and Drug Administration ("FDA") approved Eylea to treat
neovascular (wet) age-related macular degeneration ("AMD"), a disease that afflicts millions of
elderly people around the world.  Physicians administer Eylea by injection in the office.  SUMF
¶ 3.

The AKS prohibits pharmaceutical companies from directly paying Medicare patients'
copays.  42 U.S.C. § 1320a-7b(b)(2).  The Department of Health and Human Services, Office of
the Inspector General ("HHS-OIG") has, however, issued guidance that, if followed, permits
pharmaceutical companies to donate to third-party patient assistance foundations that render
financial assistance to needy Medicare patients.  *See* SUMF ¶ 4.  Among the criteria that
contributing manufacturers must meet is the condition that "[t]he pharmaceutical manufacturer
does not solicit or receive data from the charity that would facilitate the manufacturer in
correlating the amount or frequency of its donations with the number of subsidized prescriptions
for its products."  SUMF ¶ 5.

CDF is a patient assistance foundation.  SUMF ¶ 6.  Over 99 percent of CDF's funding
comes from pharmaceutical manufacturers.  SUMF ¶ 7.  Between 2012 and 2016, CDF operated
a disease state fund for various eye conditions; initially, AMD had its own fund, but at some
point, CDF's AMD Fund was consolidated with funds for other eye diseases.  SUMF ¶ 8.  CDF's

AMD Fund covered copays, deductibles, and co-insurance for Medicare patients.  SUMF ¶ 9.

## II.   REGENERON'S PAYMENTS TO AND COORDINATION WITH CDF

From 2011 to 2014, Regeneron made the following payments to CDF:

| 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|
| $125,000 | $600,000 | $35,000,000 | $27,750,000 |

SUMF ¶ 10.

In connection with its relationship with CDF, Regeneron engaged a third-party vendor, Lash, to administer its reimbursement "hub" and patient assistance program.  SUMF ¶ 11.  The reimbursement hub for Eylea was called "EYLEA4U."  SUMF ¶ 12.  In its capacity as a hub vendor, Lash conducted benefits verification, prior authorization assistance, administration of commercial copay programs, and referrals to copay foundations for Eylea patients.  SUMF ¶ 13. When Medicare patients taking (or seeking to take) Eylea needed assistance with copays, Lash connected Eylea patients with foundations directly.  SUMF ¶ 14.  At Regeneron's request, Lash also tracked which EYLEA4U-enrolled patients ultimately obtained assistance from copay foundations.  SUMF ¶ 15 (Stapleton Decl. ¶ 6).[2]

CDF paid $60,240,991 in copay assistance to Eylea patients in 2013 and 2014.  SUMF ¶ 16 (Expert Report of Peter Resnick ¶ 34).  This amount is approximately $2.5 million (or 4%) less than the amount Regeneron paid to CDF during the same years.  *See* SUMF ¶ 17 (Regeneron Response to Int. No. 1, incorporating REG_002281 by reference).

---

[2] Although not relevant directly to this Motion, Regeneron employees also received data directly from CDF.

### III.   PHYSICIANS WHO TREATED CDF-SUPPORTED EYLEA PATIENTS SOUGHT MEDICARE REIMBURSEMENT FOR EYLEA

In connection with this litigation, the United States retained Ian Dew, an expert in medical transaction data analysis.  SUMF ¶ 18.  During the course of the investigation that preceded this litigation, CDF produced data concerning disbursements it made to Eylea patients for copay assistance, including patient name and other patient biographical information, as well as the amount of the disbursement.  SUMF ¶ 19.  Mr. Dew analyzed this CDF disbursement data in conjunction with Medicare claims data, identifying the Medicare claims for which CDF paid some or all of the beneficiary's copay.  SUMF ¶ 20.  In doing so, he "matched" CDF disbursements with Medicare claims.  SUMF ¶ 21.  In 93.9% of these matches, which equals 108,183 claims, the date listed in the CDF disbursement data matches the date of service of the Medicare Eylea claim for the same Medicare beneficiary.  SUMF ¶ 26.  In other words, for 93.9% of the patients whose data Mr. Dew reviewed, the date of service for a Medicare beneficiary's Eylea injection matches the date of service for which CDF provided the same Medicare beneficiary with financial support for that Eylea injection.  For those 108,183 matched claims, Medicare reimbursements equaled $65,266,851.  SUMF ¶ 26.

### ARGUMENT

### I.   LEGAL STANDARD

Courts grant summary judgment "when the moving party shows that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Stevenson v. Amazon.com, Inc.* No. 15-cv-13505-FDS, 2017 WL 758467, at *2 (D. Mass. Feb. 27, 2017) (quoting Fed. R. Civ. P. 56(a)).  Summary judgment is appropriate even in cases where the moving party has the burden of proof, as long as "the evidence that he provides on that issue is conclusive." *Torres Vargas, et al. v. Santiago Cummings et al.*, 149 F.3d 29, 35 (1st Cir.

5

1998); *see also Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 65 (1st Cir. 2020). Here, the United States has the burden of proof as to materiality, causation, and damages, and has conclusively established that it is entitled to judgment as a matter of law on these issues.

## II.   THE COURT SHOULD AWARD SUMMARY JUDGMENT TO THE UNITED STATES ON THE ELEMENT OF MATERIALITY, BECAUSE VIOLATIONS OF THE AKS ARE PER SE VIOLATIONS OF THE FALSE CLAIMS ACT

Health care claims that include items or services resulting from illegal kickbacks are per se materially false or fraudulent for purposes of the FCA.  42 U.S.C. § 1320a-7b(g); *see also Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019); *United States ex rel. Goodman v. Arriva Med., LLC*, No. 13-cv-0760, 2020 WL 1433861, at *2 (M.D. Tenn. Mar. 24, 2020) ("Pursuant to the Anti-Kickback Statute, a claim for payment under a federal healthcare program 'that includes items or services resulting from a violation of the' AKS's anti-kickback provisions 'constitutes a false or fraudulent claim for purposes of' the FCA." (quoting 42 U.S.C. § 1320a-7b(g)).  This is because under 42 U.S.C. § 1320a-7b(g), "a violation of the Anti-Kickback Statute presumptively establishes a False Claims Act violation."  *United States ex rel. McFarland v. Fla. Pharmacy Sols.*, 358 F. Supp. 3d 1316, 1326 (M.D. Fla. 2017); *United States v. Chang*, No. 13-cv-3772, 2017 WL 10544289, at *9 (C.D. Cal. July 25, 2017) ("An AKS violation automatically amounts to a false claim under the FCA."); *see United States ex rel. Perri v. Novartis Pharm. Corp.*, No. 15-cv-6547, 2019 WL 6880006, at *10 (D.N.J. Feb. 21, 2019) ("The submission of a Medicare claim in violation of [the AKS] will establish a 'legally false' claim under the FCA.") (internal quotation and citation omitted).  Furthermore, "the vast majority of courts to address this question after *Escobar* have agreed . . . that AKS violations are per se material." *United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, No. 02-cv-2964, 2020 WL 4260797, at *14 & n.22 (E.D. Pa. July 24, 2020) (collecting cases and citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 136 S. Ct. 1989 (2016)); *see also United States ex rel. Bawduniak v.*

*Biogen Idec, Inc.*, No. 12-10601-IT, 2022 WL 2438971, at *1 (D. Mass. July 5, 2022)

(concluding that plaintiff need not demonstrate materiality at trial because "a violation of the

federal AKS is *per se* a violation of the False Claims Act") (citing *Guilfoile*, 913 F.3d at 190

("We further read the AKS amendment as obviating the need for a plaintiff to plead materiality –

that is, to plead that compliance with the AKS was material to the government's decision to pay

any specific claim.")).

Here, the United States has alleged that Regeneron violated the FCA by paying

remuneration in violation of the AKS.  *See, e.g.*, Am. Compl. ¶ 91, ECF No. 65.  Although the

United States anticipates a dispute at trial over whether Regeneron acted with scienter (and

therefore, whether Regeneron violated the AKS), there can be no dispute, as a matter of law, that

any AKS violations resulting in claims to Medicare are materially false.  The Court should

therefore find that, as a matter of law, the government need not establish materiality at trial to

prove a violation of the FCA.

## III.   THE COURT SHOULD AWARD SUMMARY JUDGMENT TO THE UNITED STATES ON THE ELEMENT OF FCA CAUSATION

### A.   "But For" Causation Is Not Required

To establish conclusively that Regeneron's kickbacks caused false claims to Medicare,

the United States must establish only that the claims at issue were *exposed* to illegal

remuneration.  Although the United States bears the burden of demonstrating that Medicare

claims "result[ed] from" violations of the AKS, 42 U.S.C. § 1320-7b(g), as long as there is a

"sufficient causal connection between an AKS violation and a claim submitted to the federal

government, that claim is false within the meaning of the FCA."  *Guilfoile*, 913 F.3d at 190

(citing *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96-98 (3d Cir.

2018) (requiring plaintiff to establish only "a link between the alleged kickbacks and the medical

care received")); *Bawduniak*, 2018 WL 1996829, at *3.  Put another way, an FCA plaintiff satisfies its burden as to causation as long as "a particular patient *is exposed* to an illegal recommendation or referral and a provider submits a claim for reimbursement pertaining to that patient." *Greenfield*, 880 F.3d at 100; *see also United States v. Teva Pharms. USA, Inc.*, 560 F. Supp. 3d 412, 422-23 (D. Mass. 2021) (rejecting defendant's argument that the government failed to plead causation where the government alleged "examples of payments made by [foundations] to cover the copays of Copaxone patients who later submitted claims to Medicare for their prescriptions").

To that end, courts within and outside the First Circuit have rejected the view that a plaintiff must establish that a health care provider would not have submitted a claim to the Medicare program *but for* the illegal remuneration.  In other words, "[i]t is sufficient to show that Defendant paid kickbacks to a physician for the purpose of inducing the physician to prescribe specific drugs, and that the physician then prescribed those drugs, even if the physician would have prescribed those drugs absent the kickback."  *Bawduniak*, 2018 WL 1996829, at *3; *see also United States ex rel. Bawduniak v. Biogen Idec Inc.*, ECF No. 619 at 44 *et seq.* (Transcript of Final Pretrial Conference) (D. Mass. Jul. 19, 2022) (recognizing that once an AKS violation occurs, the defendant is not "excused" from FCA liability because the violation "didn't make any difference" in providers' prescribing decisions)); *United States v. Teva Pharms. USA, Inc.*, 20-cv-11548-NMG, ECF No. 64 at 7 (D. Mass. Jun. 7, 2022) ("The relevant question is not whether a particular patient was in fact induced to purchase Copaxone but rather whether Teva intended to induce patients to purchase Copaxone by Teva's donations."); *United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, No. 13-cv-3003, 2021 WL 101193, at *11 (D. Minn. Jan. 12, 2021) ("but-for causation is not a requirement of the AKS"); *United States v. Teva*

*Pharms. USA, Inc.*, No. 13-cv-3702, 2019 WL 1245656, at *1 (S.D.N.Y. Feb. 27, 2019) (recognizing that "the FCA does not require the kickback to be the 'but for' cause"); *United States ex rel. Kester v. Novartis Corp.*, 41 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) (rejecting "a strict 'but for' causation requirement").[3]

More importantly, this Court affirmed the government's view of causation in AKS-based FCA cases more than two years ago, and so it must "remain the law of th[e] case." *See United States v. Moran*, 393 F.3d 1, 7 (1st Cir. 2004). In denying Regeneron's motion to dismiss, the Court cited *Greenfield*, *Guilfoile*, *Kester*, and *Bawduniak* with approval, concluding that "it is sufficient that the complaint plausibly alleges that the copay-assistance system established by CDF and defendant involved the payment of kickbacks or remuneration to patients and physicians" and that "[s]ome of those kickback-tainted prescriptions then led to Medicare claims for Eylea." ECF No. 32 at 22-24 (rejecting "but-for" causation). For the purposes of FCA causation, it is enough, as this Court concluded over two years ago, that Medicare beneficiaries "receive[d] illegal copay subsidies from CDF, and [providers] submitted Medicare claims for the remainder of the price of Eylea." *Id.* at 30. These legal conclusions remain in place as the law of this case. *See United States v. Bulger*, 928 F. Supp. 2d 305, 316 (D. Mass. 2013) ("The law of the case doctrine contemplates that a legal decision made at one point during a legal proceeding should 'remain the law of that case throughout the litigation, unless and until the decision is modified or overruled by a higher court.'" (quoting *Moran*, 393 F.3d at 7)).

---

[3] The one exception to this near-unanimous conclusion is the Eighth Circuit's decision in *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 834 (8th Cir. 2022). In *Cairns*, the court concluded that the United States needed to establish that claims would not have been submitted but for the underlying AKS violations. *Id.* This Court should not follow *Cairns*, which conflicts with binding First Circuit precedent. *See Guilfoile*, 913 F.3d at 190.

9

**B.      The Government Has Conclusively Proven that Regeneron Caused Claims Submitted to Medicare for Eylea to Be Exposed to Illegal Remuneration**

There is no dispute that, in 2013 and 2014, there were 116,455 Medicare Part B claims for which CDF paid some or all of the beneficiary's copay, and that these claims resulted in substantial Medicare reimbursements to providers for injections of Eylea.  The government's medical transaction data analysis expert, Mr. Dew, matched (i) CDF disbursements for copays for Eylea patients with (ii) Medicare reimbursements for Eylea patients for the years 2013 and 2014.  SUMF ¶ 21.  Mr. Dew reached two conclusions that are applicable here.

First, Mr. Dew identified 108,183 matched claims with the same date of service (93.9% of all matched claims), totaling $65,266,851 in Medicare reimbursements.  Initially, Mr. Dew identified $64,570,232 in Medicare reimbursements for which CDF paid all or part of the associated beneficiary's copays in 2013 and 2014.  At Mr. Dew's deposition, counsel for Regeneron identified two claims that were improperly included in the $64,570,232 total, because the names of two Medicare beneficiaries did not match the names of the individuals who received disbursements from CDF.  SUMF ¶ 23.  In preparing his rebuttal report, Mr. Dew modified his "matching" criteria to correct this error.  SUMF ¶ 24 (Dew Rebuttal Report at 2).  He also filtered out patients who did not have a diagnosis for wet AMD.  SUMF ¶ 24 (Dew Rebuttal Report at 2).  In addressing these purported errors that Regeneron identified in his original report, and in using an updated Medicare-claims dataset, Mr. Dew observed that these modifications actually expanded the universe of matched claims.  SUMF ¶ 25 (Dew Rebuttal Report at 1, 2).  Accordingly, the total government-paid-amount for the matched claims increased to $68,029,431.  SUMF ¶ 26.  Regeneron has raised no disputed issue of material fact concerning 93.9% (108,183 claims) of the matched claims (i.e., claims in which the date listed in the CDF disbursement matches the date of the Medicare Eylea claim for the same Medicare

10

beneficiary).  Those 108,183 claims total $65,266,851 in Medicare reimbursement, which is 95.9% of the amount Medicare paid for the universe of matched claims.[4]  SUMF ¶ 26.

Second, Mr. Dew identified Medicare Part C claims for which CDF paid some or all of the beneficiary copayment.  Specifically, Mr. Dew identified 74,390 Medicare Part C claims for which CDF paid all or part of the beneficiary copay in 2013 and 2014.  Because the Medicare program does not directly pay claims for Medicare Part C beneficiaries, Mr. Dew could not calculate the amount Medicare Part C payors paid on these claims.  SUMF ¶ 27 (Dew Rebuttal Report at 2 n.3; *see also* What is Medicare Part C?, https://www.hhs.gov/answers/medicare-and-medicaid/what-is-medicare-part-c/index.html (Aug. 3, 2021)).

Accordingly, the United States has established that Regeneron caused 108,183 Medicare Part B claims and 74,390 Medicare Part C claims to be exposed to illegal remuneration; therefore, the government has established FCA causation for these claims, as a matter of law.

---

[4] The remaining 4.1% of the matched-claims government-paid-amount are from matches Mr. Dew identified in which the disbursement from CDF lists a different date than the date of the matched claim.  Although Mr. Dew provides a justification for these matches in his rebuttal report, given the parties' dispute over the validity of these matches, the United States does not seek damages for these claims for purposes of this Motion.  Moreover, Mr. Dew opined that certain patients who have a Medicare supplemental plan could have received CDF assistance before meeting the deductibles to their supplemental plans, and that these patients received Medicare-reimbursed Eylea for the rest of the year, without receiving matching CDF disbursements.  SUMF Ex. 10.

**IV.    THE COURT SHOULD AWARD SUMMARY JUDGMENT TO THE UNITED STATES ON THE ISSUE OF DAMAGES IN THE AMOUNT OF AT LEAST $195,800,553**

    **A.    The Government Is Entitled to Recover the Full Value of Any Claim Tainted By Regeneron's Kickbacks**

As a matter of law, courts measure the damages for AKS-based FCA violations as the entirety of the government's payments for claims tainted by illegal kickbacks. *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008). While the First Circuit has yet to consider directly the measure of damages for AKS-tainted false claims, every court that has considered it, in a significant and growing body of caselaw, has adopted this approach.[5] The common reasoning underlying these cases is that compliance with the AKS is a condition of payment by federal health care programs. As the Court of Appeals for the Seventh Circuit explained in *Rogan*:

> [Defendant] did not furnish any medical service to the United States. The government [through Medicare and Medicaid] offers a subsidy (from the patients' perspective, a form of insurance), with conditions. *When the conditions are not satisfied, nothing is due.* Thus the entire amount that [Defendant] received on these 1,812 claims must be paid back. Now it may be that, if the patients had gone elsewhere, the United States would have paid for their care. Or perhaps the patients, or a private insurer, would have paid for care at Edgewater had it refrained from billing the United States. But neither possibility allows Rogan to keep money obtained from the Treasury by false pretenses, or avoid the penalty for deceit.

---

[5] *See e.g., United States v. Novak*, No. 14-cv-00230-RMG, 2018 WL 4205540, at *4 (N.D. Ill. Sep 4, 2018) (holding that "damages [for AKS-tainted claims] are equivalent to the entirety of what the government paid out, because [the] false claims obscured that [the hospital] was not eligible to obtain reimbursement in the first place.") (citing *Rogan*, 517 F.3d at 453); *United States ex rel. Lutz v. Bluewave Healthcare Consultants, Inc.*, No. 14-cv-00230-RMG, 2018 WL 11282049, at *1 (D.S.C., May 23, 2018) (ruling that kickbacks irredeemably tainted the claims for payment submitted by the defendants); *United States ex rel. Health Dimensions Rehab., Inc. v. RehabCare Group, Inc.*, No. 12-cv-00848-AGF, 2013 WL 5340910, at *4 (E.D. Mo. Sept. 23, 2013) ("This Court adopts the reasoning of *United States v. Rogan* . . . and concludes that the proper measure of damages is the full amount of each tainted claim, rather than the amount the United States would have paid had Defendants not engaged in kickbacks.); *United States ex rel. Freedman, M.D. v. Suarez-Hoyos, M.D.*, No. 04-cv-933-T-24-EAJ, 2012 WL 4344199, at *4 (M.D. Fla. Sept. 21, 2012) ("[T]he Court concludes that, assuming the

*Id.* (emphasis added); *see also Teva Pharms.*, No. 20-cv-11548-NMG, ECF No. 64 at 8-9 (D. Mass. Jun. 7, 2022) (adopting measure of FCA damages based upon AKS claims as full value of kickback-tainted claims).  For these reasons, the government's single damages in this case are the *full* value of any kickback-tainted claims.

### B.     The United States Should Recover At Least $195,800,553 in Damages

There is no genuine dispute of material fact as to Mr. Dew's conclusions concerning 93.9% of his matched claims.  It follows, therefore, that there is no dispute that, were the United States to establish liability by proving the elements of falsity and scienter at trial, Regeneron would be liable for at least $65,266,851 in single damages.  This amount trebled is $195,800,553.[6]

The government requests that the Court find that there is no genuine issue of material fact concerning the minimum amount of damages Regeneron owes the government, should the government establish at trial that Regeneron violated the AKS and acted with the requisite scienter.

### CONCLUSION

For the forgoing reasons, the United States respectfully requests that the Court enter judgment as a matter of law for the government on the elements of FCA materiality and

---

Government proves that it paid claims that were tainted by a kickback arrangement . . . the amount of the Government's damages resulting from the payment of such claims equals the full amount that Medicare paid.").

[6] In addition, Regeneron would be liable for up to $2,493,005,994 in civil penalties, subject to any applicable Constitutional limits. *Cf. State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).  This is because the FCA provides for civil penalties of at least $12,537 per claim, and Mr. Dew found 108,183 matched Part B claims (108,183 x $12,537 = $1,356,290,211) and 74,390 matched Part C claims (74,390 x $12,537 = $932,627,430).  *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.

causation.  The government also is entitled to summary judgment on the minimum amount of damages Regeneron owes, if the government proves that Regeneron violated the FCA.


Dated: December 28, 2022                          Respectfully submitted,

                                                  RACHAEL S. ROLLINS
                                                  United States Attorney


                                                  */s/ Evan D. Panich*
                                                  EVAN D. PANICH
                                                  ABRAHAM R. GEORGE
                                                  LINDSEY ROSS
                                                  CHARLES B. WEINOGRAD
                                                  Assistant United States Attorneys
                                                  John J. Moakley United States Courthouse
                                                  Suite 9200
                                                  1 Courthouse Way
                                                  Boston, MA 02210
                                                  Phone: (617) 748-3100
                                                  evan.panich@usdoj.gov
                                                  abraham.george@usdoj.gov
                                                  lindsey.ross@usdoj.gov
                                                  charles.weinograd@usdoj.gov