**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

---

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

REGENERON PHARMACEUTICALS, INC.,

      Defendant.

No. 20-cv-11217-FDS

---

**UNITED STATES' OPPOSITION TO REGENERON'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## INTRODUCTION

The government has more than sufficient evidence to establish Regeneron violated the law and certainly enough evidence to defeat Regeneron's motion for summary judgment. Regeneron employees (i) solicited Eylea-specific data from the Chronic Disease Fund ("CDF"); (ii) received Eylea-specific data from CDF; (iii) used Eylea-specific data from CDF in determining contribution amounts to CDF; and even (iv) ran return-on-investment ("ROI") calculations for Regeneron's contributions to CDF.  Moreover, Regeneron's employees knew they were engaging in wrongful conduct.  When Regeneron's Internal Audit function asked the relevant employees about the nature of Regeneron's relationship with CDF, *multiple* Regeneron employees (including the most-senior Commercial executive) lied on *multiple* occasions in response, concealing CDF's provision of Eylea-specific data to Regeneron and the Company's use of that information.  Of course, Regeneron scarcely mentions any of this.

Regeneron's primary goal in contributing to CDF was making money from Eylea purchases.  After all, who calculates return on investment for charitable donations?  Indeed, Regeneron's own 2013 SEC Form 10-K gives up the ghost, explaining that Regeneron's contributions to CDF were a "commercialization" cost for Eylea.  U.S. Statement of Facts ("SOF") ¶ 99.  Regeneron did not, as it now claims years later, fund CDF to help all low-income patients in the "community of retinal diseases."  Mem. in Supp. Mot. Summ. J. at 9 ("Mem."), ECF No. 246.  It paid CDF intending and expecting to provide co-pay assistance to its *own* patients.  By paying CDF, it ensured, for example, that none of its funds would help low-income patients taking Avastin (an off-label, but frequently used, wet AMD drug), because CDF's AMD fund did not cover Avastin.  Regeneron's own securities filings shed light on this decision too: year after year, Regeneron certified that it considered Avastin a "significant competitive

challenge" because Regeneron knew that Avastin was not only effective in treating wet AMD patients, but it cost patients a small fraction of the cost of Eylea.  SOF ¶¶ 86, 88.

Regeneron's arguments in support of its motion are all either divorced from the facts in the case or plainly wrong as a matter of law.  As laid out below, the government first addresses why it has, at a minimum, raised triable issues of fact on each required element of its claims.  Then, the government responds to Regeneron's meritless arguments.

## FACTUAL BACKGROUND

The government incorporates by reference its Statement of Undisputed Material Facts, ECF No. 226, its Reply to Defendant's Additional Facts, ECF No. 267, and its SOF, filed contemporaneously herewith.

## LEGAL BACKGROUND

### I.    ELEMENTS OF THE ANTI-KICKBACK STATUTE AND FALSE CLAIMS ACT

The government has more than sufficient evidence that Regeneron caused the submission of kickback-tainted claims to Medicare.  To establish a violation of the Anti-Kickback Statute ("AKS"), the government must show that Regeneron: (1) paid money via CDF; (2) to induce physicians or patients to purchase Eylea; (3) for which payment may be made, in whole or in part, under Medicare; and (4) the conduct was knowing and willful.  *See* 42 U.S.C. § 1320a-7b(b); *United States v. Regeneron Pharms. Co.*, No. 20-cv-11217, 2020 WL 7130004, at *8 (D. Mass. Dec. 4, 2020).

To prove a violation of the False Claims Act ("FCA") in this context, the government must show that Regeneron (1) caused the submission of false claims that were (2) materially false, and (3) acted knowingly.  *See* 31 U.S.C. § 3729(a)(1)(A).  As discussed below, the government has marshalled more than sufficient evidence for each of the AKS and FCA elements to proceed to trial, and for some, to prevail conclusively.  *See* ECF Nos. 224, 225.

2

## II.    HHS-OIG'S 2005 GUIDANCE

When pharmaceutical manufacturers subsidize the cost of their own drugs, even when they do so through co-pay assistance charities, that conduct implicates the AKS.  70 Fed. Reg. 70623, 70624 (Nov. 22, 2005).  In 2005, the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG") issued sub-regulatory interpretive guidance that advised manufacturers how, in the agency's view, they might donate to co-pay foundations without violating the AKS (the "Guidance").  The Guidance explained that "donations from a pharmaceutical manufacturer to an independent, bona fide charity . . . should raise few, if any, anti-kickback statute concerns, *so long as*" five criteria are met.  *See id.* at 70626-70627 (emphasis added) (regulatory text attached as Appendix A).  For an arrangement between a manufacturer and an independent co-pay assistance foundation to be "properly structured," any data reporting from the foundation to the manufacturer must be aggregated for all applicants in a particular disease state fund; it cannot relate to the "identity, amount, or nature of subsidized drugs." *Id.* at n.16.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must deny the motion as long as the non-movant proffers "specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The non-movant satisfies this standard by identifying "some evidence on which a jury could reasonably find in their favor."  *Am. Steel Erectors v. Loc. Union No. 7*, 815 F.3d 43, 71 (1st Cir. 2016) (citation and internal quotation marks omitted).  As discussed further below, the government meets this standard.

**ARGUMENT**

I. **THE GOVERNMENT HAS AT LEAST RAISED A TRIABLE ISSUE ON ITS AKS-BASED FCA CLAIMS**

    **A.  Regeneron Violated The AKS**

The government can easily demonstrate a genuine issue of material fact as to whether Regeneron violated the AKS.

        **1.  Remuneration**

There is no dispute that Regeneron provided money, in the form of co-pay assistance, to patients and doctors through CDF.  Such payments constitute "remuneration."  As this Court has already observed, "[c]opay discounts or waivers made directly to patients certainly implicate the AKS."  *Regeneron*, 2020 WL 7130004, at *8.  But so too does a manufacturer's covering of the cost of its drugs through co-pay assistance foundations.  *Id.* at *9.  After all, indirect remuneration is equally as unlawful as direct remuneration.  *United States ex rel. Banigan v. Organon USA Inc*., No. CV 07-12153-RWZ, 2016 WL 10704126, at *3 n.8 (D. Mass. Aug. 23, 2016) ("[T]he AKS prohibits even the indirect receipt of prohibited remuneration."); *see also United States v. Teva Pharms. USA, Inc*., 560 F. Supp. 3d 412, 419 (D. Mass. 2021) (denying motion to dismiss amid allegations "that Teva indirectly provided remuneration to [Copaxone patients] through donations to [foundations] which were used to cover [copays]"); *Regeneron*, 2020 WL 7130004, at *13; *United States ex rel. Strunck v. Mallinckrodt Ard LLC*, No. CV 12-175, 2020 WL 362717, at *4 (E.D. Pa. Jan. 22, 2020) (allegations of remuneration in the form of co-pays via CDF sufficiently pleaded AKS violation).

The facts show that Regeneron provided CDF with $57.75 million in 2013 to 2014.  SOF ¶ 98.  CDF, in turn, paid approximately $58.4 million in Medicare co-pays for Eylea patients in 2013 to 2014.  Regeneron CSUMF ¶ 16 (ECF No. 261).  Regeneron therefore paid (indirectly through CDF) remuneration to patients and providers in the form of co-pay assistance.

### 2. Intent To Induce

The government has marshalled substantial evidence of Regeneron's intent to induce the purchase of Eylea. There are dozens of documents in the case demonstrating that Regeneron employees (i) solicited Eylea-specific data from CDF; (ii) received Eylea-specific data from CDF; (iii) used Eylea-specific data from CDF in determining how much and when to contribute to CDF; and even (iv) ran ROI calculations for Regeneron's contributions to CDF. This evidence shows that Regeneron intended the money that it provided to CDF to induce prescribing and administration of Eylea, in order to generate revenue for Regeneron.

On at least eight separate occasions, CDF's Executive Director, Clorinda Walley, provided Regeneron with information regarding how many Eylea patients were in CDF's AMD fund, and how much money CDF needed to pay those patients' co-pays. SOF ¶ 103. Regeneron believed Ms. Walley; indeed, its employees used Ms. Walley's data to conduct ROI analyses for subsequent contributions to CDF. *Id.* ¶ 104. Regeneron, primarily through the employees of its Commercial function (e.g., William Daniels and his superiors, Robert Terifay, Robert Krukowski, Robert Davis, and Cathy Casey), determined its contributions to CDF based on Ms. Walley's data, as Regeneron's contributions to CDF demonstrate. *Id.* ¶ 105.

Further, Regeneron understood that absent co-pay assistance numerous AMD patients would opt for the far cheaper off-label treatment, Avastin. Indeed, year after year in its own securities filings, Regeneron conceded Avastin's efficacy *and* low cost for AMD patients, describing it as a "significant competitive challenge." *Id.* ¶¶ 86-88. ("[O]phthalmologists are using with success off-label, third-party repackaged versions of Genentech's approved VEGF antagonist, Avastin, for the treatment of wet AMD . . . . The relatively low cost of therapy with Avastin in patients with wet AMD presents a significant competitive challenge in this indication."). In fact, Regeneron and its CEO, Dr. Leonard Schleifer, certified repeatedly in the

Company's public filings that "EYLEA® for the treatment of wet AMD is too expensive for most patients to afford without health insurance coverage, if adequate coverage and reimbursement by third-party payers, including Medicare and Medicaid in the United States, is not available, our ability to successfully commercialize EYLEA® will be materially adversely impacted." *Id.* ¶ 89.  Likewise, Regeneron told investors and the SEC, even as early as December 2011, that its "products [are] too costly for many patients to afford them, and physicians may not prescribe them." *Id.* ¶ 90.

Regeneron's former Senior Director of Reimbursement, Cynthia Pointer (née Sherman), testified that she and her superiors, including Mr. Terifay, understood that absent financial assistance, at least some patients would choose the approximately 97-percent-cheaper off-label treatment, Avastin. *Id.* ¶ 91.  Mr. Terifay—Regeneron's executive vice president and head of Commercial—acknowledged the seemingly uncontroversial principle that unless patients can afford a drug, they will not buy it. *Id.* ¶ 92.  He further recognized that at least "in some select circumstances" a patient's inability to afford Eylea would mean that that patient would likely opt for Avastin instead. *Id.* ¶ 93.  Dr. Schleifer testified that without co-pay assistance, some segment of the Medicare population would not be able to afford Eylea. *Id.* ¶ 94.  And of course, if patients could not afford Eylea, they would not be able to buy it. *Id.*

In other words, Regeneron's senior executives understood that at least some Medicare patients could not afford Eylea unless Regeneron could somehow decrease their co-pays.  They determined that co-pay assistance, via CDF, was at least one way to effectuate that goal. *Id.* ¶ 95.  And Regeneron executives believed that by providing co-pay assistance, Regeneron would induce sales of Eylea that otherwise would not have occurred. *Id.* ¶ 96.  Indeed, at least one

Regeneron employee opined directly that generating sales of Eylea was "a purpose" of delivering co-pay assistance. *Id.* ¶ 97.

Regeneron may now assert that its contributions to CDF were "charitable donations," citing its CEO's testimony to claim that it contributed to CDF because it had a "'moral obligation to try and help the [AMD] community.'" Mem. at 9. But in its SEC filings, which the same CEO certified as truthful, Regeneron described those contributions not as charity, but as an "expense[] in connection with the *commercialization* of EYLEA." SOF ¶ 99 (emphasis added). Moreover, it is undisputed that during the relevant period Regeneron never "donated" a single dollar to any co-pay foundation's disease state fund that did not cover one of the Company's products, nor did Regeneron provide free Eylea to underinsured Medicare beneficiaries. *Id.* ¶¶ 100-101. As further evidence that Regeneron's intended its contributions to CDF to support only Eylea patients, Regeneron's former CFO even referred to CDF grants to patients taking Lucentis (Eylea's primary on-label competitor) as "Genentech's problem." *Id.* ¶ 137. In fact, a Regeneron-commissioned analysis, conducted in anticipation of Eylea's 2011 launch, recommended contributions to co-pay foundations instead of giving away free product to those who could not afford it, precisely because free product resulted in "[p]otential sales lost." *Id.* ¶ 102. In light of the contemporaneous party admissions and the other evidence that the United States has compiled (e.g., Mr. Daniels's multiple ROI calculations, shared with multiple senior executives, for the contributions to CDF), Regeneron's claim that the money it paid CDF was "benevolent goodwill," lacks credibility. Charity, Merriam-Webster, https://www.merriam-webster.com/dictionary/charity.

### 3. Knowingly And Willfully

The government also has demonstrated a genuine factual dispute that Regeneron acted knowingly and willfully. In the context of the AKS, "[k]nowingly simply means to do

something voluntarily, to do it deliberately, not to do something by mistake or by accident or even negligently." *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 33 (1st Cir. 1989).  There is no dispute Regeneron acted voluntarily in providing money to CDF on multiple occasions, totaling $57.75 million in 2013 and 2014.  SOF ¶ 98.

 With respect to "willfully," there is at least a triable issue of fact as to whether Regeneron's executives knew they were "do[ing] something purposely that [the] law forbids."[1] *Bay State*, 874 F.2d at 33.  *First*, there is substantial evidence that Regeneron's executives understood the AKS and Guidance.  Regeneron's Chief Compliance Officer, Beth Holly, testified that Regeneron's compliance department provided live trainings on the AKS and Guidance throughout the 2011-2015 period.  SOF ¶ 107.  Ms. Holly further testified that Mr. Terifay, in particular, knew about the AKS.  *Id.* ¶ 108.  In fact, in July 2011, Mr. Terifay and Mr. Davis, among others, received a copy of CDF's advisory opinion from HHS-OIG, which stated that patient assistance through CDF could "potentially generate prohibited remuneration under the [AKS]," but that OIG would not impose administrative sanctions provided that a number of conditions were met, including that no data be provided to a contributor "related to the identity, amount, or nature of products or services subsidized" by CDF.  *Id.* ¶ 109.  In addition, Mr. Daniels provided Mr. Krukowski, one of Mr. Daniels's bosses, with a copy of the Guidance in 2012.  *Id.* ¶ 110.  The 2011 Xcenda analysis that Regeneron commissioned and which a number of employees received, including Mr. Terifay and Mr. Davis, stated that donations to co-pay foundations had limitations, including "limited data provided by the foundation."  *Id.* ¶ 111.  In

---

[1] The government notes that Magistrate Judge ordered Regeneron to produce materials concerning its interviews of Mr. Terifay.  ECF No. 212 (sealed).  Following Regeneron's objection, that issue is pending before the Court.  ECF No. 227 (sealed).  The government has yet to receive the withheld materials, which it believes speak to scienter. The government is filing its Opposition in accordance with the Court's scheduling order, but reserves the right to seek leave to amend if provided access to the withheld materials.

short, the employees who were responsible for managing Regeneron's relationship with CDF understood the AKS and were aware of the Guidance.

*Second*, there is substantial evidence that in at least two instances (described below), multiple Regeneron executives concealed their conduct, which is strong evidence of consciousness of guilt.  *See United States v. Sasso*, 695 F.3d 25, 29 (1st Cir. 2012) (concluding that "jurors could reasonably infer consciousness of guilt (and, thus, intent)" from concealment).

**Regeneron's February 2013 Concealment**: In February 2013, Regeneron's Internal Audit examined the Company's patient support function, including its relationship with CDF. SOF ¶ 112.  Regeneron's Manager of Internal Audit, Thibault Corbin de Mangoux, asked Mr. Daniels whether Regeneron received Eylea-specific data from CDF.  *Id.* ¶ 113.  In response, Mr. Daniels told his superiors that he was "not comfortable **providing** the information" that Mr. Mangoux was requesting.  *Id*. (emphasis added).  Mr. Terifay forwarded Mr. Daniels's email to Regeneron's VP of Internal Audit, John Calabro, but changed the down-chain email from Mr. Daniels to say that he was "not comfortable **asking** for the information" that Mr. Calabro was requesting.  *Id.* ¶ 114 (emphasis added).  In doing so, Mr. Terifay changed the meaning of the email, leaving Internal Audit with the misimpression that Regeneron did not already possess Eylea-specific information from CDF.  *Id*.  Mr. Calabro focused on the very language that Mr. Terifay changed and clarified, "I think Bil[ Daniels] may have misunderstood as we were not asking him to ask the foundation for information, but rather we were asking if we already were receiving any information."  *Id.* ¶ 115.  But Mr. Terifay doubled down: "We do not have any documentation given that this is an independent donation."  *Id*.  And, in light of Mr. Terifay's continued, and false, representation, about the nature of Regeneron's relationship with CDF, Mr. Calabro stood down.  This concealment of the truth evinces consciousness of guilt.

**Regeneron's November 2013 Concealment**: Following negative media reports about CDF's relationship with another pharmaceutical company, in November 2013, Internal Audit decided to revisit the issue of Regeneron's relationship with CDF.  SOF ¶ 116.  On November 25, 2013, Mr. Calabro sent an e-mail to Mr. Davis, Mr. Krukowski, and Ms. Casey, seeking to confirm, based on his misimpression from the email recipients, that Mr. Daniels "ha[d] not had any conversations with CDF concerning product level data."  *Id.* ¶ 117.  On December 3, 2013, after Mr. Daniels provided Internal Audit with the example of a "monthly" aggregate data report (i.e., *not* one of the many projections Ms. Walley had sent him that contained Eylea-specific information), Mr. Calabro sent an email to Mr. Daniels, with copies to Mr. Davis, Mr. Krukowski, and Ms. Casey, asking:

- Do you receive any other reports or data in emails from CDF?  If so, please provide
- How does CDF make a request for additional funding?  Is it verbal or by email?  How do they justify it?  Please provide any documentation you might have regarding such requests.

*Id.* ¶ 118.  Mr. Davis forwarded Mr. Calabro's questions to Mr. Terifay, with a subject line reading "HOW SHOULD [WE] ANSWER SECOND QUESTION FROM [CALABRO]."  *Id.*  In response, Mr. Terifay posited: "Isn't the answer that she estimates what she needs for the year verbally and then we divide across the year when we can afford it."  *Id.*  This answer was false both in that the requests were sent in writing (i.e., not verbal) multiple times, but also Regeneron did not simply "divide across the year when [it] could afford it."  *Id.* ¶¶ 119, 121.  Nonetheless, Mr. Davis forwarded Mr. Terifay's false answer to Mr. Daniels and Mr. Krukowski.  *Id.* ¶ 120.

On December 5, 2013, Mr. Krukowski followed up with Mr. Daniels, telling him: "Bil, you received the answer from Bob [Terifay] yesterday so please make sure you respond to John [Calabro] tonight."  *Id.* ¶ 122.  Shortly thereafter, Mr. Daniels followed this instruction, sending Mr. Calabro the following email, copying Mr. Davis, Mr. Krukowski, and Ms. Casey:

John,
No I don't receive any other reports or data
My contact estimates what she needs for the year verbally and then we divide across the year when we can afford it. If she is running low, she calls and indicates what more she needs.

*Id.* ¶ 123.  Mr. Daniels provided the following testimony concerning this email:

> Q: In that email, did you write, "No, I don't receive any other reports or data."
> A: Yes, I did.
> Q: Was that true?
> A: No, it was not.
> Q: Why did you say that if it wasn't true?
> A: I was told to.

*Id.* ¶ 124.  On December 6, 2013, Mr. Calabro responded with follow-up questions to Mr. Daniels, copying Mr. Davis, Mr. Krukowski, and Ms. Casey: "When [Ms. Walley] makes a request for funding, how does she justify it? Can you send me an example email?"  *Id.* ¶ 125. Mr. Daniels then proposed to Mr. Davis that he could tell Mr. Calabro that Ms. Walley "does provide a projection of the # of patients and the[] correlating dollars." *Id.* ¶ 126.  But Mr. Davis himself responded to Mr. Calabro, copying Mr. Krukowski, Mr. Daniels, and Ms. Casey, with a four-word answer: "It is all verbal."  *Id.* ¶ 127.  This statement was false. *Id.* ¶ 128.  In fact, as Mr. Davis, Mr. Krukowski, Mr. Daniels, and Ms. Casey all knew, Ms. Walley supported her requests with spreadsheets—it was not "all verbal."  *Id.* ¶ 129.

Together, these incidents of concealment provide strong evidence of consciousness of guilt and raise a triable issue of whether Regeneron acted willfully.

### B.  Regeneron Violated the FCA

The government can easily demonstrate that there is a genuine issue of material fact as to whether Regeneron violated the FCA.

#### 1.  Falsity And Materiality

The United States will show at trial that Regeneron violated the AKS, thereby establishing falsity for purposes of the FCA.  As discussed in its affirmative motion for partial

summary judgment, (ECF No. 225 at 6-7; ECF No. 266 at 3-4), incorporated here by reference, the Court should enter summary judgment in the government's favor on the element of materiality. Under the 2010 amendments to the AKS, healthcare claims that include items or services resulting from illegal kickbacks are per se materially false or fraudulent for purposes of the FCA. 42 U.S.C. § 1320a-7b(g). Even without the 2010 amendments, under longstanding First Circuit precedent, claims tainted by kickbacks are materially false. *See United States ex rel. Hutcheson v. Blackstone Medical, Inc*., 647 F.3d 377, 393 (1st Cir. 2011) (noting that Medicare "will not pay claims if the underlying transaction that gave rise to the claim violated the AKS").

Even if that were not enough, there is substantial evidence that, as a factual matter, the government will not pay for "services or products if they were delivered in manner that does not comply with the AKS." SOF ¶ 130. As a legal and factual matter, then, AKS compliance is material to payment, and claims resulting from an AKS violation are *per se* materially false.

### 2. Causation

The government incorporates by reference its arguments in support of its motion for partial summary judgment as to the element of causation. ECF No. 225 at 7-11; ECF No. 266 at 5-15. Under the First Circuit's decision in *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019), which embraced the Third Circuit's decision in *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 96-98 (3d Cir. 2018), the government need not establish "but for" causation to prevail at trial. *See also infra* Section III.C. The government need only show a "causal connection" between Regeneron's contributions to CDF and the resulting co-pay-assisted

Eylea claims that Medicare reimbursed.  *Guilfoile*, 913 F.3d 190.  The government is entitled to summary judgment on the element of causation.

### 3.  Knowingly

The government has proffered sufficient evidence of Regeneron's intent to permit it to proceed to trial, because, as discussed above, there is sufficient evidence to defeat summary judgment on the AKS violations.  Because "[t]he AKS's scienter element is harder to meet than the FCA's scienter standard," satisfying the AKS's scienter standard also satisfies the FCA's scienter standard.  *See United States ex rel. Gohil v. Sanofi U.S. Services, Inc.*, No. 02-2964, 2020 WL 4260797, at *13 (E.D. Pa. Jul. 24, 2020) (denying defendant's motion for summary judgment); *see also United States v. Mallory*, 988 F.3d 730, 737 (4th Cir. 2021).  Because the government can establish an AKS violation, it can also defeat summary judgment on FCA scienter.  *See also infra* Sections III.D, III.E.

## II.   THE GOVERNMENT HAS AT LEAST RAISED A TRIABLE ISSUE ON WHETHER REGENERON WAS UNJUSTLY ENRICHED

There is more than sufficient evidence to support each element of an unjust enrichment claim: a benefit to the defendant, a detriment to the plaintiff, and for it to be unjust for the defendant to retain that benefit.  *Metro. Life Ins. Co. v. Beard*, No. CV 16-11782-PBS, 2019 WL 480513, at *6-7 (D. Mass. Feb. 7, 2019).  Here, the benefit and detriment are the same: the millions of dollars Regeneron reaped from Medicare's reimbursement of tainted Eylea claims.  SOF ¶ 131.  Taking into account all the evidence described herein, including in the accompanying Statement of Facts, there is more than sufficient evidence to proceed to trial.

Regeneron is incorrect that the government's *potential* remedy through the FCA renders that remedy adequate.  Although the government cannot recover twice under two different legal theories, it is premature for the Court to dismiss this count.  *United States v. Stevens*,

605 F. Supp. 2d 863, 870 (W.D. Ky. 2008) ("[S]ince the FCA claim against Ms. Bailey has not been fully litigated, it would be premature to dismiss the alternative unjust enrichment claim.").

Regeneron relies on *Shaulis v. Nordstrom, Inc*., 865 F.3d 1 (1st Cir. 2017), which is inapposite. There, the First Circuit concluded that "a party with an adequate remedy at law cannot claim unjust enrichment." *Id*. at 16. But in *Shaulis*, the parties had an express contract. *Id*. Although a claim for unjust enrichment cannot displace a valid contract, *see Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc*., 412 F.3d 215, 234 (1st Cir. 2005), the government's claims are statutory. The Court is yet to evaluate the availability of that remedy. If the Court concludes that there are legal—rather than factual—deficiencies in the government's FCA claims, it would be unfair to deprive it of any equitable common law remedies. The Court, therefore, should deny Regeneron's motion on unjust enrichment.

## III.    REGENERON'S ARGUMENTS ARE UNAVAILING
### A.  Donations From Manufacturers To Foundations Constitute Remuneration

The Court should reject Regeneron's argument that a contribution to a co-pay assistance foundation is not "remuneration" under the AKS. Mem. at 11-13. This Court has already concluded that "improperly structured donations to copay-assistance charities may violate the AKS if they are made with the intent to induce Medicare-funded referrals or drug purchases." *Regeneron*, 2020 WL 7130004, at *9 (citations omitted).

Without legal support, Regeneron makes the bald assertion that "[t]he government's initial burden in prosecutions like this one . . . is to show that the charity in question was not a bona fide, independent charity, but instead operated as a mere pass-through for its donors." Mem. at 12. Regeneron can provide no statute, regulation, or case law to support this position. The only possible basis for this statement is the Guidance, which interprets the AKS, but lacks legal force. In any event, as discussed further below, (Section III.B), the baseline assumption is

14

that when a manufacturer makes a payment to a co-pay assistance foundation with the intent to induce a claim for the manufacturer's product, it is a kickback, unless the relationship with the foundation meets certain criteria.  Guidance at 72626-27.  As discussed further below, Regeneron's relationship with CDF did not meet those criteria.

### B.   Regeneron Mischaracterizes The Role Of The Guidance; There Is At Least A Factual Dispute As To Whether Regeneron Complied With It

#### 1.   The Guidance Lacks The Force Of Law; It Is Not An Element That The Government Must Prove

The Guidance is just that: guidance.  Sub-regulatory guidance that does not go through the notice and comment rulemaking process lacks the force of law.  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 99 (1st Cir. 2001) (recognizing that "an agency interpretation is entitled to respect only to the extent that the interpretation has the power to persuade").  As such, the Guidance is akin to an "interpretive rule" which "advise[s] the public of the agency's construction of the statutes and rules which it administers."  *Perez v. Mortgage Bankers Assn.*, 575 U.S. 92, 97 (2015) (cleaned up).  The government need not establish a violation of the Guidance to prevail—it is not an element of the AKS or FCA.

Instead, co-pay foundations and manufacturers may seek to defend their conduct based on their compliance with the Guidance.  If they reasonably believed (at the time) that they were acting within the Guidance, they can argue that they did not act knowingly.  *See United States ex rel. Strunck v. Mallinckrodt ARD, LLC*, No. 12-175, 2020 WL 362717, at \*5 (E.D. Pa. Jan. 22, 2020) (summarizing defendant's argument); *see also United States v. Medica Rents Co.*, No. 03-

11297, 2008 WL 3876307, at *2-3 (5th Cir. Aug. 19, 2008). Here, as discussed below, there is no evidence that Regeneron contemporaneously relied on the Guidance in dealing with CDF.

### 2. Regeneron Did Not Comply With The Guidance And CDF Was Not Independent In Its Dealings With Regeneron

Even if the United States did have to prove non-compliance with the Guidance, there is ample evidence (i) that Regeneron did not comply with its terms and (ii) that CDF did not operate as an independent foundation in its interactions with Regeneron. For these reasons also, the Court should deny Regeneron's motion for summary judgment.

The arrangement between Regeneron and CDF failed to meet the Guidance's criteria. First and most significantly, on at least eight separate occasions, Ms. Walley provided Regeneron with Eylea-specific information. *See supra* Section I.A.ii; *see also* SOF ¶ 132. Regeneron employees believed Ms. Walley when she told them that the data were Eylea specific. *Id.* ¶ 133. As Mr. Daniels testified:

> Q What is the bottom part of the first page of 35?
> A Clorinda providing I believe the updated projections that I have referenced previously.
> Q And did she do that on April 5, 2013?
> A It appears she did.
> Q Did you forward her projection to Mr. Dressel and Mr. Krukowski later that day?
> A Yes.
> Q On the projection itself, did you understand the patient numbers to be specific to Eylea?
> A Yes.

*Id.* ¶ 134. More generally, Daniels was asked: "you had been receiving data from CDF that was specific to Eylea, correct?" Daniels answered: "Yes." *Id.* ¶ 135. Indeed, Regeneron employees used Ms. Walley's data to conduct ROI analyses for subsequent contributions. *Id.* ¶ 136. In January 2013, for instance, Mr. Krukowski forwarded Eylea-specific data received from CDF along with Mr. Daniels' ROI calculations on that data to Ms. Casey, copying Mr. Davis, stating that the amount Regeneron was planning to contribute was insufficient "based up [sic] the

current number of Eylea patients CDF has already rolled over and enrolled for 2013." *Id.* ¶ 60.

He then described a meeting he had that day with Mr. Daniels, Mr. Davis, and Mr. Terifay, in

which Mr. Daniels presented his analysis containing the ROI calculations to support "why we

need to up our funding in Q1 significantly and made Bob T [Terifay] aware that we potentially

need ~$25Mil to adequately fund *our patient* responsibility for 2013." *Id.* (emphasis added).

Mr. Krukowski went on to write that Mr. Terifay complimented Mr. Daniels and wanted to keep

a copy of his analysis "to review with 'the boys', I am assuming Len [Schleifer, CEO] and

Murray [Goldberg, CFO] to see if we can get $10mil to fund for Q1." *Id.* Mr. Daniels's ROI

calculation included, for instance, the determination that if Regeneron funded 9,000 patients the

Company would have to pay CDF approximately $22 million, but their total sales for these

patients would be approximately $116 million. *Id.* In another exchange in June 2013,

Regeneron's controller provided a CDF-contribution ROI analysis to Regeneron's CFO, saying,

"makes sense to me." *Id.* ¶ 137. By the end of 2013, Regeneron's contributions matched what

CDF requested for that year; in other words, Regeneron correlated its contributions to CDF

based on Ms. Walley's Eylea-specific data. *Id.* ¶ 138.

Second, Regeneron received Eylea-specific data concerning Eylea patients' utilization of

CDF assistance indirectly from Regeneron's reimbursement support vendor, Lash. As Lash

manager Wendi Stapleton attested, (SUMF, Ex. 6 (ECF No. 226-6)), once an Eylea patient

enrolled in Regeneron's patient support program, EYLEA4U, Lash performed benefits

verification/investigations for those patients and helped locate financial assistance. ECF No. 226

¶ 13; *id.*, Ex. 6 ¶ 2 (ECF No. 226-6). Lash received patient-specific data from CDF in multiple

ways: from patients directly; through CDF's online portal; and from a patient-specific weekly

report about Eylea patients from CDF. SOF ¶ 139. Mr. Daniels testified that the Lash data,

although it did not tell the whole story, helped him validate the information he had received from Ms. Walley directly. *Id.* ¶ 140. That CDF provided Regeneron's agent, Lash, with patient-specific data that Lash then shared with Regeneron, belies Regeneron's contention that CDF operated in an independent manner.

Third, Regeneron worked directly with CDF to obtain assistance for specific Eylea patients, despite the Guidance's requirement that "[t]he charity awards assistance without regard to the pharmaceutical manufacturer's interests." Guidance at 70626. As both Mr. Daniels and Mr. Krukowski testified, if patients received Eylea before CDF approved them for co-pay assistance, Regeneron and its agent, Lash, worked directly with CDF to obtain retroactive co-pay assistance for specific patients. SOF ¶ 141. In fact, although CDF had a policy that CDF would not provide retroactive assistance for a patient whose relevant date of service was more than sixty days prior, on several occasions Mr. Daniels and Lash requested retroactive coverage in contravention of that policy. *Id.* ¶ 142. CDF, through Ms. Walley, obliged. *Id.* ¶ 143. In doing so, CDF did not act independently.

### 3. Regeneron's Defense That CDF Did Not Provide Actual Eylea Patient Counts Is Legally Irrelevant And Factually Incorrect

Regeneron advances the legally irrelevant and factually incorrect argument "that CDF never provided Regeneron with actual EYLEA patient counts," claiming falsely that this is "something the government itself now concedes." Mem. at 15.

#### a. Regeneron's Defense Is Wrong As A Matter Of Law

Even assuming for the sake of argument that CDF never provided Regeneron with "actual Eylea patient counts," that fact would not (as Regeneron argues) automatically absolve the Company of liability under the AKS. Because the Guidance has no legal force, the most Regeneron could hope to get from the Guidance is to say that the Company *believed* it was in compliance, and therefore did not act willfully. *See Medica Rents Co.*, 2008 WL 3876307, at *2-

3.  As discussed above, however, Regeneron employees responsible for the relationship with CDF believed the opposite, i.e., that Ms. Walley was sending Eylea-specific data.  Therefore, Regeneron has no good faith defense.

### b.  Regeneron's Defense is Wrong As A Matter Of Fact

Ms. Walley did provide Regeneron with Eylea-specific data.  First, it is objectively false that the "the government itself now concedes" that "CDF never provided Regeneron with actual EYLEA patient counts."  Mem. at 15.   Regeneron attempts to substantiate this false representation by citing only to one page of testimony from the government's expert, Retired FBI Special Agent Dennis Regan.  *Id.* (citing ECF No. 247, ¶ 52).  In fact, Mr. Regan testified the very opposite*,* and even did so on the same transcript page that Regeneron attaches to its filing: "My opinion is that . . . *they represent* Eylea-specific numbers."  *See* ECF No. 247-33 at 76:8 (emphasis added).  And Mr. Regan stated this opinion repeatedly.  *See* SOF at ¶ 144.

Second, on the substantive question of whether CDF provided Regeneron with Eylea patient counts, there is ample evidence that CDF did so.  Mr. Regan critiqued Regeneron's position that one can calculate today with 100% accuracy the number of patients in the AMD fund as of a projection date, given that certain data in the system has been overwritten.  *Id.* ¶ 145.  Mr. Regan testified repeatedly, however, that the projections that Ms. Walley provided to Regeneron *closely tracked* the number of Eylea patients receiving assistance from CDF as of the date of the spreadsheet.  *Id.*  But even if Regeneron does not credit the government's expert, it need look no further than its own putative expert's report to prove the point.  By way of just one example, on July 10, 2013, Ms. Walley told Regeneron that there were 17,850 rollover patients in the AMD fund.  *Id.* ¶ 146.  Regeneron's putative expert, Peter Resnick, says that the actual number of Eylea patients in the fund at that time was 17,632—i.e., 218 fewer patients than Ms. Walley told Regeneron.  *Id.* ¶ 147.  Surely a 1.2% variance is immaterial in assessing

whether the data Ms. Walley provided would "facilitate" Regeneron's "correlat[ion]" of the amount of its contribution with the number of subsidized Eylea claims.  Guidance at 70626.  In fact, by Regeneron's own putative expert's accounting, when you combine Regeneron's contributions to CDF's AMD fund in 2013 and 2014, it matches with 99% accuracy the combined assistance that CDF's AMD fund paid to Eylea patients in those years.  SOF ¶ 42.

### c.  Regeneron's Alternative Explanation For What Ms. Walley Was Doing Is Not Credible, Nor Is Ms. Walley Credible

Regeneron has acknowledged, as it must, that Ms. Walley sent some information to Regeneron.  But Regeneron now claims that the data Ms. Walley sent was the "remaining projected need for **all patients/all drugs** in the [AMD] fund," and cites CDF's August 20, 2018 letter in support of that position.  Mem. at 2 (Regeneron's emphasis) (citing ECF No. 247 ¶ 53).  During the relevant period, Genentech Inc. ("Genentech") was Regeneron's primary competitor in the anti-VEGF space and was the only other donor of significance to the AMD fund.  *See* ECF No. 247 ¶¶ 4, 29.  So Regeneron now contends that the data Ms. Walley sent Regeneron only "reflected the amount of funding CDF projected it needed from Regeneron to meet the **aggregate** needs of the AMD Fund **after subtracting** donations from the AMD Fund's primary donor, Genentech."  Mem. at 19 (Regeneron's emphasis).  In support of this claim, it cites exclusively to Ms. Walley's testimony.  *See id.* (citing ECF No. 247 ¶ 45).

Regeneron, however, ignores that CDF's August 2018 letter stated that the projections it provided to AMD donors "were for all patients regardless of drug."  SOF ¶¶ 53, 148.  That is, Ms. Walley's 2021 testimony (claiming that she only requested the AMD fund's remaining need) is inconsistent with CDF's 2018 letter ("all patients regardless of drug").  Meanwhile, if it were true that CDF sent AMD donors data for "*all patients regardless of drug*," then Ms. Walley never would have sent Genentech and Regeneron *different data* for the AMD fund *on the same*

*day*.  But that is exactly what happened on January 25, 2013, when CDF told Regeneron that there were 8,634 assisted patients in the AMD fund, and yet told Genentech that there were 19,220 assisted patients (i.e., 223% the number it sent to Regeneron).  *Id.* ¶ 149.

In addition, although Ms. Walley has claimed that the projections that she provided to Regeneron and Genentech were not specific to each manufacturer's drug, she also testified that she used "treatment plan" data to assist in generating her projections, and then separately tailored the projections to Regeneron and Genentech based on those data.  *Id.* ¶ 150.  As she previously testified, however, "treatment plans" are patient-specific information that identify *which drug* AMD patients were using when they first began receiving financial assistance from CDF. *Id.* ¶ 151.  In short, while claiming (post hoc) that her projections were not product-specific, she nevertheless described a product-specific methodology.

Ms. Walley, the individual who (on CDF's behalf) facilitated Regeneron's violations of the law, is not a credible witness.  Not only is her testimony riddled with internal inconsistencies, but also her bias is evident on its face.  For example, Ms. Walley acknowledged that the pharmaceutical industry, including Regeneron, funds her salary.  *Id.* ¶ 152.  Further, Ms. Walley's behavior with Regeneron was part of a broader pattern of misconduct.  CDF paid the government $2 million to settle similar allegations, including impermissible data sharing with manufacturers, and CDF entered into a Corporate Integrity Agreement with HHS-OIG prohibiting CDF from future instances of improper data sharing; Ms. Walley signed both of those documents.  *Id.* ¶ 153.  Whether Ms. Walley's revisionist history and post hoc claims that she and Regeneron were not breaking the law are true (despite all evidence to the contrary), is a matter for the jury and cannot provide a basis for granting summary judgment.

### C. The Government Is Not Required To Prove But-For Causation

The government is not required to show but-for causation in AKS-FCA cases.  Indeed, the Court already has expressly and unequivocally rejected Regeneron's actual inducement argument.  The Court stated that the United States need *not* show "the kickbacks actually corrupted clinical decision-making or provide 'proof that the underlying medical care would not have been provided but for a kickback.'"  *Regeneron*, 2020 WL 7130004, at *11 (quoting *Greenfield*, 880 F.3d at 96) (citing cases).  The government incorporates by reference its arguments in support of its motion for partial summary judgment on causation.  ECF No. 225 at 12-13; ECF No. 266 at 10-15.

### 1.  *Cairns* Is Not The Law Of This Circuit And Is Inapplicable

As the government has explained in its own motion for partial summary judgment, Regeneron's reliance on *United States ex rel. Cairns v. D.S. Medical, Inc.*, 42 F.4th 828 (8th Cir. 2022), is misplaced.  *See* ECF No. 225 at 7-11; ECF No. 266 at 2, 5-15.  To summarize:  *First*, *Cairns* is contrary to the law of this Circuit.[2]  *Compare Guilfoile*, 913 F.3d at 190 (binding First Circuit precedent expressly embracing *Greenfield*'s approach to causation), *with Cairns*, 42 F.4th at 836 (expressly deviating from *Greenfield*'s approach to causation).  *Second*, the Eighth Circuit explicitly acknowledged the narrow scope of its holding, including limiting it to cases in which "a plaintiff seeks to establish falsity or fraud through the 2010 amendment."  *Cairns*, 42 F.4th at 836-37 ("We do not suggest that every case arising under the False Claims Act requires a showing of but-for causation[.]"); *see also United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, No. 13-CV-3003, 2023 WL 36174, at *2 (D. Minn. Jan. 4, 2023).  So, even under *Cairns*, "if Plaintiffs can establish all the elements of their material falsity theory without

---

[2] Likewise, the Sixth Circuit's recent holding in *United States ex rel. Martin v. Hathaway*, No. 22-cv-1463 (6th Cir. Mar. 28, 2023), is not the law in this Circuit.

reliance on the 2010 Amendment—including that the purported AKS violations were material—Plaintiffs need not prove but-for causation to establish liability under the FCA." *Fesenmaier*, 2023 WL 36174, at *3.

The government can establish material falsity without reliance on the 2010 Amendment by showing that lack of compliance with the AKS was a material precondition of payment. *See United States ex rel. Hutcheson v. Blackstone Medical, Inc*., 647 F.3d 377, 392-94 (1st Cir. 2011). In this case, this is true as a matter of law and a matter of fact.

As a matter of law, in *Hutcheson*, the First Circuit concluded that compliance with the AKS was a material precondition of payment. *Id.* As a result, the First Circuit determined that "the . . . claims were ineligible for payment" because "the underlying transaction violated the [AKS]." *Id*. (internal quotation marks omitted). So too here, the "underlying transactions" violated the AKS, and it is irrelevant whether the services otherwise would have been provided—a defense that the First Circuit rejected in *Hutcheson* and that this Court should reject (again) today. *Id*. at 394-95 (describing the defense as "impermissibly cabin[ing] what the government may consider material").

As a factual matter, CMS does not pay for products or services that are tainted by kickbacks. As a senior CMS Deputy Director of the Division of Practitioner Services has attested, "[e]ven when the underlying services or products are otherwise medically necessary, CMS's position is that it will not pay for such services or products if they were delivered in manner that does not comply with the AKS. In other words, compliance with the AKS is material to CMS's payment decision." SOF ¶ 154.

### 2. Even If The Government Were Required To Establish "But For" Causation, The Court Should Still Deny Regeneron's Motion

Even if the United States did have to show but-for causation, there is ample evidence that physicians would not have submitted claims for Eylea absent Regeneron's indirect payment of co-pay subsidies. Between 2011 and 2014, the Medicare reimbursement rate for Eylea was $1,961 per dose, while Avastin ranged from $60 to $67 per dose. SOF ¶ 155. As discussed above, Regeneron understood that some segment of the Medicare population would not be able to afford Eylea without co-pay assistance, s*ee supra* Section I.A.2, and that, as a result, those patients might choose Avastin. SOF ¶ 156. Indeed, Regeneron itself told the SEC and the public the same thing, over and over: "The relatively low cost of therapy with Avastin® in patients with wet AMD presents a significant competitive challenge" for Eylea. *Id.* ¶ 86. It is, after all, common sense that patients will not purchase a drug if they cannot afford it. In addition, the government's expert, Leemore Dafny, Ph.D., has opined that making drugs cheaper for patients through co-pay subsidies makes it more likely that patients will purchase them. *Id.* ¶ 158.

There is also evidence that physicians would not administer Eylea unless they were confident that they would receive complete payment. Multiple physicians have attested to their hesitance to saddle patients with costly co-pays, given the availability of the far cheaper alternative (Avastin). *Id.* ¶ 159. Moreover, physicians do not wish to encumber their practices with unpaid co-pay obligations, which is an issue for buy-and-bill drugs, like Eylea. *Id.* ¶ 160.[3]

Indeed, Regeneron's *own* putative medical expert, Dr. Slizard Kiss, testified that ophthalmologists' prescribing decisions "may be altered, based on other decisions" than the

---

[3] Regeneron cites to "counter-declarations" that many of these physicians executed at Regeneron's request. None of the counter-declarations cast doubt on the basic and unsurprising economic principle that physicians were disinclined to place either patients or themselves in debt resulting from unreimbursed purchases of Eylea. Also, to the extent there is any inconsistency, that only highlights that summary judgment is inappropriate here.

efficacy of a drug, including the drug's "cost." *Id.* ¶ 161.  In fact, when holding himself out as an expert on behalf of Regeneron in another litigation, Dr. Kiss swore a declaration that described cost as among "the primary drivers of ophthalmologist prescribing decisions." *Id.* ¶ 162.  Dr. Kiss explained that if an ophthalmology practice uses Eylea, and insurance does not cover the cost, the practice will not receive reimbursement.  *Id.* ¶ 163.  And because providers buy-and-bill Eylea, they must cover any non-reimbursed cost themselves.  *Id.* ¶ 164.

### 3. Regeneron's Argument That CDF's Surplus Severs The Causal Chain Is Factually Disputed, At Best

If we continue assuming for the sake of argument that the government must prove but-for causation, there is a factual dispute as to whether CDF's purported surplus severed the causal link between Regeneron's contributions to CDF and CDF's disbursements to Eylea patients. Regeneron asserts that CDF's AMD fund had sufficient funds without Regeneron's contributions in 2013 and 2014.  ECF No. 246 at 8-9, 14-15, 30.  This repeated assertion requires a deceptive sleight of hand that is at a minimum misleading, if not completely false.

According to Regeneron's putative expert, Mr. Resnick, the AMD fund had a beginning balance in 2013 of just over $44 million, received an additional $43.7 million from non-Regeneron sources, and paid just shy of $54 million in patient co-pays in 2013, leaving the fund with $33.7 million at the end of 2013:

| *2013 AMD Fund* | |
|---|---|
| January 1, 2013 AMD Fund Beginning Balance | $44,014,165 |
| + 2013 Genentech Donations after 9% Admin Fee | 43,674,750 |
| (2013 Patient Copayments) | (53,957,180) |
| **December 31, 2013 AMD Fund Surplus/(Deficit)** | **$33,731,735** |

SOF ¶ 165.  This is misleading, because it accounts for Genentech's contributions, but not Regeneron's.  Had neither company contributed in 2013, the fund would have had a *significant*

*deficit* at the end of 2013.  And there is no evidence in the record that either company was aware of the other's anticipated contributions.

But whereas Regeneron's assertions for 2013 are misleading, its assertions for 2014 are grossly deceptive.  According to Mr. Resnick, the fund's 2014 beginning balance was $65.6 million, it spent $60.2 million in co-pays, and its ending balance was $5.4 million:

| 2014 AMD Fund | |
| --- | --- |
| January 1, 2014 AMD Fund Beginning Balance | $65,581,735 |
| + 2014 Genentech Donations after 9% Admin Fee | - |
| (2014 Patient Copayments) | (60,168,607) |
| **December 31, 2014 AMD Fund Surplus/(Deficit)** | **$5,413,128** |

*Id.* ¶ 166.  According to Mr. Resnick, as reflected in the first Resnick table above, the balance at the end of 2013 would have been $33.7 million without Regeneron's contributions.  How could it be, then, that the beginning fund balance was nearly twice that ($65.6 million) at the beginning of 2014?  Because Mr. Resnick *added back in* Regeneron's 2013 contributions. *Id.* ¶ 167.  So, when Regeneron says that in 2013 and 2014 "CDF had surplus funds sufficient to cover all co-pay assistance provided to AMD patients, irrespective of treatment, ***without receiving a penny from Regeneron*** in each respective year," ECF No. 246 at 8 (Regeneron's emphasis), it deliberately fails to mention that that this only true in 2014 if you include ***every single penny from Regeneron in 2013***.  If Regeneron had not contributed in 2013, and Mr. Resnick had used the starting balance of $33.7 million, the fund would have been in a $26.4 million *deficit* in 2014.  SOF ¶ 76.  In other words, just as Ms. Walley told Regeneron in 2013 (and as Regeneron has admitted it believed, see below), without Regeneron's 2013 contributions, the AMD fund would have closed.  Using Regeneron's own math, CDF could not have covered Eylea co-pays but for Regeneron's contributions.  At a minimum, there is a genuine dispute as to these facts.

Finally, it is undisputed that Regeneron *did not believe* the AMD fund was running a

surplus during the relevant period.  In fact, it is undisputed that the opposite is true: Regeneron

*believed* that the AMD fund would have closed, but for its contributions.  Ms. Walley repeatedly

told Regeneron that the AMD fund *needed* Regeneron's money to survive.  *Id.* ¶ 168.

Regeneron's CEO, meanwhile, has testified that he believed this to be true.  *See* ECF No. 247

¶ 64 (Regeneron claiming as undisputed that its CEO "approved donations based on . . . what he

thought was needed to keep the AMD Fund open" and citing his testimony).

**D.    Objective Reasonableness Is Not The Law And Regeneron's Post Hoc Interpretation Of The Law Is Not Objectively Reasonable**

As a threshold matter, the Court should decline to follow *United States ex rel. Schutte v.

Supervalu, Inc.*, 9 F.4th 455 (7th Cir. 2022), which the Supreme Court already has agreed to

review.  143 S. Ct. 644 (2023).  *Supervalu* looked to the Supreme Court's holding in *Safeco Ins.

Co. of America v. Burr*, 551 U.S. 47 (2007)—which interpreted the scienter standard under the

Fair Credit Reporting Act ("FCRA")—to reach the conclusion that a defendant can escape FCA

liability if it can advance an objectively reasonable interpretation of an ambiguous regulation to

justify its conduct, even if that explanation comes after-the-fact.  *Supervalu*, 9 F.4th at 470.  This

standard turns FCA scienter on its head.  *Id.* at 476 (Hamilton, J., dissenting).

The Supreme Court has made clear that *Safeco*'s scienter holding—and in particular a

footnote concerning subjective bad faith—does not broadly apply to all statutes.  *See Halo

Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 105 n.* (2016).  Put simply, "differences

in the . . . statutes produced different scienter standards."  *Supervalu*, 9 F.4th at 483 (Hamilton,

J., dissenting).  Unlike with the FCRA, Congress expressly defined the FCA's scienter standard.

In fact, it did so (when amending the FCA in 1986) specifically because a line of cases had

allowed defendants to escape liability by engaging in "ostrich"-like conduct.  *See id.* at 479-80,

27

482-83 (Hamilton, J., dissenting) ("This bad-faith 'catch us if you can' approach to public funds is exactly what Congress thought it was outlawing . . . .").

The plain language that Congress used in 1986 when it added the definition of "knowingly" makes clear that Regeneron's subjective beliefs from 2012 through 2014 are indeed relevant to scienter.  The FCA imposes liability on a person who submits a false claim to the government with "actual knowledge," "deliberate ignorance," or "reckless disregard of the truth."  31 U.S.C. § 3729 (b)(1)(A)(i)-(iii).  The first two terms cover distinct species of subjective bad faith.  "[A]ctual knowledge" refers to a "state of mind that one considers that he knows." Black's Law Dictionary 784 (5th ed. 1979) (defining "knowledge"); *see also Intel Corp. Investment Policy Committee v. Sulyma*, 140 S. Ct. 768, 776 (2020) (subjectively "aware of " a violation.).  "[D]eliberate ignorance" covers a defendant who is "subjective[ly] aware[]" of a substantial risk that his statement may be false, and intentionally avoids taking steps to confirm the statement's truth or falsity.  *United States v. Ricard*, 922 F.3d 639, 656 (5th Cir. 2019).  "[R]eckless disregard," meanwhile, describes circumstances in which a defendant disregards a "high risk" of falsity "that is either known or so obvious that it should be known."  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  Unlike with the first two clauses, the third, "reckless disregard," does not necessarily require proof of the defendant's subjective awareness.  And yet, *Supervalu* collapses "actual knowledge" and "deliberate ignorance" into "reckless disregard," inappropriately rendering them surplusage.  *Supervalu*, 9 F.4th at 484 (Hamilton, J., dissenting).

The Court should consider—and allow the jury to consider—the mass of evidence that shows that when Regeneron paid kickbacks to doctors and patients through CDF, it subjectively knew it was causing false claims.  *See, e.g.*, *Halo*, 579 U.S. at 105 ("[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct."); *Mallory*,

988 F.3d at 736-38 (rejecting argument that "because [a law] is ambiguous," a defendant "cannot have knowingly violated the [FCA]"); *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) ("The . . . conclusion that a finding of scienter can be precluded by a defendant's identification of a reasonable interpretation of an ambiguous regulation that would have permitted its conduct is erroneous."). As explained above, multiple Regeneron employees lied about, and concealed from Internal Audit, the true nature of Regeneron's relationship with CDF.

Regeneron, meanwhile, has put forward no evidence that it relied on its tortured post hoc interpretation of the Guidance. *See* ECF No. 246 at 14-16. Accordingly, the Guidance cannot negate Regeneron's intent. *See, e.g.*, *United States ex rel. Hueseman v. Pro. Compounding Centers of Am., Inc.*, No. SA-14-CV-00212, 2023 WL 2669879, at *13 (W.D. Tex. Mar. 27, 2023) ("*Safeco* would not excuse liability for a post hoc interpretation of regulations that [the defendant] never actually took."); *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 629 (S.D. Tex. 2016) ("[A] defendant [cannot] disregard its obligations under the FCA and then argue *ex post facto* that a reasonable interpretation of applicable law supports its prior position."). No witness who understood Regeneron's relationship with CDF has testified that, at the relevant time, they believed that CDF was permitted to share Eylea-specific data with Regeneron. In fact, Regeneron's employees held the exact opposite view and knew that what they were doing was illegal. As Mr. Terifay told Internal Audit in February 2012, in the very email he changed to mislead them about whether CDF had sent Eylea-specific data: "Donors have no rights to information of any sort of disposition of funds." SOF ¶ 169; *id.* (Regeneron employee testifying that the rules required the company to "thr[o]w the money over the wall," without "input [or] feedback").

Moreover, even assuming that *Supervalu* articulates the correct FCA scienter standard, summary judgment is not warranted.  The Guidance is not ambiguous.  It clearly states that manufacturers can avoid AKS liability "so long as" they meet five specific criteria.  70 Fed. Reg. at 70626.  To state the obvious, "so long as" means "provided that," which in turn means "on condition that" or "only if."  So Long As, Provided, On (the) Condition That, Merriam Webster, https://www.merriam-webster.com.  Perhaps even more obvious, "when 'and' is used to connect a list of requirements, the word ordinarily has a 'conjunctive' sense, meaning that all the requirements must be met."  *United States v. Garcon*, 54 F.4th 1274, 1278 (11th Cir. 2022) (en banc) (citing *United States v. Palomar-Santiago*, 141 S. Ct. 1615 (2021)).  "For example, if a statute provides, 'You must do A, B, and C,' it is not enough to do only A, only B, or only C; 'all three things are required'—A, together with B, together with C."  *Garcon*, 54 F.4th at 1278 (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 116 (2012)).  There is no basis for Regeneron's post hoc suggestion that compliance with the Guidance does not require satisfaction of each and every one of the five required criteria.

Likewise, Regeneron's post hoc argument that "the focus should be on the sentence immediately following the five factors" and not on the five criteria themselves, Mem. at 30, is objectively *un*reasonable.  As Regeneron would have it, a general sentence that "defin[es] the boundaries of a manufacturer's legal obligation," (Mem. at 30), somehow trumps the specific criteria that the same manufacturer must follow.  That approach is inconsistent with the "well established canon of statutory interpretation . . . 'that the specific governs the general.'"  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).  Ironically, Regeneron argues that this Court should ignore the five criteria because, if the Court considers them, it would "render the 'simply put' sentence mere surplusage."  *Id.*  But, of course, adopting

Regeneron's post hoc interpretation would have the perverse effect of rendering as surplusage all five of the enumerated criteria. This result is objectively unreasonable at least in part because it flies in the face of the Supreme Court's direction to "*avoid*[]" an interpretation of a single text that results in "superfluity of *a specific provision that is swallowed by the general one*." *Id.* at 645 (2012) (emphases added). At the risk of gilding the lily, further evidence of the objective *un*reasonableness of Regeneron's interpretation can be found in its Donation Agreement with CDF. That document explains that "applicable guidelines" prohibit Regeneron's use of data that would "facilitate [it] in correlating the amount or frequency of its Donations with the number of subsidized prescriptions for its products." SOF ¶ 170. By the contract's terms, CDF also promised that it would *not* provide reports that "include any information specific to a particular product or particular provider or supplier[.]" *Id.* Regeneron's post hoc interpretation of the Guidance is so unreasonable that its application would violate the very contract that governed Regeneron's relationship with CDF.

Knowledge under the FCA is a fact-intensive question ordinarily left for the jury. *See, e.g.*, *Mallory*, 988 F.3d at 738 (upholding jury's conclusion regarding knowledge). A jury should hear the evidence and decide whether Regeneron acted knowingly.

**E. Regeneron's CEO's Knowledge Is Not Determinative Of The Company's Knowledge, And Even If It Were, There Is A Triable Issue Of Fact**

Regeneron is more than just its CEO; it is a public company. Its argument that only its CEO's knowledge can bind the company runs counter to *United States v. Bank of New England, N.A.*, 821 F.2d 844 (1st Cir. 1987) and cases like *United States v. Anchor Mortg. Corp.*, 711 F.3d 745, 747 (7th Cir. 2013) ("[c]orporations such as Anchor 'know' what their employees know"). Indeed, even Regeneron's counsel has argued that Dr. Schleifer and the Company are distinct.

> MR. SCHEFF: Evan, and I know we're sitting with the Chief Executive Officer and President of Regeneron, but he's here in his capacity as a fact witness, not

> as a company designee. So I know you're asking questions, you know, "Did
> Regeneron believe," "Did Regeneron believe" –

SOF ¶ 171 (Schleifer Dep. 46:6-11).  Regeneron and Dr. Schleifer are distinct.  The notion that

only Dr. Schleifer could bind a publicly traded company defies applicable precedent and

common sense.  If a corporation only can be held liable for its CEO's conduct, then each can

enjoy the fruits of corporate illegality consequence-free, so long as the CEO nominally remains

in the dark.  *See United States v. Josleyn*, 206 F.3d 144, 159 (1st Cir. 2000) ("no requirement that

a person be a 'central figure' at a company in order for that person's knowledge to be imputed").

It is black letter law everywhere, and well-settled law in this Circuit, that a company *acts*

and *knows* through its employees and agents.  *Bank of New England*, 821 F.2d at 856; *see also*

*United States ex rel. Jones v. Brigham and Women's Hosp.*, 678 F.3d 72, 82 n. 18 (1st Cir. 2012)

("We have long held that corporate defendants may be subject to FCA liability when the alleged

misrepresentations are made while the employee is acting within the scope of his or her

employment.").  As the Court of Appeals stated in *Bank of New England*: "The acts of a

corporation are, after all, simply the acts of all of its employees operating within the scope of

their employment. . . .  Similarly, the knowledge obtained by corporate employees acting within

the scope of their employment is imputed to the corporation."  821 F.2d at 856; *see also*

Restatement (Third) Agency § 7.03.

In *Anchor Mortgage*, the Seventh Circuit rejected the argument Regeneron makes

today—that a company cannot be liable under the FCA because the CEO did not know

something.  711 F.3d at 747.  The court rejected that argument on the basis that "Alfredo

Busano, head of one of Anchor's branch offices, knew what was going on."  *Id.*  As the court

succinctly summarized, "Busano's knowledge was Anchor's knowledge."  *Id.* at 748.

Similarly, here, multiple Regeneron employees acted knowingly under the FCA.  Mr. Daniels was the primary and, for much of the relevant period, sole Regeneron point-of-contact with CDF.  SOF ¶ 171.  Mr. Daniels, who received the Guidance at least as early as December 2012 (and indeed forwarded it to Mr. Krukowski and Ms. Casey on December 5, 2012), continued to solicit and receive data from Ms. Walley, data that he believed to be Eylea-specific (and it was), and then used that data to make recommendations about how much Regeneron should contribute to CDF.  *Id.* ¶ 173.  Mr. Daniels did not act alone.  In fact, he presented his recommendations directly to his supervisors, including Mr. Terifay, Mr. Krukowski, Mr. Davis, and Ms. Casey, evening citing to the CDF "quoted" number of Eylea patients in the fund.  *Id.* ¶ 174.  The evidence makes clear that Mr. Daniels's supervisors relied on his work in determining CDF's "donation" amounts and that Mr. Daniels played a key role in determining what funds to send to CDF.  *See, e.g.*, *id.* ¶ 175.  And then later, Mr. Daniels, Mr. Krukowski, Mr. Davis, Ms. Casey, and Mr. Terifay conspired to conceal what they had done.  *Id.* ¶ 176.

According to Regeneron's Rule 30(b)(6) witness, it was not Dr. Schleifer, but "Bob Terifay's organization [that] was responsible for determining the amount and the timing of the contributions to each charitable co-pay foundation."  *Id.* ¶ 177.  Mr. Terifay, and the members of his "organization" knew that the Guidance would afford them no protection if they "solicit[ed] or receive[d] data from the charity that *would facilitate* the manufacturer in correlating the amount or frequency of its donations," and yet they did.  *Id.* ¶ 178 (emphasis added).  As described in detail above, *see* Section I.A.3, when Regeneron's Internal Audit inquired about these practices, Mr. Terifay and others covered it up, demonstrating a "consciousness of guilt (and, thus, intent)." *Sasso*, 695 F.3d at 29.

Finally, even if Dr. Schleifer is the only individual whose conduct is of any moment in this case, there is at least a jury question as to whether Dr. Schleifer acted with intent. After all, Dr. Schleifer certified in the 2013 10-K that Regeneron contributed money to CDF to "commercialize Eylea," *see supra* at Section I.A.2, and there is no dispute that he understood the Guidance. SOF ¶ 55. Further, Dr. Schleifer was entirely reliant on his employees in determining the amount, timing, and recipient of each of Regeneron's contributions. SOF ¶ 179.

### F. Responding to Regeneron's *Ad Hominem* Attack

Regeneron claims that prosecutors "pressed ahead with its meritless claims" despite knowing that CDF did not provide Regeneron with patient-specific data. See Mem. at 2 & n.1, 7. But the truth is that the data were actually Eylea specific. The United States has shown as much above and it will prove as much to a jury, if necessary (although it is legally irrelevant).

Regeneron's attempt to argue misconduct is a distraction meant to draw attention away from the actual facts. *See* ECF No. 254 (sealed). The Company misleadingly implies that the government refused to timely produce an advocacy letter that CDF's counsel sent the government in 2018. Mem. at 2 n.1. But the government was not hiding this letter, and more to the point Regeneron *had this letter* at least by September 16, 2021—i.e., nearly eight months before the close of fact discovery. SOF ¶¶ 180, 182. At that point, in September 2021, Regeneron did not move for any relief related to the letter, it did not file discovery requests about the letter, it did not even ask the government's attorneys about the letter.[4] And still, to this day, Regeneron has done nothing substantive with CDF's 2018 letter, presumably because Regeneron knows the letter has no evidentiary value and is of no utility except to the extent the Company

---

[4] After fact discovery closed, Regeneron "sent a letter to the U.S. Attorney's Office taking issue with the government's failure to produce [CDF's letter]." Mem. at 2 n.1. It was at that point that the United States re-reviewed its internal files; realized that it had inadvertently failed to produce the letter; and promptly produced it on May 24, 2022, explaining that non-production had been inadvertent. SOF ¶ 183.

can use it to advance specious claims of prosecutorial misconduct.  That is why Regeneron waited 218 days to produce the letter on the eve of fact discovery's closure.  *Id.* ¶ 181.

Finally, Regeneron cannot claim truthfully that it was only through discovery that it experienced a factual revelation.  In March 2019, 

In September 2019,

There was no revelation—just a concocted post-hoc attempt to explain away unlawful conduct.  The government found these defenses unconvincing in 2019 and, respectfully, so too should the Court.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Regeneron's motion for summary judgment.

Dated:  April 14, 2023

RACHAEL S. ROLLINS
United States Attorney

*/s/Abraham R. George*
ABRAHAM R. GEORGE
EVAN D. PANICH
LINDSEY ROSS
CHARLES B. WEINOGRAD
Assistant United States Attorneys
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
evan.panich@usdoj.gov
abraham.george@usdoj.gov
lindsey.ross@usdoj.gov
charles.weinograd@usdoj.gov

# APPENDIX A

it to the agency. Thus, each firm submitting a compliance extension request will need 5 hours of employee time to complete the request. Given that 56 businesses are expected to submit written requests in year one, the total burden hours for year one are 280.

In year two, FDA expects about one-half as many firms to request a labeling compliance extension. So for year two, 28 firms are expected to file a request for an extension to the labeling compliance date. Again, assuming that it will take 5 hours to complete each request, the total burden hours for year two will be 140.

Dated: November 14, 2005.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 05–23040 Filed 11–21–05; 8:45 am]

**BILLING CODE 4160–01–S**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

**[Docket No. 2005N–0343]**

### Agency Information Collection Activities; Announcement of Office of Management and Budget Approval; Guidance for Requesting an Extension to Use Existing Label Stock After the Trans Fat Labeling Effective Date of January 1, 2006

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is announcing that a collection of information entitled ''Guidance for Requesting an Extension to Use Existing Label Stock after the *Trans* Fat Labeling Effective Date of January 1, 2006'' has been approved by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (the PRA). Elsewhere in this issue of the **Federal Register**, FDA is publishing a notice announcing an opportunity for public comment on this collection of information. Since this collection received emergency approval that expires on January 1, 2006, FDA is following the normal PRA clearance procedures by issuing that notice.

**FOR FURTHER INFORMATION CONTACT:** Peggy Robbins, Office of Management Programs (HFA–250), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–827–1223.

**SUPPLEMENTARY INFORMATION:** In the **Federal Register** of September 1, 2005 (70 FR 52108), the agency announced that the proposed information collection had been submitted to OMB for review and clearance under 44 U.S.C. 3507. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. OMB has now approved the information collection and has assigned OMB control number 0910–0571. The approval expires on January 31, 2006. A copy of the supporting statement for this information collection is available on the Internet at *http://www.fda.gov/ohrms/dockets*.

Dated: November 14, 2005.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 05–23041 Filed 11–21–05; 8:45 am]

**BILLING CODE 4160–01–S**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Health Resources and Services Administration

### Advisory Commission on Childhood Vaccines; Notice of Meeting

In accordance with section 10(a)(2) of the Federal Advisory Committee Act (Pub. L. 92–463), notice is hereby given of the following meeting:

*Name:* Advisory Commission on Childhood Vaccines (ACCV).

*Date and Time:* December 12, 2005, 9 a.m.—5 p.m., EST.

*Place:* Audio Conference Call and Parklawn Building, Conference Rooms G & H, 5600 Fishers Lane, Rockville, MD 20857.

The ACCV will meet on Monday, December 12, from 9 a.m. to 5 p.m. The public can join the meeting in person at the address listed above or by audio conference call by dialing 1–800–369–6048 on December 12 and providing the following information:

*Leader's Name:* Dr. Geoffrey Evans.

*Password:* ACCV.

*Agenda:* The agenda items for the December meeting will include, but are not limited to: A summary of the U.S. Court of Federal Claims' 18th Judicial Conference; a report from the ACCV Workgroup looking at proposed guidelines for future changes to the Vaccine Injury Table; and updates from the Division of Vaccine Injury Compensation (DVIC), Department of Justice, National Vaccine Program Office, Immunization Safety Office (Centers for Disease Control and Prevention), National Institute of Allergy and Infectious Diseases (National Institutes of Health), and Center for Biologics and Evaluation Research (Food and Drug Administration). Agenda items are subject to change as priorities dictate.

*Public Comments:* Persons interested in providing an oral presentation should submit a written request, along with a copy of their presentation to: Ms. Cheryl Lee, Principal Staff Liaison, DVIC, Healthcare Systems Bureau (HSB), Health Resources and Services Administration (HRSA), Room 11C–26, 5600 Fishers Lane, Rockville, Maryland 20857 or e-mail *clee@hrsa.gov*. Requests should contain the name, address, telephone number, and any business or professional affiliation of the person desiring to make an oral presentation. Groups having similar interests are requested to combine their comments and present them through a single representative. The allocation of time may be adjusted to accommodate the level of expressed interest. DVIC will notify each presenter by mail or telephone of their assigned presentation time. Persons who do not file an advance request for a presentation, but desire to make an oral statement, may announce it at the time of the comment period. These persons will be allocated time as it permits.

*For Further Information Contact:* Anyone requiring information regarding the ACCV should contact Ms. Cheryl Lee, Principal Staff Liaison, DVIC, HSB, HRSA, Room 11C–26, 5600 Fishers Lane, Rockville, MD 20857; telephone (301) 443–2124 or e-mail *clee@hrsa.gov*.

Dated: November 15, 2005.

**Tina M. Cheatham,**

*Director, Division of Policy Review and Coordination.*

[FR Doc. 05–23042 Filed 11–21–05; 8:45 am]

**BILLING CODE 4165–15–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Office of Inspector General

### Publication of OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees

**AGENCY:** Office of Inspector General (OIG), HHS.

**ACTION:** Notice.

**SUMMARY:** OIG periodically develops and issues guidance, including Special Advisory Bulletins, to alert and inform the health care industry about potential problems or areas of special interest. This **Federal Register** notice sets forth the recently issued OIG Special Advisory Bulletin addressing patient assistance programs for Medicare Part D enrollees.

**FOR FURTHER INFORMATION CONTACT:** Darlene M. Hampton, Office of Counsel to the Inspector General, (202) 619–0335.

**SUPPLEMENTARY INFORMATION:**

### Special Advisory Bulletin: Patient Assistance Programs for Medicare Part D Enrollees (November 2005)

*I. Introduction*

Patient assistance programs (PAPs) have long provided important safety net assistance to patients of limited means

who do not have insurance coverage for drugs, typically serving patients with chronic illnesses and high drug costs. PAPs are structured and operated in many different ways. PAPs may offer cash subsidies, free or reduced price drugs, or both. Some PAPs offer assistance directly to patients, while others replenish drugs furnished by pharmacies, clinics, hospitals, and other entities to eligible patients whose drugs are not covered by an insurance program. Some PAPs are affiliated with particular pharmaceutical manufacturers; others are operated by independent charitable organizations (such as, for example, patient advocacy and support organizations) without regard to any specific donor or industry interests.

Many pharmaceutical manufacturers have historically sponsored PAPs that assist patients whose outpatient prescription drugs are not covered by an insurance program (including some Medicare beneficiaries), in obtaining the manufacturer's products for free or at greatly reduced cost. Beginning on January 1, 2006, Medicare Part D will offer Medicare beneficiaries who elect to enroll broad coverage for outpatient prescription drugs. Accordingly, Medicare beneficiaries who enroll in Part D will no longer qualify under traditional PAP eligibility criteria. Part D enrollees will incur cost-sharing obligations (including deductibles and copayments), although many low-income beneficiaries will qualify for subsidies that will reduce or eliminate their financial obligations.[1] Pharmaceutical manufacturers have expressed interest in continuing to assist Medicare Part D enrollees of limited means who do not qualify for the low-income subsidy.

OIG is mindful of the importance of ensuring that financially needy beneficiaries who enroll in Part D receive medically necessary drugs, and OIG supports efforts of charitable organizations and others to assist financially needy beneficiaries, as long as the assistance is provided in a manner that does not run afoul of the Federal anti-kickback statute or other laws.[2] We have been asked whether the

anti-kickback statute will be implicated if pharmaceutical manufacturer PAPs[3] continue to offer assistance to financially needy Medicare beneficiaries who enroll in Part D by subsidizing their cost-sharing obligations for covered Part D drugs. For the reasons set forth below and consistent with extant OIG guidance, we conclude that pharmaceutical manufacturer PAPs that subsidize Part D cost-sharing amounts present heightened risks under the anti-kickback statute. However, in the circumstances described in this Bulletin, cost-sharing subsidies provided by *bona fide*, independent charities unaffiliated with pharmaceutical manufacturers should not raise anti-kickback concerns, even if the charities receive manufacturer contributions. In addition, we believe other arrangements described in this Bulletin, if properly structured, may pose reduced risk. Thus, we believe lawful avenues exist for pharmaceutical manufacturers and others to help ensure that all Part D beneficiaries can afford medically necessary drugs.

Given the importance of ensuring continued access to drugs for beneficiaries of limited means and the expedited time frame for implementation of the Part D benefit, we are issuing this Special Advisory Bulletin to identify potentially abusive PAP structures, as well as methods of providing assistance that mitigate or vitiate the potential for fraud and abuse. This Special Advisory Bulletin draws on the government's prior fraud and abuse guidance and enforcement experience. However, because the Part D benefit has not yet begun, and any

assessment of fraud and abuse is necessarily speculative, this Bulletin cannot, and is not intended to, be an exhaustive discussion of relevant risks or beneficial practices.

At the outset, it is important to note the following:

• PAPs need not disenroll all Medicare beneficiaries from their existing PAPs to be compliant with the fraud and abuse laws. Enrollment in Part D is voluntary; therefore, existing PAPs may continue to provide free or reduced price outpatient prescription drugs to Medicare beneficiaries who have not yet enrolled in Part D. The Centers for Medicare & Medicaid Services (CMS) anticipates instituting procedures that will help PAPs determine if PAP clients have enrolled in Part D.

• Occasional, inadvertent cost-sharing subsidies provided by a pharmaceutical manufacturer PAP to a Part D enrollee should not be problematic under the anti-kickback statute (*e.g.*, where, despite due diligence, a pharmaceutical manufacturer PAP does not know and should not have known that a beneficiary has enrolled in Medicare Part D).

• Nothing in the Part D program or in any OIG laws or regulations prevents pharmaceutical manufacturers or others from providing assistance (*e.g.*, through cash subsidies or free drugs) to uninsured patients. Nothing in this Bulletin impacts programs that assist uninsured patients.

• Nothing in this guidance should be construed as preventing pharmacies from waiving cost-sharing amounts owed by a Medicare beneficiary on the basis of a good faith, individualized assessment of the patient's financial need (or failure of reasonable collection efforts), so long as the waiver is neither routine, nor advertised. Financial need-based waivers that meet these criteria have long been permitted.[4] However, a pharmacy has not waived a cost-sharing amount if the amount has been paid to the pharmacy, in cash or in kind, by a

---

[1] *See* 42 CFR 423.782.

[2] This Bulletin focuses on the application of the Federal anti-kickback statute. Other potential risk areas, including, for example, potential liability under the False Claims Act, 31 U.S.C. 3729–33, or other Federal or State laws, are not addressed here. Moreover, this Bulletin focuses on arrangements that involve pharmaceutical manufacturers directly or indirectly subsidizing Part D cost-sharing amounts. Programs that subsidize Part D premium amounts pose risks under the anti-kickback statute that are not addressed here. Similarly, PAPs established by health plans that subsidize cost

sharing or premium amounts under Part D raise different issues and may require a different analysis. While this Bulletin may provide some useful guidance for other kinds of PAP arrangements, such PAPs are not specifically considered here.

[3] For purposes of this Special Advisory Bulletin, a pharmaceutical manufacturer PAP includes any PAP that is directly or indirectly operated or controlled in any manner by a pharmaceutical manufacturer or its affiliates (including, without limitation, any employee, agent, officer shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)). Moreover, for purposes of an anti-kickback analysis, we would not consider a charitable foundation (or similar entity) formed, funded or controlled by a manufacturer or any of its affiliates (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) to be a *bona fide*, independent charity, because interposition of the entity would not sever the nexus between the patient subsidies and the manufacturer. Indeed, in most cases, the foundation would receive all of its funding from the pharmaceutical manufacturer (or its affiliates) and would provide subsidies only for the manufacturer's products.

[4] *See, e.g.*, section 1128A(i)(6)(A) of the Act; OIG Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries, August 2002, *http://oig.hhs.gov/fraud/docs/alertsandbulletins/ SABGiftsandInducements.pdf*. The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) included a safe harbor specifically incorporating these criteria for waivers of cost-sharing amounts for Part D drugs. Additionally, the safe harbor protects cost-sharing waivers offered to individuals who qualify for the low income subsidy, even if the waivers are routine and do not follow an individualized determination of financial need, provided they are not advertised. *See* Section 1860D–42 of MMA, codified at 42 U.S.C. 1320a–7b(b)(3)(G).

third party (including, without limitation, a PAP).

## II. The Federal Anti-Kickback Statute

The Federal anti-kickback statute, section 1128B(b) of the Social Security Act (the Act),[5] makes it a criminal offense knowingly and willfully to offer, pay, solicit, or receive any remuneration to induce or reward the referral or generation of business reimbursable by any Federal health care program, including Medicare and Medicaid. Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a Federal health care program, the anti-kickback statute is violated. By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction. For purposes of the anti-kickback statute, "remuneration" includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind. The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. OIG may also initiate administrative proceedings to exclude a person from Federal health care programs or to impose civil money penalties for kickback violations under sections 1128(b)(7) and 1128A(a)(7) of the Act.[6]

A determination regarding whether a particular arrangement violates the anti-kickback statute requires a case-by-case evaluation of all of the relevant facts and circumstances, including the intent of the parties. For PAPs, the nature, structure, sponsorship, and funding of the particular PAP are necessarily relevant to the analysis.

## III. Patient Assistance Programs

As described more fully below, cost-sharing subsidies provided by pharmaceutical manufacturer PAPs pose a heightened risk of fraud and abuse under the Federal anti-kickback statute. However, there are non-abusive alternatives available. In particular, as discussed below, pharmaceutical manufacturers can donate to *bona fide* independent charity PAPs, provided appropriate safeguards exist. Moreover, this Bulletin discusses several other alternatives that may pose a reduced risk of fraud and abuse.

This section addresses in turn: pharmaceutical manufacturer PAPs, independent charity PAPs, manufacturer PAPs that operate "outside of Part D"; "coalition model" PAPs, and bulk replacement programs.

### A. Pharmaceutical Manufacturer PAPs

Analytically, pharmaceutical manufacturer PAPs raise two main issues in connection with the Part D program: (i) Whether subsidies they provide can count toward a Part D enrollee's true out-of-pocket costs (known as the TrOOP); and (ii) whether the subsidies implicate the Federal anti-kickback statute.[7]

As to the first issue, the Part D regulations make clear that beneficiaries may count toward their TrOOP assistance received from any source other than group health plans, other insurers and government funded health programs, and similar third party payment arrangements.[8] The preamble to the Part D regulations explains that cost-sharing assistance furnished by a PAP, including a manufacturer PAP, will count toward a beneficiary's TrOOP expenditures, even if the PAP does not comply with the fraud and abuse laws.[9] This approach relieves beneficiaries of the financial risk of accepting assistance from an entity that may be improperly structured or operated.

As to the second issue, the core question is whether the anti-kickback statute would be implicated if a manufacturer of a drug covered under Part D were to subsidize cost-sharing amounts (directly or indirectly through a PAP) incurred by Part D beneficiaries for the manufacturer's product. Consistent with our prior guidance addressing manufacturer cost-sharing subsidies in the context of Part B drugs,[10] we believe such subsidies for

Part D drugs would implicate the anti-kickback statute and pose a substantial risk of program and patient fraud and abuse.[11] Simply put, the subsidies would be squarely prohibited by the statute, because the manufacturer would be giving something of value (*i.e.*, the subsidy) to beneficiaries to use its product. Where a manufacturer PAP offers subsidies tied to the use of the manufacturer's products (often expensive drugs used by patients with chronic illnesses), the subsidies present all of the usual risks of fraud and abuse associated with kickbacks, including steering beneficiaries to particular drugs; increasing costs to Medicare; providing a financial advantage over competing drugs; and reducing beneficiaries= incentives to locate and use less expensive, equally effective drugs.

It is impossible to predict with certainty the way in which abuse may occur in a new benefit program that is not yet operational. The following are illustrative examples of some types of abuse that may occur:

• Increased costs to the program. We are concerned that a manufacturer might use beneficiary cost-sharing subsidies, which help beneficiaries meet their TrOOP requirement, to increase the number of beneficiaries using the manufacturer's product who reach the

---

[5] 42 U.S.C. 1320a–7b(b).

[6] 42 U.S.C. 1320a–7(b)(7); 42 U.S.C. 1320a–7a(a)(7).

[7] In some cases, a subsidy for Part D cost-sharing obligations provided by a pharmaceutical manufacturer may also implicate the prohibition on offering inducements to beneficiaries, as set forth in section 1128A(a)(5) of the Act, if the subsidy is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier, such as a physician or pharmacy. We have interpreted "provider, practitioner, or supplier" to exclude pharmaceutical manufacturers unless they also own or operate pharmacies, pharmaceutical benefits management companies, or other entities that file claims for payment under the Medicare or Medicaid programs. *See* Special Advisory Bulletin on Offering Gifts and Other Inducements to Beneficiaries, supra note 4.

[8] *See* 42 CFR 423.100; 42 CFR 423.464; 70 FR 4194, 4239 (January 28, 2005). We note that CMS is the proper agency to address questions about the mechanics of calculating TrOOP. In certain circumstances, knowing improper TrOOP calculations may give rise to liability under the False Claims Act, 31 U.S.C. 3729–33.

[9] *See* 70 FR 4194 at 4239.

[10] *See, e.g.,* OIG Advisory Opinion Nos. 02–13 and 03–3 (unfavorable opinions involving proposals

from pharmaceutical manufacturer PAPs to subsidize Part B cost-sharing amounts). We note that the cost and utilization management features of the Part D program, while important, do not sufficiently mitigate the risks.

[11] Some in the industry have asserted that cost-sharing subsidies for Part D drugs differ from cost-sharing subsidies for Part B drugs so long as the subsidies are given to patients who are in a Part D "coverage gap" (*i.e.*, a benefit period during which the beneficiary pays 100% of the cost of the drugs). To support their position, they contend either that beneficiaries in the coverage gap are functionally "uninsured" or that the situation is comparable to providing free drugs to financially needy beneficiaries so long as no Federal health care program is billed for all or part of the drug, a practice we previously permitted in the context of subsidies for Part B drugs. *See* OIG Advisory Opinion Nos. 02–13 and 03–3. Under Part D, a "coverage gap" is a period of insurance coverage. *See* CMS Frequently Asked Question ID 4855, *http://questions.cms.hhs.gov/cgi-bin/cmshhs.cfg/php/enduser/std_adp.php?p_faqid=4855* (regarding prescription drug benefit coordination of benefits and TrOOP). During the coverage gap, beneficiaries remain enrolled in their Part D plans and have a continuing obligation to pay Part D premiums; Part D plans continue to receive the monthly per-enrollee direct subsidy from the Medicare program. Moreover, subsidies during the coverage gap are not like furnishing free drugs where no Federal health care program is billed. Sufficient spending during the coverage gap qualifies the beneficiary to reach the catastrophic coverage portion of the Part D benefit, at which point the Medicare program resumes payment for most of the costs of the beneficiary's drugs. In this regard, the different structures of the Part B and Part D benefits are crucial to the analysis.

catastrophic benefit in any given coverage year and to hasten the point during the coverage year at which beneficiaries reach the catastrophic benefit. This is of particular import because Medicare will make cost-based payments during the catastrophic coverage benefit.[12] We know from experience that cost-based reimbursement is inherently prone to abuse, including by vendors that sell products reimbursed on a cost basis. Similarly, we are concerned about the use of cost-sharing subsidies to shield beneficiaries from the economic effects of drug pricing, thus eliminating a market safeguard against inflated prices. Inflated prices could have a "spillover" effect on the size of direct subsidies, reinsurance payments, and risk corridor payments paid by Medicare to Part D plans in future years,[13] potentially resulting in higher costs to the Medicare program.

• Beneficiary steering and anti-competitive effects. Subsidies provided by traditional pharmaceutical manufacturer PAPs have the practical effect of locking beneficiaries into the manufacturer's product, even if there are other equally effective, less costly alternatives (and even if the patient's physician would otherwise prescribe one of these alternatives). Subsidizing Medicare Part D cost-sharing amounts will have this same steering effect. Moreover, as we have previously noted in the Part B context, cost-sharing subsidies can be very profitable for manufacturers, providing additional incentives for abuse. So long as the manufacturer's sales price for the product exceeds its marginal variable costs plus the amount of the cost-sharing assistance, the manufacturer makes a profit. These profits can be considerable, especially for expensive drugs for chronic conditions. We are concerned that pharmaceutical manufacturers may seek improperly to maximize these profits by creating sham "independent" charities to operate PAPs; by colluding with independent charity programs to ensure that the manufacturer's contributions only or primarily benefit patients using its products (discussed in more detail below); or by manipulating financial need or other eligibility criteria to maximize the number of beneficiaries qualifying for cost-sharing subsidies.

These risks are necessarily illustrative, not exhaustive, of the potential risks presented by pharmaceutical manufacturer PAPs that subsidize Part D cost-sharing amounts.

Cost-sharing subsidies offered by a pharmaceutical manufacturer PAP to the dispensing supplier differ in two important respects from a provider's or supplier's unadvertised, non-routine waiver of cost-sharing amounts based on a patient's financial need, which has long been permitted. First, the subsidies result in the dispensing supplier receiving full payment for the product and avoiding the risk of non-collection, thus providing the supplier with an economic incentive to favor the subsidized product and a disincentive to recommend a lower-cost alternative, such as a generic. In addition, the availability of PAP assistance is typically advertised and may influence a beneficiary's choice of product (through the prescribing physician acting on behalf of the beneficiary). Moreover, once a beneficiary is enrolled in a pharmaceutical manufacturer PAP, the beneficiary is effectively locked into using the pharmaceutical manufacturer's product, since the beneficiary risks losing financial assistance if he or she switches products, even if an equally effective, but less expensive, product would be in his or her best medical interests.

A definitive conclusion regarding whether a particular manufacturer PAP violates the anti-kickback statute would require a case-by-case analysis of all of the relevant facts and circumstances, including the intent of the parties. However, for the reasons noted above, we believe that pharmaceutical manufacturer PAPs that subsidize Part D cost-sharing amounts raise substantial concerns under the anti-kickback statute.

*B. Independent Charity PAPs*

Long-standing OIG guidance makes clear that pharmaceutical manufacturers can effectively contribute to the pharmaceutical safety net by making cash donations to independent, *bona fide* charitable assistance programs.[14]

Under a properly structured program, donations from a pharmaceutical manufacturer to an independent, *bona fide* charity that provides cost-sharing subsidies for Part D drugs should raise few, if any, anti-kickback statute concerns, so long as:

(i) Neither the pharmaceutical manufacturer nor any affiliate of the manufacturer (including, without limitation, any employee, agent, officer, shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) exerts any direct or indirect influence or control over the charity or the subsidy program;

(ii) The charity awards assistance in a truly independent manner that severs any link between the pharmaceutical manufacturer's funding and the beneficiary (*i.e.*, the assistance provided to the beneficiary cannot be attributed to the donating pharmaceutical manufacturer);

(iii) The charity awards assistance without regard to the pharmaceutical manufacturer's interests and without regard to the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

(iv) The charity provides assistance based upon a reasonable, verifiable, and uniform measure of financial need that is applied in a consistent manner; and [15]

(v) The pharmaceutical manufacturer does not solicit or receive data from the charity that would facilitate the manufacturer in correlating the amount or frequency of its donations with the number of subsidized prescriptions for its products.[16]

---

[12] *See* 42 CFR 423.329. For purposes of calculating payments under catastrophic coverage, the cost of a beneficiary's drug is based in part on the plan's negotiated price (*i.e.*, a price that is set by the plan based on negotiations with pharmaceutical manufacturers and pharmacies).

[13] *See* 42 CFR 423.329; 42 CFR 423.336.

[14] In-kind donations of drugs to independent charity PAPs pose additional risks not yet directly addressed in prior OIG guidance, and we have insufficient experience with them to offer detailed guidance here. While in-kind donations have the potential benefit of increasing the value of donations (because marginal costs of drugs are generally low), they also have the effect of creating a direct correlation between the donation and use of a particular donor's product, thereby weakening important safeguards of an independent charity PAP arrangement. Moreover, there would appear to be difficult accounting and valuation issues raised by the use of in-kind product to subsidize Part D

cost-sharing obligations, both for purposes of calculating TrOOP and for purposes of determining the amount of in-kind drug that equals the Part D cost-sharing amount owed.

[15] We recognize that what constitutes an appropriate determination of financial need may vary depending on individual patient circumstances. We believe that independent charity PAPs should have flexibility to consider relevant variables beyond income. For example, PAPs may choose to consider the local cost of living; a patient's assets and expenses; a patient's family size; and the scope and extent of a patient's medical bills.

[16] We have previously approved a *bona fide* independent charity PAP arrangement that included only limited reporting of *aggregate* data to donors in the form of monthly or less frequent reports containing *aggregate* data about the number of all applicants for assistance in a disease category and the number of patients qualifying for assistance in that disease category. *See* OIG Advisory Opinion No. 02–1. No individual patient information may be conveyed to donors. Moreover, neither patients nor donors may be informed of the donation made to the PAP by others, although, as required by Internal Revenue Service regulations, the PAP's annual report and a list of donors may be publicly available. *See* OIG Advisory Opinion No. 04–15. Reporting of data that is not in the aggregate or that is patient specific would be problematic, as would reporting of any data, whether or not in the

**Federal Register** / Vol. 70, No. 224 / Tuesday, November 22, 2005 / Notices　　70627

Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices.[17]

We recognize that some *bona fide* independent charities reasonably focus their efforts on patients with particular diseases (such as cancer or diabetes) and that some of these charities permit donors to earmark their contributions generally for support of patients with a specific disease. In general, the fact that a pharmaceutical manufacturer's donations are earmarked for one or more broad disease categories should not significantly raise the risk of abuse. However, we are concerned that, in some cases, charities may artificially define their disease categories so narrowly that the earmarking effectively results in the subsidization of one (or a very few) of donor's particular products. For example, we would be concerned if disease categories were defined by reference to specific symptoms, severity of symptoms, or the method of administration of drugs, rather than by diagnoses or broadly recognized illnesses or diseases. This type of arrangement would present an elevated risk of fraud and abuse because of the increased likelihood that the PAP would function as an improper conduit for manufacturers to provide funds to patients using their specific drugs. To avoid this risk, pharmaceutical manufacturers should not influence, directly or indirectly, the identification of disease or illness categories,[18] and pharmaceutical manufacturers should limit their earmarked donations to PAPs that define categories in accordance with widely recognized clinical standards and in a manner that covers a broad spectrum of available products.[19]

---

aggregate, related to the identity, amount, or nature of subsidized drugs.

[17] For further guidance on establishing compliant independent charity PAPs, see OIG Advisory Opinion Nos. 04–15, 02–1, 98–17, and 97–1 (favorable opinions issued to *bona fide*, independent charities that accept industry funding).

[18] Nothing in this Bulletin should be construed as preventing a charity from obtaining educational materials from donors that the donors generally make available to practitioners or the general public (*e.g.*, clinical information about drug products).

[19] We recognize that, in rare circumstances, there may only be one drug covered by Part D for the diseases in a particular category or only one pharmaceutical manufacturer (including its affiliates) that makes all of the Part D covered drugs for the diseases in a particular category. In these unusual circumstances, the fact that a disease category only includes one drug or manufacturer would not, standing alone, be determinative of an anti-kickback statute violation. Such a determination could only be made on a case-by-case basis after examining all of the applicable facts and

## C. PAPs Operating Outside Part D

CMS has issued guidance stating that PAPs may elect to provide free drugs to financially needy Medicare Part D enrollees outside the Part D benefit.[20] In these circumstances, the beneficiary obtains drugs without using his or her Part D insurance benefit. Beginning when a beneficiary's assistance under a PAP became effective, no claims for payment for any covered outpatient prescription drug provided outside of the Part D benefit may be filed with a Part D plan or the beneficiary, and the assistance must not count toward the beneficiary's TrOOP or total Part D spending for any purpose. For the reasons noted in connection with pharmaceutical manufacturer PAPs discussed above, PAPs that provide assistance outside the Part D benefit only during the coverage gap (*i.e.*, "wrapping around" the Part D benefit) pose a heightened risk of abuse. However, while it is difficult to assess the application of the fraud and abuse laws to PAPs that operate outside Part D absent a specific set of facts, it would appear that PAPs that furnish free outpatient prescription drugs entirely outside the Part D benefit pose a reduced risk under the anti-kickback statute, provided that:

(i) The PAP includes safeguards that ensure that Part D plans are notified that the drug is being provided outside the Part D benefit so that no payment is made for the subsidized drug by any Part D plan and no part of the costs of the subsidized drug is counted toward any beneficiary's TrOOP;

(ii) The PAP provides assistance for the whole Part D coverage year (or the portion of the coverage year remaining after the beneficiary first begins receiving the Part D assistance);[21]

(iii) The PAP assistance remains available even if the beneficiary's use of the subsidized drug is periodic during the coverage year;

(iv) The PAP maintains accurate and contemporaneous records of the

---

circumstances, including the intent of the parties. We note that it would be important for the PAP program to cover additional products or manufacturers as they become available.

[20] *See* CMS Frequently Asked Question ID 6153, *http://questions.cms.hhs.gov/cgi-bin/cmshhs.cfg/php/enduser/std_adp.php?p_faqid=6153* (regarding PAPs providing assistance with Part D drug costs to Part D enrollees outside of the Part D benefit and without counting towards TrOOP).

[21] We note that our position that PAPs operating outside the Part D benefit should provide assistance for the remainder of the coverage year is consistent with our observation in several advisory opinions that manufacturers "may provide free drugs to financially needy beneficiaries, so long as no Federal health care program is billed for all or part of the drugs." OIG Advisory Opinion Nos. 02–13 and 03–3.

subsidized drugs to permit the Government to verify the provision of drugs outside the Part D benefit;

(v) Assistance is awarded based on reasonable, uniform, and consistent measures of financial need and without regard to the providers, practitioners, or suppliers used by the patient or the Part D plan in which the patient is enrolled; and

(vi) The arrangement complies with any then-existing guidance from CMS.

In addition, to promote quality of care, we believe it would be important for PAPs that provide free drugs outside the Part D benefit to coordinate effectively with Part D plans so that the plans can undertake appropriate drug utilization review and medication therapy management program activities.

## D. "Coalition Model" PAPs

We are aware of nascent efforts by some in the industry to develop arrangements through which multiple pharmaceutical manufacturers would join together to offer financially needy Part D enrollees a card or similar vehicle that would entitle the enrollees to subsidies of their cost-sharing obligations for the manufacturers' products, typically in the form of discounts off the negotiated price otherwise available to the enrollee under his or her Part D plan. It is premature to offer definitive guidance on these evolving programs. Although these programs would operate so that the manufacturers effectively underwrite only the discounts on their own products, we observe that the risk of an illegal inducement potentially may be reduced if: (i) The program contains features that adequately safeguard against incentives for card holders to favor one drug product (or any one supplier, provider, practitioner, or Part D plan) over another; (ii) the program includes a large number of manufacturers, including competing manufacturers and manufacturers of both branded and generic products, sufficient to sever any nexus between the subsidy and a beneficiary's choice of drug; and (iii) each participating pharmaceutical manufacturer offers subsidies for *all* of its products that are covered by *any* Part D plan formulary. Other safeguards may also be needed to reduce the risk of an improper inducement. Moreover, a program under which Part D enrollees pay a portion of their drug costs out-of-pocket would tend to reduce the risk of abuse by preserving the beneficiary's incentive to locate and purchase equally effective, lower cost drugs.

## IV. Bulk Replacement Models

Bulk replacement'' or similar programs, pursuant to which pharmaceutical manufacturers (or their affiliated PAPs) provide in-kind donations in the form of free drugs to pharmacies, health centers, clinics, and other entities that dispense drugs to qualifying uninsured patients, are different from traditional PAPs that provide assistance directly to patients. These programs potentially implicate the Federal anti-kickback statute if the free drugs are given to a recipient that is in a position to generate Federal health care program business for the donor manufacturer. Whether a particular bulk replacement program complies with the fraud and abuse laws would require a case-by-case analysis. In undertaking any analysis, we would consider, among other factors, how the program is structured and whether there are safeguards in place: (i) To protect Federal health care program beneficiaries from being steered to particular drugs based on the financial interests of their health care providers or suppliers; (ii) to protect the Federal health care programs from increased program costs; and (iii) to ensure that bulk replacement drugs are not improperly charged to Federal health care programs. Additionally, bulk replacement as a means of subsidizing only the Medicare Part D cost-sharing amount potentially raises substantial risks related to accounting for the amount of replacement drug that would be equivalent to the cost-sharing amount owed by the beneficiary; properly attributing that amount to specific beneficiaries; and properly calculating TrOOP.

## V. Transitioning From Existing Pharmaceutical Manufacturer PAPs

OIG is mindful of the importance of a smooth, effective transition for beneficiaries who are currently participating in pharmaceutical manufacturer PAPs and elect to enroll in Medicare Part D. While most such enrollees are likely to qualify for the low-income subsidies available under Part D, we are concerned that there may not be sufficient independent charity PAPs available before the January 1, 2006 start date of the Part D program to accommodate beneficiaries of limited means who may need an alternative PAP arrangement. We recognize the importance of not unnecessarily burdening or alarming beneficiaries. We believe that manufacturers will play an important role in ensuring an effective transition.

With respect to pharmaceutical manufacturer PAPs that are in existence prior to the date of publication of this Special Advisory Bulletin, during the initial calendar year of the Part D benefit, OIG will take into consideration in exercising its enforcement discretion with respect to administrative sanctions arising under the anti-kickback statute whether the PAP is taking prompt, reasonable, verifiable, and meaningful steps to transition patients who enroll in Part D to alternative assistance models, such as independent charities.

In addition to taking steps to transition beneficiaries to other programs, pharmaceutical manufacturer PAPs can reduce their fraud and abuse exposure by taking one or more of the following steps: (i) Adjusting financial need criteria to reflect the lower drug costs incurred by Part D enrollees (*i.e.*, liability for premiums and cost-sharing amounts only, instead of the total cost of the drugs); (ii) where possible, subsidizing other drugs in the same class as the manufacturer's products covered by the PAP if a beneficiary's physician prescribes an alternate product; and (iii) checking CMS eligibility files, to the extent available, on a reasonably regular basis to determine whether PAP patients have enrolled in Part D and should be transitioned to other assistance programs. Occasional, inadvertent cost-sharing subsidies provided to a Part D enrollee should not be problematic (*e.g.*, where, despite due diligence, a pharmaceutical manufacturer PAP does not know and should not have known that a beneficiary has enrolled in Medicare Part D). Notwithstanding a pharmaceutical manufacturer's compliance with the foregoing, the Government will take enforcement action in cases where there is evidence of unlawful intent.

The potential variability of PAPs, the fact that the Part D program is not yet operational, and the fact that it is not possible to predict all future or potential fraud and abuse schemes with certainty, make it difficult to provide comprehensive general guidance on the application of the anti-kickback statute to PAPs for Part D enrollees at this time. We intend to monitor the situation closely and may issue further guidance, if needed. Nothing in this Bulletin should be construed as precluding any form of lawful assistance not described in this Bulletin.

## VI. OIG Advisory Opinion Process

OIG has an advisory opinion process that is available to individuals and entities, including pharmaceutical manufacturers, that want assurance that they will not run afoul of the fraud and abuse laws.[22] OIG advisory opinions are written opinions that are legally binding on OIG, the Department, and the party that requests the opinion. To obtain an opinion, the requesting party must submit a detailed, written description of its existing or proposed business arrangement. The length of time that it takes for OIG to issue an opinion varies based upon a number of factors, including the complexity of the arrangement, the completeness of the submission, and how promptly the requestor responds to requests for additional information. Further information about the process, including frequently asked questions, can be found on the OIG Web page at *http://oig.hhs.gov/fraud/advisoryopinions.html.*

The Office of Inspector General (OIG) was established at the Department of Health and Human Services by Congress in 1976 to identify and eliminate fraud, abuse, and waste in the Department's programs and to promote efficiency and economy in departmental operations. OIG carries out this mission through a nationwide program of audits, investigations, and inspections. The Health Care Fraud and Abuse Control Program, established by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), authorized OIG to provide guidance to the health care industry to prevent fraud and abuse and to promote the highest level of ethical and lawful conduct. To further these goals, OIG issues Special Advisory Bulletins about industry practices or arrangements that potentially implicate the fraud and abuse authorities subject to enforcement by OIG.

**Daniel R. Levinson,**
*Inspector General.*
[FR Doc. 05–23038 Filed 11–21–05; 8:45 am]
**BILLING CODE 4150–04–P**

## DEPARTMENT OF HOMELAND SECURITY

**[DHS–2005–0054]**

## Office of State and Local Government Coordination and Preparedness; SAFER Grant Program

**AGENCY:** Office of State and Local Government Coordination and Preparedness, DHS.

**ACTION:** Notice and request for comment.

**SUMMARY:** Pursuant to the Paperwork Reduction Act, the Department of Homeland Security (DHS) solicited comments on the proposed collection of information in connection with the Staffing for Adequate Fire and Emergency (SAFER) Grant Application.

[22] Section 1128D(b) of the Act; 42 CFR part 1008.