UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>REGENERON PHARMACEUTICALS, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)   No. 20-cv-11217-FDS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**OPPOSITION TO REGENERON'S MOTION TO
SEAL EXHIBITS TO THE GOVERNMENT'S COUNTERSTATEMENT
IN RESPONSE TO REGENERON'S STATEMENT OF FACTS**

Though Regeneron may want to entomb documents that are embarrassing to the Company and harmful to its case, under First Circuit law there is no legal basis for its request. First, Regeneron desires to seal presentations that it made to the government before the government filed its Complaint. As discussed below, these presentations directly undercut Regeneron's false claims of government misconduct, which *Regeneron* levied in its motion for summary judgment (and elsewhere). Since Regeneron has refused to withdraw these baseless accusations, the government is entitled to defend itself by pointing to Regeneron's *own* statements. Second, Regeneron seeks to seal purportedly privileged documents, including one that Regeneron's third-party vendor, Lash Group ("Lash"), voluntarily produced to the government. These documents are not privileged; if they were, Regeneron waived any privilege; and in any event, there is nothing in them that warrants a Court order shielding them from public view. Because Regeneron has failed to advance any legitimate reasons for non-disclosure, the Court should deny its motion.

BACKGROUND

The government assumes the Court's familiarity with the overall facts of this case in light of the parties' recent cross-motions for summary judgment.

I.   REGENERON'S PRESENTATIONS TO THE GOVERNMENT

Prior to the government's commencement of this litigation in June 2020, the government investigated whether Regeneron had violated federal law.  On March 29, 2019, Regeneron presented to the government its defenses.  That presentation is attached as Exhibit 30 to the United States' Statement of Facts (ECF No. 275 ("SOF")), which the government included with its opposition to Regeneron's motion for summary judgment, pursuant to Local Rule 56.1.  Regeneron's March 2019 presentation failed to convince the government to decline to file suit.  Consequently, Regeneron asked for an opportunity to present its defenses to senior Department of Justice officials in Washington.  The government granted Regeneron's request, and Regeneron presented to the government again on September 19, 2019, using the slides attached as Exhibit 31 to the SOF.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[1]  In making this assertion, Regeneron purported to rely on information that it had obtained from CDF prior to the filing of the Complaint.

When it moved for summary judgment, Regeneron averred that the government had withheld from Regeneron a 2018 letter from CDF's counsel to the government, arguing that the

---

[1] The government does not believe that this text (or any text in this document) should be redacted, but until the Court rules on Regeneron's motion to seal, the government offers Regeneron the professional courtesy of not describing the contents of sealed documents on the public docket.

numbers that CDF provided to Regeneron in 2013 and 2014 did not reflect the actual number of Eylea patients that CDF supported. *See, e.g.*, ECF No. 246 at 2 n.1, 7.

## II.     EMAILS BETWEEN REGENERON AND LASH

During the relevant period in this case, Lash managed the reimbursement "hub" for Regeneron's drug Eylea. *See* Decl. of Wendi Stapleton ("Stapleton Decl."), ECF No. 275-111, ¶ 3. As Regeneron's hub, a Lash team that Wendi Stapleton managed provided insurance benefits verifications for Eylea patients, assisted Eylea patients in obtaining prior authorizations from insurers, and referred Eylea patients to third-party co-pay foundations, including CDF. *Id*. ¶ 2. In addition, following a referral of an Eylea patient from Lash to CDF, Lash maintained records of whether CDF approved the patient for co-pay assistance. *Id*. ¶ 6. Lash subsequently reported this data to Regeneron in a variety of ways. *Id*. ¶ 7.

On February 11, 2022, the government deposed Regeneron employee Christopher Fenimore. During that deposition, the government asked Mr. Fenimore a series of questions about an email chain that the government marked as Exhibit 18. *See* ECF No. 275-22 (currently sealed). In a down-chain email, Mr. Fenimore (then Regeneron's Vice President of Financial Planning) posed certain questions concerning the co-pay assistance program to Robert Krukowski (then Regeneron's Director of Market Access). Mr. Fenimore copied Regeneron's General Counsel, Joseph LaRosa. Mr. Krukowski forwarded the email chain to two Lash employees, Ms. Stapleton and Dana Edwards, seeking information that he could use to respond to Mr. Fenimore's inquiries. *See id.* Mr. Krukowski subsequently responded to Mr. Fenimore. *See* ECF No. 275-120 (currently sealed). Counsel for the government asked Mr. Fenimore

multiple questions about Exhibit 18 (ECF No. 275-22) without drawing a single privilege objection. Following the deposition, on February 14 and February 22, counsel for the government and Regeneron exchanged emails about whether the email thread (i.e., the specific email used in the deposition, ECF No. 275-22, and other emails related to it, including ECF No. 275-120) was privileged.

Shortly after the exchange of emails concerning Mr. Fenimore's deposition, on February 28, 2022, counsel for Regeneron sent an additional letter to the United States. Ex. A. Through that letter, Regeneron claimed that attorney-client privilege protected 66 emails, including the specific email that the United States had used in Mr. Fenimore's deposition. *See id.* During the United States' pre-suit investigation, Lash (again, a third party) had produced these communications to the United States and the United States, in turn, had produced these documents to Regeneron on February 25, 2021 (i.e., 368 days before Regeneron asserted attorney-client privilege).

Rather than litigate Regeneron's belated claim of privilege at that time, the United States agreed to enter into a stipulated court order pursuant to Federal Rule of Evidence 502(d). *See* ECF Nos. 139, 140. The government never agreed, however, that the communications between Regeneron and Lash were privileged. *See id*.

## ARGUMENT

I.  **LEGAL STANDARD**

"Courts long have recognized 'that public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system.'" *In re Providence Journal Co.,* 293 F.3d 1, 9 (1st Cir. 2002) (quoting *Siedle v. Putnam Inv., Inc.*, 147 F.3d 7, 10 (1st Cir. 1998)). As a result, there is "a presumption that the public has a common-law right of

access to judicial documents." *Providence Journal*, 293 F.3d at 9 (citing *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978)).  "This presumptive right of access attaches to those materials 'which properly come before the court in the course of an adjudicatory proceeding and which are relevant to that adjudication.'" *Providence Journal*, 293 F.3d at 9 (quoting *FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 412-13 (1st Cir. 1987)).  That common law right extends to "materials on which a court relies in determining the litigants' substantive rights." *Anderson v. Cryovac, Inc.,* 805 F.2d 1, 13 (1st Cir. 1986).

This Court, of course, recently applied First Circuit precedent on this issue, recognizing that public access to judicial records "may be denied only for compelling reasons after specific judicial findings." ECF No. 281 at 7 (quoting *M2 Consulting, Inc. v. MRO Software, Inc.*, No. 1:03-CV-12589, 2005 WL 6726727, at *2 (D. Mass. Sept. 8, 2005)) ("[a]s a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings").  There is no basis to make such findings here with respect to either category of document, as discussed further below.

## II. THERE IS NO BASIS TO SEAL REGENERON'S PRESENTATIONS TO THE GOVERNMENT

Regeneron contends that its presentations to the government should be sealed.  It does so even though the government proposes only to file publicly those portions of the presentations that directly contradict Regeneron's concocted argument that the government engaged in misconduct.  As Regeneron would have it, the Company is entitled to smear the government publicly and falsely with inadmissible materials, and then shield from public view its own statements that decisively undercut its groundless claims of misconduct.  *See United States v. Gonyer*, No. 1:12-CR-00021-JAW, 2012 WL 3027846, at *1 (D. Me. July 24, 2012)

(recognizing that defendant can "open[] the door" to otherwise inadmissible evidence through argument). That position is untenable.

In addition, Regeneron has failed to make a sufficient proffer from which the Court could make "specific judicial findings" that "compelling reasons" exist to seal the presentations. ECF No. 281 at 7. This is not a case where, for example, the presentations include trade secrets or confidential business information that "might harm [] [Regeneron]'s competitive standing." *Nixon*, 498 U.S. at 598. Although Regeneron points out that the documents themselves are stamped "confidential," it has not identified a single piece or category of information that it in fact treats as confidential and whose disclosure would adversely impact its commercial interests. Application of a "confidential" stamp to a document does not confer that document with actual confidential status. *See Raad v. Lime Financial Servs., Ltd.*, No. 11-CV-11791–DJC, 2012 WL 4469107, at *4 (D. Mass. Sept. 28, 2012) ("[S]aying so does not make it so."). Without an explanation as to what information is confidential and why, there is no basis for the Court to conclude that sealing is appropriate. And, in any event, in light of Regeneron's (manufactured) claims of confidentiality, the government's use of the presentations is quite limited, attaching only those sections necessary to support the proposition for which they are cited (i.e., that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇).

Regeneron's citation to Rule 408 misses the point. Rule 408 is a rule of admissibility and does not address whether the information should be on the public docket. Regeneron's assertions that the presentations are "clearly inadmissible," ECF No. 280 at 3, are belied by its own conduct. As explained above, the government attached the presentations to respond to

specific, false attacks by Regeneron asserting that the government inappropriately withheld material during the fact discovery process. *See* ECF No. 274 at 34-35 (explaining how the relevant letter is facially inaccurate and inculpatory, and that Regeneron was in possession of it months before the close of discovery). If offering these documents "for some other purpose—other than proving or disproving liability" makes them "irrelevant," ECF No. 280 at 4, then Regeneron's claims of misconduct—purportedly supported by categorically inadmissible evidence, i.e., an advocacy letter that CDF's lawyer sent the government years after the relevant conduct, ECF No. 247-34—are also "irrelevant." Try as it might, Regeneron cannot have it both ways.

In any event, even assuming for the sake of argument that Rule 408 does apply here, the plain language of the Rule undermines Regeneron's argument. Contrary to Regeneron's conclusory statement (unsupported by a citation to any authority), parties *can* use statements made during the course of settlement talks for "purpose[s ]other than proving or disproving liability." ECF No. 280, ¶ 6. The Rule explains, for example, that a "court may admit this evidence for another purpose, such as . . . negating a contention of undue delay[] or proving an effort to obstruct a criminal investigation or prosecution." Fed. R. Evid. 408(b). In other words, the Rule expressly allows for parties to use statements made during compromise negotiations to disprove (or prove) allegations of improper conduct in litigation. So where, as here, Regeneron levied false allegations of improper conduct in litigation (e.g., that the government withheld evidence), Rule 408 presents no bar to the government's use of statements made during compromise negotiations to disprove that bogus claim. *See Urico v. Parnell Oil Co.*, 708 F.2d 852, 854 (1st Cir. 1983) (recognizing Rule 408's "flexibility"); *McKenzie v. Brannan*, No. 2:20-CV-00262-JAW, 2020 WL 8361998, at *3 (D. Me. Oct. 23, 2020) (recognizing that "it is

doubtful that potential inadmissibility under Rule 408 can defeat the presumption of public access because there is a distinction between 'inadmissibility' and 'confidentiality'").

In short, if Regeneron wants to engage in baseless allegations of misconduct, the government ought to be afforded the opportunity to defend itself in an equally public setting. The Court should permit the excerpts of the presentations to remain on the public docket.

### III.   THE LASH-RELATED EMAILS SHOULD NOT BE SEALED

#### A.   The Lash-Related Emails (Exhibits 22 and 120) Are Not Privileged

The Court should reject Regeneron's request to seal purportedly privileged materials because they are not actually privileged. Courts narrowly construe the attorney-client privilege because it "stands as an obstacle of sorts to the search for truth." *In re Keeper of Recs. (Grand Jury Subpoena Addressed to XYZ Corp.) (XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003); *accord In re Horowitz,* 482 F.2d 72, 81-82 (2d Cir. 1973) (citing Wigmore for the proposition that privilege "ought to be strictly confined within the narrowest possible limits") (further citation omitted); *United States v. Kinsella*, 545 F. Supp. 2d 148, 156 (D. Me. 2008). The party invoking privilege—in this case, Regeneron—must show both that the privilege attached and that the party did not waive. *In re Grand Jury Proceedings*, 802 F.3d 57, 65 (1st Cir. 2015); *XYZ Corp.*, 348 F.3d at 22. Here, the documents in question were not privileged, and Regeneron waived any privilege when it disclosed any of the documents to a third-party.

#### 1.   The Emails Were Never Privileged

Regeneron cannot meet its burden to demonstrate to the Court that Exhibits 22 and 120, are privileged. To bear its burden, Regeneron first must establish (among other things) that the communications relate to legal advice that it sought from a professional legal adviser in their capacity as such. *Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002). Privilege does

not ordinarily attach to communications other than between the attorney and the client. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (attorney-client privilege "extends to communications between a client and an attorney for the purpose of obtaining legal advice"). Moreover, "'the fact that an attorney either is copied on or is one of multiple recipients of an email does not on its own support a claim of attorney-client privilege.'" *Anderson v. Trustees of Dartmouth Coll.*, No. 19-CV-109-SM, 2020 WL 5031910, at *3 (D.N.H. Aug. 25, 2020) (quoting *United States ex rel. Barke v. Halliburton*, Co., 74 F. Supp. 3d 183, 188-89 (D.D.C. 2014)); *see also Lee v. Chicago Youth Centers*, 304 F.R.D. 242, 248 (N.D. Ill. 2014).

Regeneron has failed to offer any explanation of how the information that Mr. Fenimore sought or that Mr. Krukowski provided had any nexus to legal advice. Nor could it. As is apparent from the very subject line of the email, the information relates to "Utilization Data" concerning co-pay assistance. *See* ECF No. 275-120. That the senders copied attorneys is not enough to cloak those communications with protection, especially given the First Circuit's "familiar platitude . . . that the privilege is narrowly confined." *United States v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 684-85 (1st Cir. 1997); *see also Anderson*, 2020 WL 5031910, at *3; *Lee*, 304 F.R.D. at 248 (copying lawyers is not enough). Because Regeneron took no effort to carry its burden of showing that the primary purpose of the emails even remotely related to legal advice, the privilege affords no protection.

Likewise, even assuming these communications relate to legal advice that was sought from a professional legal adviser, Regeneron's (unarticulated) claim of privilege still fails. It is axiomatic that, for attorney-client privilege to attach to the communication, that communication must be made and intended to be kept in confidence. *Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 71-72 (1st Cir. 2002); *United States v. Ahmed*, No. 05-CR-10057-RCL, 2006 WL 3210037,

at *6, *8 (D. Mass. Aug. 3, 2006); *Pacamor Bearings, Inc. v. Minebea Co., Ltd.,* 918 F. Supp. 491, 511 (D.N.H. 1996); *Winchester Cap. Mgmt. Co. v. Manufacturers Hanover Tr. Co.*, 144 F.R.D. 170, 174 (D. Mass. 1992). When Mr. Fenimore sent Mr. Krukowski his questions concerning "Utilization Data," he said nothing to Mr. Krukowski concerning keeping his request confidential. ECF Nos. 275-22, 275-120. To the contrary, his email reflected *no* "circumstances indicating the intention of secrecy [that] must appear." 1 McCormick on Evid. § 91 (8th ed.). Putting aside the fact that Mr. Fenimore did not brand the email as attorney-client privileged, there is no evidence in the record that any Regeneron employee told Mr. Krukowski not to disseminate the request widely, let alone not to send it outside the Company.[2] And indeed, within nine minutes of receiving Mr. Fenimore's email, Mr. Krukowski did just that, forwarding it to third-party Lash. *Id.* There can be no doubt that neither Mr. Fenimore, Mr. Krukowski, nor anyone else at Regeneron intended for this communication to be confidential. It goes without saying that Regeneron's claim of privilege over Exhibit 22 in particular—a document that a *third party* produced—is dubious at best. *See* ECF No. 275-22; *see also* Ex. A (claiming privilege over sixty-six Lash-produced documents).[3] Because Regeneron has "failed to explain, or even attempt to explain except in conclusory statements, how the documents claimed to be protected establish that they relate to a confidential client communication," the attorney-client privilege does not protect Exhibits 22 or 120 (or any similar communications). *Maine*, 298 F.3d at 72.

---

[2] The government can only posit hypothetical counterfactuals about how Regeneron might have demonstrated its intent to keep the communications confidential because, as noted, Regeneron has made no effort to carry its own burden.

[3] That Regeneron's privilege claim is without merit is reinforced by the fact that Regeneron has claimed its privilege attaches even to communications *exclusively among Lash personnel*. ECF No. 275-22.

## 2. Regeneron Waived Any Attorney-Client Privilege Over Exhibit 22

Even assuming for the sake of argument that Regeneron's internal communications were privileged, Regeneron has not carried its burden of proving that its employees did not waive by forwarding its communications to a third party, Lash. Mr. Krukowski waived any privilege that existed by transmitting potentially privileged emails to Lash: "It is crystal clear that any previously privileged information actually revealed [to a third party] los[es] any veneer of privilege." *XYZ Corp.*, 348 F.3d at 23. Although the First Circuit has not addressed the circumstances in which an employee has ostensible authorization to waive the attorney-client privilege, other courts have concluded that an employee outside the company's "control group" may waive the attorney-client privilege as long as the employee did not inadvertently produce the purportedly privileged materials or act adversely to the employer's interests. *See Mediostream, Inc. v. Microsoft Corp.*, No. 2:08-CV-369-CE, 2010 WL 11485121, at *2 (E.D. Tex. June 1, 2010) (concluding that an engineer who forwarded an internal memo to another company had authority to waive the privilege because "[n]o showing ha[d] been made that [the engineer] inadvertently produced the memo or that he was working adversely to his employer's interests"); *Jonathan Corp v. Prime Computer, Inc.*, 114 F.R.D. 693, 699 (E.D. Va. 1987) (rejecting proponent of attorney-client privilege's argument that "the privilege can be created for the benefit of legal communications with employees at all levels but cannot be waived or destroyed by these employees");[4] *see also Denney v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 414 (S.D.N.Y. 2004) ("the privilege may be waived not only by officers and directors, but also

---

[4] *Jonathan Corp.* distinguished *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985) on the basis that the Supreme Court was addressing only the narrow issue of control of attorney-client privilege of a bankrupt corporation, for which only the corporation's officers and directors can effectuate a waiver.

by lower-level employees, when, acting on behalf of the corporation, they disclose attorney-client communications to third parties—at least where the corporation authorized the employee's possession of the confidential communication, and the corporation took inadequate steps to prevent the employee disclosing it") (citations omitted).

Regeneron cannot demonstrate that its employees lacked authority to waive its privilege over Exhibit 22.  First, in working with Lash, Regeneron employees were working in concert, rather than against, the Company's interests.  Regeneron employees chose to share the purportedly privileged emails in question in the ordinary course of Regeneron's business relationship with Lash—a relationship that benefitted Regeneron by assisting patients to obtain Eylea.  Second, this was not an isolated incident.  Regeneron has identified at least sixty-six separate documents that contain purportedly inadvertent disclosure of privileged materials.  Third, there is no indication that the disclosing employees lacked the authority to possess the purportedly confidential communications in the first place.  Finally, there is no indication that Regeneron took sufficient steps to prevent this repeated disclosure.

### 3. The 502(d) Order Is Irrelevant to the Question of Whether The Privilege Applies to Exhibits 22 and 120

As described above, there is no evidence that Regeneron was seeking legal advice in Exhibits 22 and 120, nor does Regeneron make any argument to carry its burden of showing that these documents were privileged.  Further, with respect to Exhibit 22, even if there were any such privilege, Regeneron plainly waived it.  As such, both documents are not protected, and they should not be sealed.  Nevertheless, Regeneron argues that the existence of the Fed. R. Evid. 502(d) Order, ECF No. 140, somehow saves the day, contending that because of the 502(d) Order, "there is no need for the Court to address [the] dispute" of whether the documents are

privileged. ECF No. 280 at 5, ¶ 9. Regeneron misconstrues the purpose and effect of the 502(d) Order.

By entering into the agreement underlying the 502(d) Order, the government did not concede that the documents at issue were privileged, nor did the government agree not to seek their public filing. Instead, the government merely agreed that Regeneron could *produce* the documents to the government, without the government claiming that the *production itself* constituted a waiver. And indeed, the government is not making the claim that production under the 502(d) Order constitutes waiver. But Regeneron's position goes much too far. Instead of recognizing that the 502(d) Order merely facilitated Regeneron's production of the documents without facing a waiver argument, Regeneron suggests that the 502(d) Order ends the debate in its favor on whether the documents should be sealed. Far from ending the debate, the 502(d) Order does not address—nor is any 502(d) order intended to address—whether documents used later in the litigation are privileged or should be sealed. Because the documents are not protected, there is no basis to seal them, and the existence of the 502(d) Order is irrelevant.

### B. There Is No Basis to Seal the Emails Between Regeneron and Lash

Regeneron has failed to make a sufficient proffer from which the Court could make "specific judicial findings" that "compelling reasons" exist to seal the emails between Regeneron and Lash. ECF No. 281 at 7. The most that Regeneron offers is its *ipse dixit* that the emails are privileged. They are not, as discussed, but even if they were, the Rule 502(d) Order confers sufficient protections upon Regeneron with respect to any other litigation; namely, Regeneron's *production* of the documents does not effectuate a waiver. "The rule provides that when a confidentiality order governing the consequences of *disclosure* in that case is entered in a federal proceeding, its terms are enforceable *against non-parties* in *any* federal or state proceeding."

13

Fed. R. Evid. 502 advisory committee's note (emphases added).  Accordingly, Regeneron's claim that public disclosure of materials governed by a Rule 502(d) order could waive privilege in another proceeding misstates the law—it does not.  ECF No. 280 at 6.  Whether these documents are privileged, however, is another matter—they are not, and there is nothing Regeneron can do about that.

## CONCLUSION

For the foregoing reasons, the Court should deny Regeneron's motion to seal.

Dated:  May 4, 2023

RACHAEL S. ROLLINS
United States Attorney

*/s/ Evan D. Panich*
EVAN D. PANICH
ABRAHAM R. GEORGE
LINDSEY ROSS
CHARLES B. WEINOGRAD
Assistant United States Attorneys
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
evan.panich@usdoj.gov
abraham.george@usdoj.gov
lindsey.ross@usdoj.gov
charles.weinograd@usdoj.gov