**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>Plaintiff, )<br><br>v. )<br><br>REGENERON PHARMACEUTICALS, INC., )<br><br>Defendant. ) | No. 1:20-cv-11217-FDS |

**UNITED STATES' REPLY IN SUPPORT OF ITS**
**<u>SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

The First Circuit's ruling in *United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377 (1st Cir. 2011), controls nearly all issues pertinent to this Motion. Regeneron nevertheless tries its best to slip *Hutcheson*'s handcuffs. It invents several theories and plays fast and loose with the actual language of the opinion (and the *Regeneron* First Circuit opinion too), deliberately confusing, for example, what's sufficient for what's necessary in a desperate attempt to distinguish the undistinguishable. Ultimately, however, *Hutcheson* cannot be evaded: *first,* defendants who cause innocent submitters to present false claims *are liable* under the False Claims Act ("FCA"), even if those submitters' unwitting false statements are only on forms like the provider agreement; and *second*, notwithstanding the CMS declarant's admitted mistake, the CMS forms at issue are clear and, in relevant part, *identical* to at least one that was also at issue in *Hutcheson*. And even were that not the case, all claims at issue here impliedly certified Anti-Kickback Statute ("AKS") compliance.

Regeneron fails to create a genuine dispute on the elements of falsity and materiality, and its continued insistence that but-for causation is the law is incorrect and contrary to this Court's and the First Circuit's opinions in this very case.[1]

## I.    The Government Is Entitled To Summary Judgment On The Sub-Element Of Certification—Each Eylea Claim Represented Compliance With The AKS

Regeneron's strident falsity arguments misread First Circuit case law and mischaracterize the government's requested relief. Regeneron argues that, because it is not a claim submitter, the

---

[1] The United States has not, as Regeneron claims, "abandoned the 2010 Amendment" theory. Opp'n at 16. It should be obvious, but the point of this Motion was to place the government in the *status quo ante*—i.e., prior to the summary judgment ruling that changed the law of causation. The government already survived the defendant's summary judgment motion and is entitled to proceed to trial on the 2010 theory. The outcome of this Motion may affect its ultimate trial strategy. In any event, the Court's August 4, 2025 Order addressed this issue. Dkt. No. 397 at 10 ("Here, the government is limited to *two* theories of potential liability, and the Court will not permit any others.") (emphasis added).

government must prove that the medical providers who did submit Eylea claims participated in Regeneron's illegal conduct. *See, e.g.*, Opp'n at 7. Applying this incorrect statement of law, Regeneron contends, "even if every claim for Medicare reimbursement is accompanied by an explicit or implicit certification that the provider has complied with the AKS, that still does not suffice to render claims false." *Id.* at 9. This defense fails for at least two reasons. *First*, it is directly contrary to binding precedent. *Hutcheson*, 647 F.3d at 390. *Second*, the defense's underlying premise—i.e., that "those certifications *were not false here*," Opp'n at 14—is a red herring. The government only asks for a finding that the Eylea claims at issue represented compliance with the AKS, reserving for trial proof of falsity.

### A. *Hutcheson* Controls: An Unwitting Submitter Does Not Immunize Regeneron

Nearly fifteen years ago, the First Circuit rejected the very arguments Regeneron makes today.[2] *See Hutcheson*, 647 F.3d at 379. Regeneron claims that the government must prove that the submitter had to have at least known about the AKS violation. Opp'n at 7, 13. This cannot square with *Hutcheson*'s description of submitting hospitals as "unwitting[]." 647 F.3d at 378. Likewise, Regeneron's argument that physicians were required to know they were lying in their representations to Medicare is flatly inconsistent with the Court's holding "that unlawful acts by non-submitting entities may give rise to a false or fraudulent claim even if the claim is submitted by *an innocent party*." *Id.* at 390 (emphasis added) (citing *United States v. Bornstein*, 423 U.S. 303, 309 (1976); *Murray & Sorrenson, Inc. v. United States*, 207 F.2d 119, 123-24 (1st Cir.

---

[2] The parallels between defendant-appellee's brief in *Hutcheson* and Regeneron's opposition here are uncanny. *See, e.g.*, Appellee Br., *United States ex rel. Hutcheson v. Blackstone Med., Inc.*, No. 10-1505, 2010 WL 4411253, at *34-35 (1st Cir. Sept. 27, 2010) ("there is no allegation that *any* [submitting] hospital participated or assisted in any misconduct"); *id.* at *21 ("Hutcheson does not allege that a [submitting] hospital violated the AKS while certifying that it had not; nor that [the non-submitting defendant] violated the AKS while certifying that it had not").

1953); *Scolnick v. United States*, 331 F.2d 598 (1st Cir. 1964); *United States v. Rivera*, 55 F.3d

703, 710–12 (1st Cir. 1995)).  Indeed, describing the defendant's tactics (which Regeneron

echoes now) as an attempt "to divert attention from "th[e] clear language" of provider enrollment

agreements (also at issue today), the First Circuit held that whether the claim submitter "knew of

the underlying kickbacks" is "a fact that has no bearing on [the non-submitting defendant's]

potential liability under the FCA."  *Id.* at 393.

Synthesizing decades of precedent, *Hutcheson* explained that "[w]hen the defendant in an

FCA action is a non-submitting entity, the question is whether *that entity* knowingly caused the

submission of either a false or fraudulent claim or false records or statements to get such a claim

paid," even if the person who ultimately submitted the claim was unwitting.  *Id.* at 389 (emphasis

added).  And yet, Regeneron urges the Court instead to focus on what was in the *submitter's*

mind.  Remarkably, Regeneron cites *Hutcheson* for support, writing: "'False Claims liability can

attach' under the implied false certification theory where nothing on the face of the claim is

actually false—<u>but only</u> '[s]o long as the statement [of compliance] in question is *knowingly*

*false when made*.'" Opp'n at 7 (underline emphasis added) (quoting *Hutcheson*, 647 F.3d at 390).

But there is a reason Regeneron added "but only": the sentence, excerpted and out of context, is

in a multi-paragraph *rejection* of the defendant-appellee's "proposed limitation in the concept of

certification" that would have restricted liability to the submitter.  647 F.3d at 389.  The *next*

sentence contradicts Regeneron in full:  "The Supreme Court has long held that a non-submitting

entity may be liable under the FCA for knowingly causing a submitting entity to submit a false or

fraudulent claim, and *it has not conditioned this liability on whether the submitting entity knew*

*or should have known about a non-submitting entity's unlawful conduct*." *Id.* at 390 (emphasis

added) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)).

This is a theme of the Opposition.  Presumably because no Supreme Court or First Circuit case supports its position, Regeneron selectively quotes case law and argues that what a court described as *sufficient* proof is actually *necessary* proof.  It does this, for instance, by repeatedly adding "only" and "only if" to quotes where they do not exist.  *See e.g.*, Opp'n at 6 (adding "only" not found in *Universal Health Srvs., Inc. v. United States, et al, ex rel. Escobar*, 579 U.S. 176 (2016)); *id.* at 7 (twice adding "only" not found in *Hutcheson*); *id.* (adding "*but only if*" not found in *Escobar*).  Similarly, when this case was up on appeal, the First Circuit did not, as Regeneron now claims, set out a comparable rule, i.e., "'if a [sic] medical provider does not represent compliance with the AKS (expressly or otherwise),' then false certification liability does not lie."  Opp'n at 16-17 (quoting *United States v. Regeneron Pharm., Inc.*, 128 F.4th 324, 335 (1st Cir. 2025)).  While the first clause (the nested quote) is in the First Circuit's *Regeneron* opinion, the second clause (that there is no false certification liability) is not.  In fact, the rest of the First Circuit's sentence makes no mention of false certification at all.  128 F.4th at 335 ("But if the medical provider does not represent compliance with the AKS (expressly or otherwise), then a <u>claim submitted on that provider's behalf can still be 'per se false' under the 2010 amendment</u>." (underline emphasis added)).  Moreover, Regeneron's typographical error ("if <u>a</u> medical provider" is actually "if <u>the</u> medical provider") is telling because the First Circuit was describing an illustrative hypothetical, not pronouncing a rule.  *Id.*

Regeneron's other efforts to distinguish *Hutcheson* are similarly unavailing.  For instance, it claims that *Hutcheson* is different because the defendant in that case bribed physicians directly and "not some different (alleged) kickback made by the defendant . . . to a nonparty."  Opp'n at 15.  But that makes no sense because the bribes in this case did go to the certifying physicians.  As this Court has recognized, "the AKS prohibits even the indirect receipt

of prohibited remuneration.  Here, there is evidence that the promise of copay assistance through CDF indirectly provided remuneration to the physicians prescribing Eylea."  MSJ Order at 9, Dkt. No. 351 (citation and quotation marks omitted); *see also* Mot. to Dismiss Order at 20, Dkt. No. 32.  In any event, Regeneron makes no effort to explain why it is possibly relevant to *Hutcheson*'s analysis that Regeneron funneled bribes through CDF.  Instead, Regeneron attempts to manufacture a "[defendant]-physician connection" exception to *Hutcheson*'s unwitting-submitter holding.  Opp'n at 15.  Citing nothing, Regeneron claims that *Hutcheson*'s conclusion was contingent on "the hospitals [being] prompted to do so by the physicians *who worked for the hospitals* and who themselves were the recipients of illicit kickbacks."  *Id.* (emphasis added). Even a cursory review of *Hutcheson* reveals that the physicians' employment status had nothing to do with the court's rationale.  And, Regeneron's argument is factually wrong: the defendant-appellee in *Hutcheson* argued the exact opposite, describing the physician there as "neither an employee nor an agent of the hospital."  Appellee Br., 2010 WL 4411253, at *21; *id.* at *26.

Likewise, there is no merit to Regeneron's suggestion that *Hutcheson* is distinguishable because it applies only to express false certifications vis-à-vis the hospital cost report.[3]  Opp'n at 7-8.  But why is a hospital's certification on a cost report express in *Hutcheson*, but a physician's certifications on a provider agreement not express today?  Regeneron also contradicts its own position just a few pages earlier, Opp'n at 6-7, arguing that a certification is only "express" when it is on the claim itself and not, for example, on an annual hospital cost report.  *Contra Hutcheson*, 647 F.3d at 381 (describing cost report as separate from and "along with [hospital]

---

[3] Regeneron also focuses entirely on the hospital cost reports in *Hutcheson*, but ignores the physician services claims also at issue.  Regarding the latter, the First Circuit held that those claims could be false because physicians signed provider enrollment agreements (just like those at issue here) in which they agreed to comply with the AKS.  647 F.3d at 381.

claims for reimbursement"); *id.* at 394 n.20 (describing DRG claims); Def.'s Mem. at 15, *United States v. Hutcheson v. Blackstone Med. Inc.*, No. 1:06-cv-11771-WGY, 2009 WL 5187231 (D. Mass. July 20, 2009) (differentiating cost reports from DRG-based hospital claims). Regeneron cannot have it both ways. In any event, *Hutcheson* disavowed the categorization of express and implied certifications, and said those atextual terms did not affect its analysis.[4] 647 F.3d at 389.

Regeneron assails the government's argument as "an attempt to make the false certification theory less demanding than the 2010 Amendment pathway." Opp'n at 16. But it is Regeneron that is trying to change the law by suggesting that false certification requires greater proof than it does. Regeneron misleadingly suggests that the First Circuit somehow adopted *United States ex rel. Thomas v. Bailey*, which found that a non-submitter cannot violate the FCA if the submitter was unaware of the falsity of its certification. Opp'n at 16 (citing *Bailey*, No. 4:06CV00465, 2008 WL 4853630, at *13 (E.D. Ark. Nov. 6, 2008)). But that is not true. *Regeneron* described *Bailey*'s holding to provide historical context to legislative history, but the First Circuit never adopted it. *Regeneron*, 128 F.4th at 334-35. In fact, *Hutcheson* expressly rejected it. And while the defendant's arguments in *Bailey* might have initially carried the day in the Eastern District of Arkansas, they did not in the First Circuit, and never have.

**B.  *Hutcheson* Controls: The Unrebutted Material Facts Prove That Every Eylea Claim Represented Compliance With The AKS**

Much as with the Opposition's characterization of the law of false certification, its application to the record ignores basic, undisputable, and unrebutted facts and conflicts with binding First Circuit precedent that holds that essentially identical representations "are sufficient

---

[4] This defense is also inconsistent with Regeneron's arguments elsewhere that the submitter's "knowledge of[] the alleged AKS violation," is relevant regardless of whether it "is accompanied by an explicit *or implicit* certification." *E.g.,* Opp'n at 9 (emphasis added).

to support [a false certification] claim." *Hutcheson*, 647 F.3d at 392.

Regeneron begins on a flawed premise: "to establish liability under either
§ 3729(a)(1)(A) or § 3729(a)(1)(B), there must be something false or fraudulent *in an actual
'claim*,' i.e., in a demand for payment presented to the government." Opp'n at 11. Despite the
purportedly "black-letter" nature of this proposition, Regeneron cites to an out-of-circuit opinion
that does not stand for it at all. *Id.* (quoting *United States ex rel. Grant v. United Airlines, Inc.*,
912 F.3d 190, 196 (4th Cir. 2018)). But again, *Hutcheson* controls. As the First Circuit
unequivocally said: "we hold that the Provider Agreement and Hospital Cost Report
forms . . . are sufficient to support [a false certification] claim." 647 F.3d at 392. Neither of
these documents are "*an actual 'claim*.'" Opp'n at 11. Indeed, when the defendant in
*Hutcheson* argued a similar point—e.g., that "[p]hysicians and hospitals file separate enrollment
forms to participate in Medicare [and] submit separate claims with separate certifications (CMS
Form 1500 for physicians and CMS Form 1450 for hospitals)," Appellee Br., 2010 WL 4411253,
at *31 n.12—the First Circuit found irrelevant the paper on which the misrepresentations were
made. *Hutcheson*, 647 F.3d at 394. Relying exclusively on representations that third-party
physicians and hospitals made *in enrollment forms* (like those in this case), and not on "*an actual
'claim*,'" Opp'n at 11, the First Circuit concluded that the "allegations of misrepresentation, we
hold, are sufficient to state a claim that the hospital and physician claims for payment at issue
here were false or fraudulent." 647 F.3d at 393.

And yet, Regeneron attacks the government's reliance on physician representations in
provider enrollment agreements (CMS Form 855I). It says that it cannot be liable because the
physicians who signed the 855Is did not understand that they were violating the AKS when they
signed the agreements, Opp'n at 13, or because they did not have some "involvement" in the

"underlying transaction" of Regeneron's kickbacks, *id.* at 15. Moreover, Regeneron claims, for the 855Is to be false, the physicians' enrollment representations had to have been hyper-specific about when copay assistance is "linked to an AKS violation." *Id.* at 13-14.

The Court should reject this rehash of arguments that the First Circuit found unconvincing nearly fifteen years ago. *See, e.g.*, Appellee Br., *Hutcheson*, 2010 WL 4411253, at *29 ( "[T]his language, *is not specific enough* to create FCA liability through an express certification theory." (cleaned up, emphasis added)). As *Hutcheson* held:

> The Provider Agreement, drafted by CMS, requires that hospitals and physicians acknowledge that they "understand that payment of a claim by Medicare is conditioned upon the claim and the *underlying transaction* complying with [Medicare's] laws, regulations and programs instruction." (Emphasis added.) The Agreement specifically identifies "the Federal anti-kickback statute" as one of only two enumerated examples of the relevant "laws, regulations, and program instructions." This language makes clear that the federal Medicare program will not pay claims if the underlying transaction that gave rise to the claim violated the AKS. The Agreement makes no exception for instances in which that "underlying transaction" violated the AKS because of the actions of a third party like [the defendant].

*Hutcheson*, 647 F.3d at 392-93. In other words, the First Circuit found it sufficient that innocent third parties unknowingly made false representations by signing the exact same language at issue in the provider agreements in this case. *See* Dkt. No. 413-3 ¶ 5. The 855I is "more than specific enough to make clear that the claims submitted by [the submitter] represented that any underlying transactions had not involved third party kickbacks prohibited by the AKS." *Hutcheson*, 647 F.3d at 393. The Court should eschew "a formalistic reading of the documents," and reject Regeneron's attempt "to divert attention from this clear language by focusing on whether the [submitters] knew of the underlying kickbacks, a fact that has no bearing on [Regeneron]'s potential liability under the FCA." *Id.* Finding otherwise "would not only strain the language of the documents; it would systematically excuse from FCA liability non-

submitting entities who cause the submission of claims that fail to meet that stated precondition." *Id.*

In light of this unequivocal language from the First Circuit, Regeneron tries, unconvincingly, to create a dispute about the content of the 855I when submitted electronically. Opp'n at 12-13. But the electronic 855I is the same application, just with a different *submission option*. The plain language of the 855I form makes this clear: the first section of the form, titled "Who Should Complete This Application" states that "[p]hysicians and non-physician practitioners can apply for enrollment in the Medicare program . . . using either" the internet-based system or the paper enrollment process. Dkt. No. 410, Ex. 2. In other words, the "application" itself is the same, it simply offers two routes of submission. Moreover, the United States has produced examples of electronic 855I submissions, which show that the content effectively matches, section-by-section, the paper form. *See, e.g.*, U.S. Reply Statement of Facts ("RSUMF") ¶ 4. The United States also produced printouts of the signed certification statement in the electronic submission, which again, essentially mirrors the certification in the paper form. *See, e.g.*, Dkt. No. 413-8. In short, the record is clear that (i) each provider who administered Eylea during the relevant period submitted an 855I, containing a representation of compliance with the AKS; and (ii) the representation (and the underlying form) was the same, regardless of whether they were submitted in paper or electronically.[5]

Regeneron's position that certifications did not accompany Eylea claims similarly is incorrect. Concerning paper claims, Regeneron highlights the lack of an express representation of AKS compliance on the CMS 1500 in effect until January 2014. Opp'n at 10. In so doing,

---

[5] Regeneron does not dispute the language of the 855I, Dkt. No. 417 ¶ 5, but states that it is a legal question whether such language constitutes a certification. *Hutcheson* is clear—it does.

Regeneron ignores the language of the previous CMS 1500 (version 08/05, Dkt. No. 413-11), which included the following language: "I certify that the statements on the reverse apply to this bill and are made a part thereof," and, on the reverse side:

> This is to certify that the foregoing information is true, accurate and complete.  I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

*Id.*  The language of the 08/05 version is undisputed.  *See* Resp. SUMF at 8, Dkt. No. 417.  In other words, it is undisputed that during the relevant period, any claim for Eylea submitted on paper contained, at minimum, a representation as to the truth, accuracy, and completeness of the claim, or, during 2014, an express representation of AKS compliance.

Finally, Regeneron repeats similar, and long-ago-rejected, arguments about the EDI Enrollment form.  It argues that the form contains merely an "acknowledgement of the legal framework and the consequences for violating it," which would not be "false" even if Regeneron violated the AKS.  Opp'n at 12.  But this defense is not new—the *Hutcheson* defendant tried it and failed.  *Compare* Appellee Br., 2010 WL 4411253, at *13-14 ("As to the hospital cost report, the District Court concluded that that document does not create FCA liability for failure to comply with the AKS because it 'simply acknowledges the civil and criminal liability of failing to comply with the [AKS].'"), *with Hutcheson*, 647 F.3d at 393 ("The Hospital Cost Report . . . further underscores that hospitals submitting claims represent compliance with the AKS.").

Moreover, the record is clear that CMS required providers' electronic claims to comply with the EDI Enrollment Form's certifications.  Indeed, Regeneron does not dispute that the EDI Form requires the submission of "accurate, complete, and truthful" claims.  Dkt. No. 417 ¶ 11.  Instead, it cites to a portion of Mr. Sendros's testimony acknowledging that Medicare Administrative Contractors ("MACs") were permitted to use their own "organization-specific"

enrollment forms, and asks the Court to conclude that there is accordingly "*no evidence*" of the certifications that providers made before submitting electronic claims. Opp'n at 12. Regeneron omits key context: CMS required that MACs "use these two forms, or their own organization's specific forms given they are comparable in terms of content," and Mr. Sendros testified that MACs complied. Dkt. No. 413-5 ¶ 10 n.1 (citing Medicare Claims Processing Manual, Pub. 100-04, ch. 24 § 30); RSUMF ¶ 3; *see also* Dkt. No. 413-12; 413-14 (Claims Processing Manual, Pub. 100-04, ch. 24, versions in effect between 2012-2014). The Manual requires organization-specific forms to include, "[a]t a [m]inimum," that providers agree to "submit claims that are accurate, complete, and truthful" and acknowledge that "the submission of such claims is a claim for payment under the Medicare program, and [] anyone who misrepresents or falsifies . . . any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Dkt. Nos. 413-12, 413-14. Nothing more is necessary to establish that electronic claims certified compliance with Medicare requirements, regardless of the MAC. The record is clear: these certifications applied to all electronic claims. *Id.* ("[T]he CMS-assigned unique identifier number (submitter identifier) or NPI constitutes the provider's legal electronic signature and constitutes an assurance by the provider that services were performed as billed[.]").[6]

In short, each Eylea claim submitted in 2013-2014 included at least: (i) a representation of AKS compliance through the 855I enrollment form; and (ii) one of the following, (a) for 2013

---

[6] Regeneron states that "Mr. Sendros testified that, to his knowledge, healthcare providers do not make express certifications of AKS compliance when they submit claims electronically." Dkt. No. 417 ¶ 6. This is based on his affirmative response to questions asking whether electronic claims submitted following EDI enrollment were "implicit." Dkt No. 417-1 at 261:20-24. The government objected to this questioning as improperly calling for a legal conclusion. *Id.* at 260:13-14. In any event, Regeneron omits his unequivocal testimony that "by submitting the claims, [providers] are making those certifications [in the EDI Enrollment]." *Id.* at 260:19-24.

paper claims, a certification as to the truth, accuracy, and completeness of the claim; (b) for 2014 paper claims, a certification of AKS compliance, or (c) for electronic claims a certification as to the truth, accuracy, and completeness via the EDI Enrollment form.

### C. Regeneron Ignores Implied Certification

The parties agree that *Escobar*, 579 U.S. at 190, sets out one method of proving implied false certification: a two-part test. *See* Mem. at 12-13 (Dkt. No. 413-1); Opp'n at 6. This Court already has found that the submission of claims containing procedure codes for Eylea "plausibly amounts to [making] specific representations about the goods or services provided," i.e., the first element of that test. Mem. at 13-14 (quoting *United States v. Regeneron Pharm., Inc.*, No. 20-cv-11217, 2025 WL 2207299, at *4 (Aug. 4, 2025)). All that is left is to prove, at trial, that the claim "fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Escobar*, 579 U.S. at 181.

Regeneron does not respond to this argument, except to say that, regarding the Form 855I specifically, it "does not contain any 'specific representations about the goods or services provided.'" Opp'n at 14. That is a *non sequitur*. These facts are unrebutted (and indisputable): the only claims at issue in this case are for the administration of Eylea to treat Medicare beneficiaries. Each such claim must have made a "specific representations about the goods or services provided*,*" e.g., that a specific physician used Eylea to treat a specific patient on a specific day. The Supreme Court has said that that is enough to certify that each claim complied with payment preconditions (here, AKS compliance). *Escobar*, 579 U.S. at 190. But if that is not enough, every physician who treats Medicare beneficiaries with Eylea must have enrolled in Medicare. When they enrolled, they promised not to violate the AKS. The First Circuit has said that that is enough to certify compliance with the AKS. *Hutcheson*, 647 F.3d at 392-93.

Regeneron also does little to take on the government's argument that "a demand for payment standing alone impliedly certifies compliance with [the AKS]." Mem. at 15-17. Its only defense is to say that "[n]o law supports this theory." Opp'n at 15. To the contrary, the government cites many cases, Mem. at 15-16 & n.6, and Regeneron never addresses them. Even if the Court agrees with Regeneron both that Mr. Sendros's testimony should be struck and that the forms in effect during this period did not contain sufficient representations of compliance with Medicare requirements, the government is nevertheless entitled to summary judgment. This is because *all* claims for payment impliedly represent AKS compliance. *See id.* (citing cases). As the government stated previously, AKS compliance is central to the federal government's health care fraud enforcement and to payment of Medicare claims, and no claim escapes (regardless of medical necessity) the requirement to comply with the AKS.[7]

Finally, and accordingly, Regeneron's assertion that the government was required to produce some indeterminate number of "as-submitted" 1500 forms misses the mark. Opp'n at 10. The government has not sought summary judgment on whether particular claims were, in fact, submitted via the paper Form 1500 or electronically. Rather, the government has shown that *every* claim during the applicable period, *regardless* of how it was submitted, certified compliance with Medicare requirements through the provider agreement and through the CMS 1500 or the EDI Form.

---

[7] That claims may make implied representations without anything more is not a new concept. In addition to the government's cited AKS-FCA cases, the Supreme Court has recognized, e.g., that if the government buys guns but the guns do not fire, the associated claims for payment are impliedly false, regardless of any written certification. *Escobar*, 579 U.S. at 191.

### D.  The Government Has Moved On Only A Sub-Element Of Proof

Regeneron expends great energy on a distraction:  that the government has not adduced evidence that physicians lied when they certified compliance.  Only Regeneron's knowledge, however, is relevant.  Moreover, for this Motion, "[t]he government only asks that the Court find, as a matter of law, that every Eylea claim to Medicare Part B in 2013 and 2014 carried with it a representation of compliance with the AKS, whether under the express or implied certification theories or otherwise."  Mem. at 18.  The falsity of those representations is for trial.  *Id.* at 17.

## II.    The Government Is Entitled To Summary Judgment On Materiality

### A.  AKS-Compliance Is Material Regardless Of The "Particular" AKS Violation

Regeneron's articulation of the materiality inquiry is based on a fundamental misreading of *Escobar*.  According to Regeneron, the government must show not that CMS would decline to pay for AKS-tainted claims, but rather that CMS would decline to pay "for the *particular* medical treatment 'if it knew of the' *particular* (alleged) AKS violation."  Opp'n at 26 (emphasis in original).  In other words, Regeneron argues that some AKS violations could be immaterial either because of the nature of the medical treatment or because some AKS violations are "minor or insubstantial."  579 U.S. at 194-95.[8]

There is simply no support for this interpretation.  *Escobar* held that proof of materiality includes "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement."  *Id.*  That is, while the mere identification of a statutory requirement

---

[8] Regeneron misunderstands the significance of the +$1.5 billion in settlements in co-pay cases. These enforcement actions establish conclusively that AKS violations are not "minor and insubstantial."  Mem. at 21-22 (citing *Escobar*, 579 U.S. at 194).

(e.g., the AKS) as a condition of payment cannot, without more, establish materiality, evidence

that the government *in fact* treats that requirement as a condition of payment can. And *Escobar*'s

direction for courts to look to the "mine run of cases," i.e., the common case, is exactly the

opposite of Regeneron's manufactured standard requiring assessment of the "particular medical

treatment" or "particular (alleged) AKS violation" at issue. *Id.*; Opp'n at 26. Rather, *Escobar*

noted that the government's payment of a "particular" claim despite "actual knowledge" of

noncompliance would be "strong evidence" of immateriality. 579 U.S. at 195. There is no such

"actual knowledge" here. Notably, Regeneron does not cite a *single case* in which any court has

found that an AKS violation was "minor or insubstantial" or otherwise immaterial.[9] To the

contrary, there are many cases finding that AKS-compliance is material to CMS. *See Guilfoile v.

Shields*, 913 F.3d 178, 191 n.12 (1st Cir. 2019); *United States ex rel. Westmoreland v. Amgen,

Inc.*, 812 F. Supp. 2d 39, 54-55 (D. Mass. 2011); *Hutcheson*, 647 F.3d at 378 ("If kickbacks

affected the transaction underlying a claim, as Hutcheson alleges, the claim failed to meet a

condition of payment."); *see also* Mem. at 19 n.7.

### B. There Is No Genuine Dispute That AKS-Compliance Is Material To CMS

There is no genuine dispute concerning materiality, and the government is entitled to

summary judgment. Regeneron does not dispute that the 855I and the 02/12 version of the Form

1500 do reference and make representations about AKS compliance. Opp'n at 28; Dkt. No. 417

¶ 5. These representations establish materiality—it is irrelevant that CMS does not "review"

those certifications "in deciding whether to pay a claim." Opp'n at 28. *See Westmoreland*, 812

---

[9] The sole case Regeneron cites as "denying summary judgment on materiality" was a denial of
the *defendant's* motion on the grounds that the government's continued payments and declination
to intervene were not dispositive of materiality *for the defendant.* Opp'n at 27 (citing *United
States ex rel. Carter v. Emergency Staffing Sols., Inc.*, No. 3:10-cv-01238-E, 2025 WL 2433526,
at *16, n.12 (N.D. Tex. July 31, 2025)).

F. Supp. 2d at 56 (provider agreement was "dispositive evidence" of materiality, and that "even if

the Provider Agreement did not identify compliance with the [AKS] as a precondition of

payment, this materiality analysis strongly suggests that, because the government will not pay

kickback-tainted claims, [AKS] compliance must be a precondition of payment.").

Nor is the government required to show that CMS specifically asked submitters about the

role of pharmaceutical companies or co-pay foundations.  Opp'n at 29.  According to Regeneron,

CMS risks a finding that the violation was immaterial if it fails to identify (or require an inquiry

into) every possible category of AKS violation.  Contrary to Regeneron's suggestion (based on

two news articles discussing investigations of CDF's relationship with an unrelated

pharmaceutical company), there is no evidence in the record to suggest that CMS had actual

knowledge of Regeneron's fraud.  Even in cases where CMS *does* have actual knowledge of the

alleged fraud, courts have found that continued payment by the government is not dispositive of

materiality.  *Emergency Staffing Sols., Inc.*, 2025 WL 2433526, at \*16 (citing *United States ex

rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017)).[10]

Moreover, even Regeneron's cherry-picked excerpts from Mr. Sendros's testimony do not

"affirmatively undermine[]" the materiality of AKS violations.  Opp'n at 29.  It is not true, for

example, that Mr. Sendros testified that "the existence of an active AKS case against a provider

will not stop CMS from paying claims that provider submits."  *Id.*  Rather, Mr. Sendros testified

that "CMS can institute payment suspensions in instances where we have . . . credible allegations

---

[10] The cases that Regeneron cites for the proposition that continued payment refutes materiality
both involve fraud on the FDA approval process, and are factually miles apart.  *United States ex
rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 35 (1st Cir. 2017) (refusing to allow a
"jury of six people [to] retroactively eliminate the value of FDA approval");  *D'Agostino v. ev3,
Inc.*, 845 F.3d 1, 7 (1st Cir. 2016) (holding that, because FDA had not recalled or relabeled the
purportedly unsafe drug, CMS's payment decision had little applicability).

of fraud.  An AKS violation could fall into those buckets, and we could put a payment suspension on the claim if we reach that conclusion."  Dkt. No. 417-1 at 317:2-8.  As Regeneron acknowledged, "Mr. Sendros testified that CMS will still pay out claims for reimbursement *unless it knows a provider has not complied with the AKS*" and that "it's possible" that even a "strong suspicion" could lead to a payment suspension.  Dkt. No. 417 ¶ 1 (quoting Sendros Dep. Tr. at 315:15-317:12) (emphasis added).  Additional portions of Mr. Sendros's testimony (that Regeneron did not include) affirm the centrality of AKS compliance to CMS:

- As far as Mr. Sendros is aware, CMS tries to recover funds every time it identifies an AKS violation.  RSUMF ¶ 1.
- Physicians and entities "must comply with AKS.  If they do not, we will not pay AKS-tainted claims . . . ."  RSUMF ¶ 2.  This is true even for medically necessary services or products.  *Id.*

This is consistent with the declaration of CMS's 30(b)(6) representative, Dr. Scott Lawrence (incorporated by reference to the government's original Motion), regarding the materiality of AKS-compliance to CMS:

- Even when underlying services or products are medically necessary, CMS will not pay for such services or products if they were delivered in a manner that does not comply with the AKS.  Dkt. No. 275, Ex. 109 (Decl. of Scott Lawrence), ¶ 4.
- If CMS knows that a particular claim is tainted by an AKS violation, it will not pay the claim, and frequently works with DOJ to recover funds CMS had paid out before knowing that the claim was made in violation of the AKS.  *Id.* ¶ 8.
- Dr. Lawrence has been personally involved in cases with the DOJ in which the defendant submitted claims that the government alleged to be in violation of the AKS, and for which CMS sought recoupment.  *Id.*

Nor is it true that Mr. Sendros lacks personal knowledge concerning CMS's position that it will not pay for non-AKS compliant claims.  He testified repeatedly that based on his years of work at CMS in the organization's fraud, waste, and abuse program, he *personally* knew this. *See, e.g.*, RSUMF ¶ 2.  In sum, there is no genuine dispute of any fact material to the element of materiality, and the Court should find that AKS-compliance is material as a matter of law.

17

### III.    The Government Is Entitled To Summary Judgment On The Law Of Causation

The parties agree that the government needs to prove *both* factual and legal causation. *See* Mem. at 26.  Regeneron's suggestion otherwise mischaracterizes the government's years-old position.  *See, e.g.*, Gov't Surreply, Dkt. No. 315, at 9.  The parties disagree, however, on what *type* of factual causation applies, and *how* it applies, in AKS-FCA cases.  Regeneron argues that the government must prove that providers would not have administered Eylea in the absence of Regeneron's co-pay contributions.  The government disagrees—it need only show that Regeneron's provision of remuneration was a *substantial factor in causing the physician to falsely represent compliance with the AKS*.  Regeneron's view, if accepted, would effectively impose the "results from" language of the 2010 Amendment, 42 U.S.C. § 1320a-7b(g), on the FCA.  That is not the law.  *See Regeneron*, 128 F.4th at 333 ("The government further argues that, when Congress passed the 2010 amendment, it did not clearly intend to alter false-certification caselaw by imposing a but-for causation requirement. . . .  [W]e agree.").

### A.    The FCA Does Not Require The Government To Prove That Providers Would Not Have Submitted Eylea Absent the Alleged Kickbacks

The FCA requires the government to prove that Regeneron "cause[d] to be presented," or "cause[d] to be made or used, a false record or statement material to" a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A), (B).  The government recognizes, and always has, that in a false certification case involving a non-submitting entity's AKS-violative conduct, the government must prove both factual and legal causation.  But the causation the government must show is not that the alleged AKS violation caused the doctor to administer the product.  *See, e.g., United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, No. 13-cv-3003, 2023 WL 36174, at *3 (D. Minn. Jan. 4, 2023).  Any such requirement is wrong in two respects.  *First*, the government is not required to prove but-for causation, but only that Regeneron's conduct was a substantial

factor.  MSJ Order at 22, Dkt. No. 351 ("Under traditional principles a negligent act will satisfy

the but-for causation requirement if it was a 'substantial factor in bringing about' the harm.")

(internal citations omitted).  *Second*, the causation at issue in a false certification case is *not* that

kickbacks influenced providers' prescribing decisions, but that Regeneron's AKS violations were

a substantial factor in causing the providers to falsely represent AKS compliance.

For instance, the district court in *Fesenmaier* considered the defendant's argument that

the government must also show but-for causation under the false certification theory (referenced

there as the "material-falsity" theory).  *Fesenmaier*, 2023 WL 36174, at *2 ("Under these pre-

2010 cases, therefore, plaintiffs could establish liability under the FCA by demonstrating that the

AKS was violated, and that this violation was a material condition of the government's payment

of a claim.").  The district court rejected the defendant's position and held that the government

"need not prove but-for causation to establish falsity under the FCA."  *Id*. at *3.

Similarly, in *Hutcheson*, the First Circuit rejected the defendant's argument that the

"physician claims . . . were not false or fraudulent because the claims were for services that

would have been provided in the absence of the alleged AKS violations."  647 F.3d at 393.  Put

simply, under the false certification theory at least, the medical necessity of a particular item has

no bearing on whether a defendant caused a false claim by violating the AKS.  Rather, what

matters is whether the defendant's conduct caused *the representation* to be false.  *See United*

*States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244-45 (3d Cir. 2004).[11]  It is that false

representation that constitutes the government's injury in a false certification case.  This Court

---

[11] *Hutcheson* and *Zimmer* are device manufacturer cases that highlight the problem with the
medical necessity argument.  Because CMS pays by procedure code, Regeneron's argument
would require proof that the *surgery* would not have occurred but for the kickback.  This theory
improperly limits the FCA's scope and is inconsistent with its text, as *Hutcheson* observed.

too, following return of the mandate, stated that "[t]he change in the standard for causation under the 2010 amendment does not impact the sufficiency of the pleadings to state a claim under a false-certification theory, because that particular standard does not apply to false certification." *Regeneron*, 2025 WL 2207299, at *4 n.2.

### B.    Regeneron All But Ignores 31 U.S.C. § 3729(a)(1)(B)

The government previously noted that even if were true under § 3729(a)(1)(A) that the government would have to prove that the physicians would not have administered Eylea absent the alleged kickback (it is not), it cannot be the case that the government would have to prove that form of but-for causation under § 3729(a)(1)(B).  Regeneron ignores this argument.  But, while § 3729(a)(1)(A) covers causing the presentment of false claims, § 3729(a)(1)(B) deals with causing false records or statements to be made.  Whether the physician would have administered Eylea in the absence of the kickback has no bearing on whether the kickback caused the provider to state falsely (express or impliedly) that the claim complied with the AKS.  Even if the physician would have administered Eylea no matter what, Regeneron's kickbacks (if proved) render the statement of compliance false.  Again, the government's position is that neither § 3729(a)(1)(A) nor (B) require but-for causation, but if the Court holds that the former subsection does, it should nevertheless hold that the latter subsection does not.

### CONCLUSION

For the reasons above, the government requests an order for partial summary judgment.

Dated:  November 18, 2025

LEAH B. FOLEY
United States Attorney

*/s/ Abraham R. George*
ABRAHAM R. GEORGE
CHARLES B. WEINOGRAD
LINDSEY ROSS
DIANE SEOL
Assistant United States Attorneys
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
abraham.george@usdoj.gov
charles.weinograd@usdoj.gov
lindsey.ross@usdoj.gov
diane.seol@usdoj.gov